**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

COALITION FOR EMERGENCY
RESPONSE AND CRITICAL
INFRASTRUCTURE,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS
COMMISSION and UNITED STATES,

*Respondents*.

No. 24-1364

**PETITION FOR REVIEW**

**PETITION FOR REVIEW**

Pursuant to 5 U.S.C. § 702, 42 U.S.C. § 402(a), 28 U.S.C. §§ 2342(1) and 2344, Federal Rule of Appellate Procedure 15(a), and D.C. Circuit Rule 15, the Coalition for Emergency Response and Critical Infrastructure ("CERCI") hereby petitions this Court to review the Eighth Report and Order of the Federal Communications Commission ("FCC" or the "Commission") captioned *In the Matter of Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, FCC 24-114 (released October 22, 2024) ("Order") (Ex. A). A summary of the Order was published in the Federal Register on November 20, 2024. *See* 89 Fed. Reg. 91578 (Ex. B).

This petition is timely filed within sixty (60) days of publication of the Order in the Federal Register. Venue is proper in this Court pursuant to 28 U.S.C. § 2343, both because this Court is a proper venue for petitions for review of all FCC orders and because CERCI has its principal place of business in the District of Columbia. CERCI actively participated in the underlying proceeding before the FCC, including through multiple filings, and is aggrieved by the Order within the meaning of 28 U.S.C. § 2344.

The Order exceeds the FCC's statutory authority, violates the Administrative Procedure Act ("APA"), and raises constitutional concerns.  The Order creates a framework whereby an entity known as a "Band Manager" will receive a nationwide overlay license for use of the 4940–4990 MHz band of spectrum ("4.9 GHz Band") that is currently designated for public safety use; the Band Manager is then authorized to enter into a "sharing agreement" to enable the federal First Responder Network Authority ("FirstNet") to use that spectrum.  The Order also "freezes" the licenses of incumbent public safety users in the 4.9 GHz Band and converts their geographic licenses into site-based licenses.

The Order is contrary to the statute that created FirstNet and limited it to operating only on a single, 700 MHz license.  *See* 47 U.S.C. §§ 1401, 1421, 1424.  The Order is also contrary to the Communications Act's spectrum-assignment framework.  *See id.* §§ 305(a), 309(j), 902(b)(2)(A).  Moreover, the Order's promulgation violates the APA both procedurally and substantively and raises constitutional concerns.

Accordingly, CERCI seeks review of the Order on the grounds that it is arbitrary, capricious, an abuse of discretion, and/or otherwise contrary to law; contrary to constitutional right or power; in excess of statutory jurisdiction, authority, or limitations; and promulgated without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 701 *et seq.*  CERCI respectfully requests that the Court hold the Order unlawful, vacate it, and remand the matter to the FCC for further proceedings.

Dated: November 27, 2024

Respectfully submitted,

/s/ *Jessica Ring Amunson*
Jessica Ring Amunson
Jenner & Block LLP
1099 New York Ave, NW Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for Petitioner*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| COALITION FOR EMERGENCY RESPONSE AND CRITICAL INFRASTRUCTURE, | |
| *Petitioner*, | No._____ |
| v. | **PETITION FOR REVIEW** |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES, | |
| *Respondents*. | |

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the Coalition for Emergency Response and Critical Infrastructure ("CERCI") submits the following disclosure statement.

CERCI is a trade association of public safety and critical infrastructure organizations and telecommunications companies headquartered in Washington, DC. Its purpose is to protect local control of the 4.9 GHz Band. CERCI is an unincorporated entity whose members have no ownership interest in it; CERCI has no parent company, and no publicly traded company has a 10% or greater ownership interest in CERCI. As a trade association, CERCI is exempt from disclosure of members that have issued shares or debt securities to the public under D.C. Circuit Rule 26.1(b).

Dated: November 27, 2024

Respectfully submitted,

/s/ *Jessica Ring Amunson*

Jessica Ring Amunson
Jenner & Block LLP
1099 New York Ave, NW Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Petition for Review was served on November

27, 2024, by e-mail on the following:

P. Michele Ellison
General Counsel
Federal Communications Commission
45 L Street NE
Washington, DC 20554
LitigationNotice@fcc.gov

I hereby certify that a copy of the foregoing Petition for Review was served on November

27, 2024, by first-class mail on the following:

Merrick Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530

*/s/ Jessica Ring Amunson*
Jessica Ring Amunson

Exhibit A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Amendment of Part 90 of the Commission's Rules | )     WP Docket No. 07-100 |
| | ) |

**EIGHTH REPORT AND ORDER**

**Adopted: October 18, 2024**                    **Released:  October 22, 2024**

By the Commission:  Commissioner Gomez not participating.

**TABLE OF CONTENTS**

Heading                                                                                          Paragraph #

I.   INTRODUCTION ........................................................................................................................ 1
II.  BACKGROUND ......................................................................................................................... 2
     A.  Current 4.9 GHz Band Rules .............................................................................................. 2
     B.  Current State of the 4.9 GHz Band .................................................................................... 5
     C.  Procedural History ............................................................................................................. 6
     D.  FirstNet ............................................................................................................................. 13
     E.  Summary of the Record .................................................................................................... 15
III. EIGHTH REPORT AND ORDER ............................................................................................ 19
     A.  Nationwide Overlay License ............................................................................................ 21
     B.  Spectrum Sharing Agreement with FirstNet .................................................................... 27
     C.  Band Manager Responsibilities ........................................................................................ 38
         1.  Frequency Coordination and Interference Protection for Incumbent Licensees ...... 39
         2.  Managing a Spectrum Sharing Agreement with FirstNet ......................................... 42
         3.  Technological Innovation .......................................................................................... 44
         4.  Non-Public Safety Access through Leasing .............................................................. 45
         5.  Annual Reporting Requirement ................................................................................. 48
     D.  Selection of the Band Manager ........................................................................................ 50
     E.  4.9 GHz Band Freeze ....................................................................................................... 53
     F.  Future Licensing of the Band ........................................................................................... 56
IV.  PROCEDURAL MATTERS ..................................................................................................... 60
V.   ORDERING CLAUSES ............................................................................................................ 67
APPENDIX A:  Final Rules
APPENDIX B:  Final Regulatory Flexibility Analysis

I.   **INTRODUCTION**

        1.        In this *Eighth Report and Order*, we take another major step towards ensuring that the
4940–4990 MHz band (4.9 GHz band) is efficiently and intensely utilized in support of public safety
missions nationwide.  To that end, we bolster the coordinated nationwide approach to the band that the
Commission established in its *Seventh Report and Order*[1] in which it adopted a nationwide Band Manager

---
[1] *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Seventh Report and Order and Ninth
Further Notice of Proposed Rulemaking, 38 FCC Rcd 704 (2023) (*Seventh Report and Order* or *Ninth Further
Notice*); *see also Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Erratum (2023).

framework to coordinate operations in the 4.9 GHz band, optimize public safety use, and facilitate the integration of the latest commercially available technologies, including 5G, for the benefit of public safety users.  To further these goals—and ensure that the 4.9 GHz band is put to more robust use nationwide in the near term—the 4.9 GHz Band Manager, once selected, will be eligible to apply for a nationwide overlay license and authorized to enter into a sharing agreement with the First Responder Network Authority (FirstNet).  Pursuant to this sharing agreement, FirstNet may be permitted to use unassigned spectrum in the 4.9 GHz band as part of its nationwide public safety broadband network (NPSBN) in a manner that protects incumbent operations.  In addition to expanding the Band Manager's responsibilities to include entering into a sharing agreement with FirstNet and establishing rules governing the nationwide Band Manager overlay license, we also reaffirm our commitment to the nationwide Band Manager framework and clarify the Band Manager's responsibilities to address the new rules we adopt herein.

## II.    BACKGROUND

### A.    Current 4.9 GHz Band Rules

2.    The current licensing and regulatory regime for the 4.9 GHz band is significantly different from other public safety bands.  As an initial matter, the 4.9 GHz band has less restrictive eligibility requirements; unlike the 700 MHz band which has statutorily defined eligibility criteria,[2] or the Public Safety Pool which has Commission-defined eligibility criteria,[3] an entity need only provide public safety services to be eligible for a 4.9 GHz license.[4]  Licensees include state and local government entities,[5] as well as nongovernmental organizations (NGOs) that support communications essential to services having the sole or principal purpose of protecting the safety of life, health, or property.[6]

3.    The 4.9 GHz band is shared amongst eligible licensees—no licensee has a right to exclusive, or interference free, access to the band.[7]  Similarly, unlike other public safety bands that only authorize operations on specific frequencies and in clearly delineated geographic areas, 4.9 GHz band licenses authorize operation on any channel over the entire 50 megahertz of the band and are generally issued for the geographic area encompassing the legal jurisdiction of the licensee.[8]  Moreover, a 4.9 GHz licensee has blanket authority to operate base stations and mobile units (including portables and handheld units) and/or temporary (one year or less) fixed stations anywhere within its authorized area.[9]  Our rules also permit eligible entities to license fixed point-to-point (P-P) and point-to-multipoint (P-MP) operations on specific channels within their jurisdictions, although only those fixed sites that are used to deliver broadband service are accorded "primary" status under the rules.[10]

---

[2] *See* 47 U.S.C. § 337(f)(1)(B).

[3] *See* 47 CFR § 90.20.

[4] *Id.* § 90.1203(a) (referring to 47 CFR § 90.523(b), which allows a nongovernmental organization that provides services, the sole or principal purpose of which is to protect the safety of life, health, or property, to hold a license in the band).

[5] *Id.* § 90.523(a).

[6] *Id.* § 90.523(b).  In addition, to establish eligibility, a NGO must secure and maintain support for the right to operate its system from a state or local governmental entity whose mission is to oversee or provide services that have the sole or principal purpose of protecting the safety of life, health, or property and the NGO must provide a written certification of such support in any submitted application.  *Id.*

[7] *Id.* § 90.1209(a).

[8] *Id.* § 90.1207(a).  In the case of a NGO, the license is issued for the legal jurisdiction of the state or local government entity supporting the NGO.  *Id.*  Some licenses are issued for only part of a licensee's jurisdiction, for example, an area defined by a point and a specified radius of operation.

[9] *Id.* § 90.1207(b).

[10] *Id.* § 90.1207(d).

4.      While licensees in this band are geographically limited to the state or local jurisdictions specified on the license,[11] they are also permitted to operate base stations with mobile units and temporary fixed stations outside their authorized area with the permission of the jurisdiction in which they will operate.[12]  This licensing scheme means that licenses often overlap with one or more geographic area licenses covering a given location and authorizing operations on the same spectrum, as well as multiple fixed-site licenses in the same area.[13]  The Commission established this flexible structure based on public safety agencies' unique history of coordination with one another in the use of shared frequencies.[14]  Our 4.9 GHz rules, however, historically have not specified a formal coordination requirement.[15]

## B.      Current State of the 4.9 GHz Band

5.      There are 3,676 licenses currently issued in the band.[16]  This includes over 130 statewide area licenses, over 1,100 countywide area licenses, and over 2,400 other licenses, either geographic area licenses, other types of geographic licenses (such as for a group of counties, a city, or parts of one or more cities), or for fixed sites.[17]  Most of the United States and U.S. territories are covered by at least one statewide license.[18]  In some states, multiple state entities hold statewide licenses.[19]  Licensees use P-P and P-MP operations, to facilitate video streaming, communications system backhaul, and data connections for advanced devices.[20]  Commenters have suggested that emerging and potential uses of the band may include robotics and airborne operations, as well as the Internet of Things.[21]

---

[11] *Id.* § 90.1207.

[12] *Id.* § 90.1207(c).

[13] For example, a common scenario might involve a statewide license held by the state police, a county-wide license held by the sheriff's department, and fixed-site licenses operating in the same area by various public safety entities. Licensees informally cooperate with one another to ensure that their operations do not cause interference and to resolve interference if it occurs.

[14] *The 4.9 GHz Band Transferred from Federal Government Use*, WT Docket No. 00-32, Memorandum Opinion and Order and Third Report and Order, 18 FCC Rcd 9152, 9164, para. 28 (2003) (*4.9 GHz Third Report and Order*) (noting that "many public safety agencies already have procedures or protocols in place with nearby jurisdictions to govern frequency sharing during situations requiring joint operations," and further explaining that "the nature of public safety operations in general will . . . facilitate this sharing requirement").

[15] 47 CFR §§ 90.175(j)(22), 90.1209(b).

[16] *Universal Licensing System*, FCC, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchLicense.jsp (last visited Oct. 7, 2024).

[17] For example, Southwestern NH District Fire Mutual Aid holds a license, call sign WQNM520, covering three counties in New Hampshire.

[18] The following states and territories are not covered by a statewide license:  American Samoa, Georgia, Iowa, Kansas, the Northern Mariana Islands, and South Dakota.

[19] For example, the State of Maryland holds a statewide 4.9 GHz band license (WPYX998), as do four other agencies of the Maryland state government (Maryland State Highway Administration, WQAN291; Maryland Department of Information Technology, WPYZ305; Maryland DNR, WPYT728; and Maryland MIEMSS, WQAL856).

[20] *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Order on Reconsideration and Eighth Further Notice of Proposed Rulemaking, 36 FCC Rcd 15032, 15036, para. 9 (2021) (*2021 Order on Reconsideration* or *Eighth Further Notice*).

[21] Letter from Ralph A. Haller, Chairman, National Public Safety Telecommunications Council, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100, at 3 (filed Aug. 13, 2021) (NPSTC Aug. 13, 2021, *Ex Parte*) ("The NPSTC recommendations incorporate provisions for new public safety operations that advances in robotics, the internet of things (IoT) and unmanned aerial systems technologies are generating."); *see also* EWA Nov. 29, 2021, Comments at 8–9 ("Designating specific 4.9 GHz channels for UAS, for robotics, and for IoT technologies will

(continued….)

**Federal Communications Commission**                    **FCC 24-114**

### C.    Procedural History

6.    In 2002, the Commission designated the 4.9 GHz band for public safety use.[22] Operations in the band are limited to those in support of public safety operations,[23] and licenses for the band are exclusively available to public safety entities or those operating in support of public safety.[24] Since the designation of the band, the rules have evolved in response to changing conditions, including band use and technological innovation.[25] In these endeavors, the Commission has sought to increase the use of the band with the goal of maximizing the spectrum's potential.[26]

7.    *4.9 GHz Band Freeze.* In an effort to stabilize the band while the Commission considers changes to its rules as part of this proceeding,[27] on September 8, 2020, the Public Safety and Homeland Security Bureau (PSHSB) and the Wireless Telecommunications Bureau (WTB) (collectively, the Bureaus) announced a freeze on applications in the 4.9 GHz band.[28] On October 21, 2021, pursuant to the *2021 Order on Reconsideration*, the Bureaus amended the freeze to allow those with existing 4.9 GHz licenses to seek to modify those licenses, whether for permanent fixed sites or geographic areas, as permitted under the rules.[29]

---

(Continued from previous page) ————————————

further promote efficient use of this spectrum."); IAFC Nov. 23, 2021, Comments at 6–7 ("The IAFC also agrees with NPSTC that 4.9 GHz spectrum can be instrumental in supporting emerging technologies beneficial to public safety, including aeronautical, both manned and unmanned (UAS), robotics and the public safety Internet of Things (PS IoT)."). While section 90.1205(c), 47 CFR § 90.1205(c), of the Commission's rules currently prohibits aeronautical mobile operations, some operations have been authorized through rule waiver. *See, e.g.*, City of Long Beach, California, call sign WQJE424.

[22] *See The 4.9 GHz Band Transferred from Federal Government Use*, WT Docket No. 00-32, Second Report and Order and Further Notice of Proposed Rulemaking, 17 FCC Rcd 3955 (2002) (*Second Report and Order*).

[23] 47 CFR § 90.1203(b).

[24] *Id.* § 90.1203(a).

[25] *See, e.g.*, *2021 Order on Reconsideration* and *Eighth Further Notice*, 36 FCC Rcd 15032; *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Sixth Report and Order and Seventh Further Notice of Proposed Rulemaking, 36 FCC Rcd 1958 (2020) (*Sixth Report and Order* or *Seventh Further Notice*); *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Sixth Further Notice of Proposed Rulemaking, 33 FCC Rcd 3261 (2018) (*Sixth Further Notice*).

[26] The Commission has also received extensive input from public safety organizations such as the Association of Public-Safety Communications Officials-International, Inc. (APCO) and the National Public Safety Telecommunications Council (NPSTC). *See, e.g.*, APCO International, 4.9 GHz Task Force Report (2015), https://ecfsapi.fcc.gov/file/60001325364.pdf, (APCO Sept. 28, 2015 Report); NPSTC, 4.9 GHz National Plan Recommendations Final Report (2013), https://npstc.org/download.jsp?tableId=37&column=217&id=3222&file=4_9_GHz_National_Plan_Report_131024.pdf, (NPSTC Oct. 24, 2013 Plan).

[27] This proceeding began in 2007, and has been the subject of ongoing efforts from the Commission and the public safety community to make the most of this valuable spectrum. *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Notice of Proposed Rulemaking, 22 FCC Rcd 9595 (2007).

[28] *Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Announce Temporary Filing Freeze on the Acceptance and Processing of Certain Part 90 Applications for the 4940–4990 MHz Band*, WP Docket No. 07-100, Public Notice, 35 FCC Rcd 9522 (PSHSB/WTB 2020) (*Freeze Public Notice*). Pursuant to the *Freeze Public Notice*, the Bureaus stopped accepting applications for new or modified licenses, including both geographic area licenses and individual fixed-site licenses. *Id.* The *Freeze Public Notice* also noted that any 4.9 GHz licensee could seek relief from the freeze through the Commission's waiver provisions. *Id.* at 9523.

[29] *Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Modify Temporary Filing Freeze on the Acceptance and Processing of Certain Part 90 Applications for the 4940–4990 MHz Band*, WP Docket No. 07-100, Public Notice, 36 FCC Rcd 15185 (PSHSB/WTB 2021) (*Freeze Modification Public Notice*); *2021 Order on Reconsideration*, 36 FCC Rcd at 15041–42, para. 25. In the *2021 Order on Reconsideration* the

(continued….)

8.      *2021 Order on Reconsideration and Eighth Further Notice.*  On September 30, 2021, the Commission adopted the *2021 Order on Reconsideration and Eighth Further Notice*.[30]  The *2021 Order on Reconsideration*, which was issued before the framework adopted in the *Sixth Report and Order* could become effective, granted three public safety organization petitions[31] insofar as they sought reconsideration of the rules adopted in the *Sixth Report and Order*.[32]  The Commission agreed that, rather than allowing state lessors to use and lease the band for non-public safety purposes, the public interest would be better served by considering other models, in particular those that advanced a single, nationwide framework for the band.  In the *Eighth Further Notice*, the Commission sought comment on important technical and policy questions concerning how to maximize the use of the band to support public safety, leverage technological advancements (such as 5G), foster a robust equipment market, and address non-public safety use of the band on a nationwide basis.[33]  The Commission also sought comment on implementation of a single, nationwide framework and sought comment on requiring formal frequency coordination in the 4.9 GHz band to support interference protection and increase public safety confidence in using the band.[34]  In addition, the Commission asked about the role of the Regional Planning Committees (RPCs), and whether, if it adopted frequency coordination requirements, the RPCs have the technical expertise and resources to serve as coordinators.[35]

9.      The Commission also solicited feedback on several alternatives to promote innovation, stimulate investment, and facilitate robust public safety access in the 4.9 GHz band.[36]  In particular, the Commission sought comment on establishing a database that would contain consistent and reliable information about what spectrum is available and where it is being used.[37]  Alongside these potential changes, the Commission inquired about allowing non-public safety use of the band to

(Continued from previous page) ─────────────
Commission gave the example that an incumbent licensee is permitted to add base stations within its jurisdiction.  47 CFR § 90.1207(c).  Also, an incumbent licensee may continue to seek an individual station license if required pursuant to Commission rule section 90.1207(b)(1).  *Id.* § 90.1207(b)(1).  In addition to new deployments within its jurisdiction pursuant to an existing geographic area license, a public safety entity may expand operations through leasing from a State Lessor.  *2021 Order on Reconsideration*, 36 FCC Rcd at 15041–42, para. 25.

[30] *2021 Order on Reconsideration and Eighth Further Notice*, 36 FCC Rcd at 15032.  On May 27, 2021, the Commission granted the Public Safety Spectrum Alliance's Petition for Stay of the *Sixth Report and Order*, which stayed the implementation of the new leasing framework adopted in the *Sixth Report and Order* for the 4.9 GHz band, which had not yet become effective, pending a Commission decision on the petitions for reconsideration filed in this proceeding.  *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Order, 36 FCC Rcd 9761 (2021) (*Stay Order*).

[31] Petitions for reconsideration were filed by PSSA, APCO, and NPSTC.  *2021 Order on Reconsideration*, 36 FCC Rcd at 15038–42, paras. 16–26.

[32] In the *Sixth Report and Order and Seventh Further Notice*, the Commission adopted a leasing framework that granted states the option to lease spectrum access through a single statewide entity designated as the State Lessor to state and local entities—whether public safety or non-public safety—as well as to commercial and other private entities in their jurisdictions.  *Sixth Report and Order*, 36 FCC Rcd at 1959, para. 2.  In the *Seventh Further Notice*, the Commission, among other things, proposed an expansion of the new state-based framework to include public safety operations and proposed to amend its 4.9 GHz licensing rules to limit future licensing to state entities seeking a statewide license in states without an existing statewide license for purposes of this coordination.  *Seventh Further Notice*, 36 FCC Rcd at 1977–82, paras. 48–60.  State Lessors were also permitted to use the band for non-public safety purposes themselves.  *Sixth Report and Order*, 36 FCC Rcd at 1971–72, paras. 35–36.

[33] *Eighth Further Notice*, 36 FCC Rcd at 15042–62, paras. 27–89.

[34] *Id.* at 15048–50, paras. 45–50.

[35] *Id.* at 15051–52, paras. 54–56.

[36] *Id.* at 15052–53, paras. 57–60.

[37] *Id.* at 15044–46, paras. 32–36.

encourage a more robust and innovative equipment market without causing harmful interference to public safety operations in the band.[38]  The Commission, while emphasizing the importance of public safety operations in this band, sought comment on whether allowing non-public safety use could lower equipment and deployment costs and increase efficient use of spectrum, without undermining critical public safety operations.  In addition, the Commission sought comment on implementing a nationwide spectrum management framework reflecting public safety input, thereby "promot[ing] more opportunistic use of the 4.9 GHz band without compromising the integrity and security of public safety operations."[39]  More specifically, the Commission asked about designating a single entity to serve as a nationwide Band Manager or licensee for the 4.9 GHz band and what its responsibilities would be under such an approach.[40]

10.     *Seventh Report and Order and Ninth Further Notice of Proposed Rulemaking.*  In January 2023, the Commission adopted the *Seventh Report and Order and Ninth Further Notice* in which it established a comprehensive and coordinated nationwide approach to managing the 4.9 GHz band.[41]  In doing so, the Commission solidified the band's status as public safety spectrum, while also exploring secondary, non-public safety use as agreed to by public safety licensees through a new potential leasing model.[42]  Critical to this vision for the 4.9 GHz band was the addition of a nationwide Band Manager, to be selected based on its expertise and connections to the public safety community.[43]  The Band Manager was given responsibility for coordinating all operations in the band to ensure that any non-public safety use remains fully secondary to, and preemptible by, public safety operations.[44]

11.     The *Seventh Report and Order* also modified our rules to allow for the collection of granular data on public safety operations in the 4.9 GHz band.[45]  The Commission noted that this data combined with a formal coordination structure performed by the Band Manager will improve interference mitigation efforts, bolster public safety confidence in the band, and play a crucial role in the Band Manager's ability to find opportunities for increasing access into the band.[46]

12.     In the *Ninth Further Notice* the Commission sought comment on a range of questions related to the implementation of the new Band Manager model for the 4.9 GHz band adopted in the *Seventh Report and Order*.[47]  Specifically, the Commission sought comment on the Band Manager's efforts in coordinating public safety operations, in particular mitigating harmful interference and modernizing operations.[48]  Next, the Commission sought comment on the potential integration of the band with broadband networks used by public safety, as well as the Band Manager's role in that potential process.[49]  The Commission also sought comment on the Band Manager's role in facilitating leasing to

---

[38] *Id.* at 15054–60, paras. 61–86.

[39] *Id.* at 15042–62, paras. 27–89; *see also Sixth Further Notice*, 33 FCC Rcd at 3262, para. 3.

[40] *Eighth Further Notice*, 36 FCC Rcd at 15050–51, paras. 51–53.

[41] *Seventh Report and Order* and *Ninth Further Notice*.  In 2023, the Bureaus granted a 14-day extension of the time to file comments and reply comments.  *See Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Order, 38 FCC Rcd 2303 (WTB/PSHSB 2023).

[42] *Seventh Report and Order*, 38 FCC Rcd at 711–23, paras. 18–49.

[43] *Id.* at 711–16, paras. 18–29.

[44] *Id.* at 711–21, paras. 18–43.

[45] *Id.* at 716–18, paras. 30–35.

[46] *Id.* at 711–24, paras. 18–54.

[47] *Ninth Further Notice*, 38 FCC Rcd at 732–48, paras. 71–147.

[48] *Id.* at 732–37, paras. 73–90.

[49] *Id.* at 736, paras. 87–88.

non-public safety users, how to enable such leasing, how to manage the revenues that arise from it, and how to ensure preemption rights for public safety operations.[50]  We also asked questions related to the implementation of a committee-based selection process for the Band Manager, which mirrors the approach we have taken for selecting clearinghouses and transition coordinators in a number of other bands.[51]  Finally, we sought comment on our oversight of the Band Manager, on future licensing of the band, and on other considerations related to the band.[52]  The Commission received 57 comments and reply comments and 148 *ex partes*.

     **D.**     **FirstNet**

     13.     Congress created FirstNet in 2012 pursuant to the Spectrum Act, which called for the deployment of a NPSBN.[53]  To that end, the Spectrum Act established FirstNet as an independent authority within the National Telecommunications and Information Administration (NTIA)[54] and required the Commission to grant a license to FirstNet for the 758–769/788–799 MHz band (sometimes referred to as "Band 14").[55]  Congress authorized FirstNet to exercise all powers specifically granted by the provisions of the Spectrum Act, along with such incidental powers as are necessary to accomplish the purposes of the Spectrum Act.[56]

     14.     The Spectrum Act required the Commission to "grant a license to [FirstNet] for the use of the 700 MHz D block spectrum and existing public safety broadband spectrum."[57]  Pursuant to this provision, on November 15, 2012, PSHSB granted FirstNet's initial license, call sign WQQE234, for a period of 10 years.[58]  PSHSB renewed this license in 2023.[59]  In granting the renewal, PSHSB reviewed

---

[50] *Id.* at 737–45, paras. 93–134.

[51] *Id.* at 732–47, paras. 135–42.

[52] *Id.* at 747–50, paras. 143–55.

[53] Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, §§ 6001–6303, 6413, 126 Stat. 156, 201–22, 235–36 (codified at 47 U.S.C. §§ 1401–1443, 1457) (Spectrum Act).

[54] 47 U.S.C. § 1424(a).

[55] *See id.* § 1421(a) ("[T]he Commission shall . . . grant a license to the First Responder Network Authority for the use of the 700 MHz D block spectrum and existing public safety broadband spectrum."); *id.* § 1421(b)(1) ("The license granted [to FirstNet under section 1421(a)] shall be for an initial term of 10 years from the date of the initial issuance of the license."); *see also id.* § 1401(2) (defining "700 MHz D block spectrum" as 758–763/788–793 MHz); *id.* § 1401(14) (defining "existing public safety broadband spectrum" as 763–768/793–798 MHz and 768–769/798–99 MHz).

[56] *Id.* § 1426(a).

[57] *Id.* § 1421(a).

[58] On September 7, 2012, PSHSB issued, on delegated authority, a *Report and Order* adopting rules implementing the mandate of the Spectrum Act to grant a license to FirstNet.  *Implementing Public Safety Broadband Provisions of the Middle Class Tax Relief and Job Creation Act of 2012*, WP Docket No. 12-94, Report and Order, 27 FCC Rcd 10953 (PSHSB 2012) (*FirstNet Report and Order*).  On September 25, 2012, FirstNet submitted a request for issuance of its license as contemplated in the *FirstNet Report and Order*.  *See* Letter from Samuel Ginn, Chairman of the Board, First Responder Network Authority, to David S. Turetsky, Chief, Public Safety and Homeland Security Bureau (dated Sept. 25, 2012).  The Bureau granted the license in the Commission's Universal Licensing Service (ULS) on November 15, 2012, under call sign WQQE234.

[59] *First Responder Network Authority, Nationwide Public Safety Broadband Network, Renewal of SP-700 MHz Public Safety Broadband Nationwide License Radio Service*, Order, 38 FCC Rcd 4989 (PSHSB 2023) (*FirstNet Renewal Order*).  The Bureau renewed FirstNet's license for ten years from the November 15, 2022, expiration of the initial license, or for the remaining period of its authorization from Congress, whichever is sooner.  *Id.* at 1.  The Spectrum Act provides that FirstNet's statutory authority shall terminate 15 years after the statutory date of enactment, i.e., on February 22, 2027, unless Congress extends that authority.  47 U.S.C. § 1426(f).

FirstNet's compliance with the Spectrum Act's requirements and concluded that FirstNet has sufficiently demonstrated compliance with the requirements of the Spectrum Act to warrant renewal of its license.[60] PSHSB noted that as a Commission licensee, FirstNet remains subject to the Commission's statutory and regulatory authority, and that PSHSB will continue to monitor and oversee FirstNet's performance.[61]

### E.    Summary of the Record

15.    As noted above, in the *Ninth Further Notice*, the Commission sought comment on a range of issues related to implementation of the nationwide Band Manager framework adopted in the *Seventh Report and Order*.[62]  The Commission sought comment on the Band Manager's role in mitigating harmful interference to public safety licensees, modernizing operations in the band, potential integration of the band with broadband networks used by public safety entities, and facilitating leasing to non-public safety users.[63]  The Commission also sought comment on implementing a committee-based process for selecting the Band Manager, among other issues.[64]

16.    Commenting parties overwhelmingly support the Commission's decision in the *Seventh Report and Order* to solidify the band's status as a public safety band,[65] and were almost universally in agreement that the Band Manager's primary responsibility "should be to protect public safety licensees from harmful interference."[66]  Commenting parties also support the Band Manager promoting 5G and other advanced technologies in the band[67] and integrating the band in some manner with public safety

---

[60] *FirstNet Renewal Order*, 38 FCC Rcd at 4992–99, paras. 10–37.

[61] *Id.* at 4999, para. 38.

[62] *Ninth Further Notice*, 38 FCC Rcd at 732, paras. 71–72.

[63] *Id.* at 732–45, paras. 75–134.

[64] *Id.* at 745–50, paras. 135–55.

[65] AASHTO Apr. 10, 2023, Comments at 2 (stating that it is "vital that the 4.9 GHz band be preserved and held separate for use by state and local agencies to enhance public safety"); APCO Apr. 13, 2023, Comments at 1 (stating that "success for the band will depend upon an unwavering commitment to preserving public safety use of 4.9 GHz"); BART Mar. 30, 2023, Comments at 1 (strongly supporting "primacy of its public safety operations" in the 4.9 GHz band); IAFC Apr. 13, 2023, Comments at 1 (stating that it "appreciates the FCC's interest in promoting better utilization of the 4.9 GHz band for public safety"); iCERT Apr. 10, 2023, Comments at 1 (supporting "preservation of the band for public safety use"); Motorola Apr. 13, 2023, Comments at 3 (stating that it supports "retaining the band's primary use for public safety organizations."); PSSA Apr. 12, 2023, Comments at 2 (supporting "preserving the integrity and priority of public safety communications within the [4.9 GHz] band"); TDD May 15, 2023, Reply at 3 (citing APCO Apr. 13, 2023, Comments at 1, iCERT Apr. 10, 2023, Comments at 2, Motorola Apr. 13, 2023, Comments at 3).

[66] BART Mar. 30, 2023, Comments at 4; *see also* AASHTO Apr. 10, 2023, Comments at 3 ("The bottom line is that the incumbent public safety licensees must be protected [from harmful interference]."); APCO Apr. 13, 2023, Comments at 10 (stating that it "generally supports tasking the band manager with responsibility for establishing interference criteria for public safety operations in the band"); Caltrans Apr. 11, 2023, Comments at 7 (stating that the "[a]bsence of harmful interference complaints" should be used as a performance measure for effective frequency coordination); EEI Apr. 13, 2023, Comments at 11 ("One of the primary tasks for a nationwide Band Manager should be ensuring that protection from harmful interference is strictly observed."); Motorola Apr. 13, 2023, Comments at 2 (urging "the Commission to establish a framework where the existing Part 90 FCC recognized frequency coordinating committees are a part of the solution to coordinate access to the band, prevent harmful interference, and mitigate harmful interference complaints"); WISPA Apr. 13, 2023, Comments at 2 (stating that it "strongly agrees with the Commission on the necessity of protecting public safety operations from harmful interference . . ."); MTA May 15, 2023, Reply at 5 (citing BART Mar. 30, 2023, Comments).  *But see* GWTCA May 1, 2023, Reply at 2 (stating that "discussion of an appropriate interference standard to separate co-channel or adjacent channel systems does not need an immediate decision . . .").

[67] APCO Apr. 13, 2023, Comments at 11 (stating that it "agrees that designating one or more preferred (but not required) standards could make coordination and facilitating non-public safety use easier"); T-Mobile May 15, 2023,

(continued….)

broadband networks.[68]  On the other hand, commenting parties were split on the type of leasing model that the Commission could implement to facilitate use of the band by non-public safety entities.[69] Commenting parties were also split over whether the Band Manager selection committee should be comprised solely or mostly of public safety representatives[70] or whether it should include a more diverse array of stakeholders.[71]

(Continued from previous page) ─────────────────

Reply at 4 (stating "commercial use of the 4.9 GHz band will complement the wireless industry's current robust public safety activities . . . [and that] . . . [t]he latest generation of wireless networks—5G—has even further improved first responders' response times and their ability to quickly assess emergency situations").  *But see* AASTHO Apr. 10, 2023, Comments at 6 (stating that it "believes [5G integration] will happen naturally, as public service agencies buy new equipment and systems").

[68] APCO Apr. 13, 2023, Comments at 10–11 ("The band manager should explore a variety of opportunities to leverage excess spectrum and facilitate innovation in the band, including leasing spectrum to operators of [public safety] broadband networks, so long as public safety licensees are fully protected."); IAFC Apr. 13, 2023, Comments at 2 ("In order to ensure integrated data flows on the incident scene, data and other communications on both the FirstNet network and the 4.9 GHz band should be integrated to present a clear picture of the incident and the responding resources and personnel to the incident commander."); Maryland Apr. 13, 2023, Comments at 4 ("[T]he Band Manager should explore opportunities to lease spectrum . . . to operators of broadband networks used by public safety in other frequency bands."); Corning May 15, 2023, Reply at 4 ("Integration of the 4.9 GHz band with the NPSBN must be seamless and automatic to provide end users with wireless communications free of delays which is paramount to the efficient and effective operation of public safety services."); Nextivity May 15, 2023, Reply at 1 (stating that integration with the FirstNet will "facilitate the availability of 5G and other advanced broadband communications and services, and ensure full interoperability of all public safety broadband communications nationwide, avoiding piecemeal, parallel networks").

[69] APCO Apr. 13, 2023, Comments at 5–8; WISPA Apr. 13, 2023, Comments at 11; MTA May 15, 2023, Reply at 8 (supporting Model 1 leasing).  *But see* AASHTO May 15, 2023, Comments at 6–7; BART Mar. 30, 2023, Comments at 12–13; Caltrans Apr. 11, 2023, Comments at 6; EEI Apr. 13, 2023, Comments at 11–12; FPL Apr. 13, 2023, Comments at 6; UTC Apr. 13, 2023, Comments at 5–6; Cal OES May 15, 2023, Reply at 5 (supporting Model 2 leasing).

[70] APCO Apr. 13, 2023, Comment at 22 ("If the Commission concludes that non-public safety entities should be represented, the public safety members of the committee should comprise a supermajority."); IAFC Apr. 13, 2023, Comments at 2 ("[T]he selection committee should have a clear majority of public safety representatives, who have experience in use of new public safety technologies on the nation's incident scenes."); Maryland Apr. 13, 2023, Comments at 2 (stating the selection committee should be "heavily weighted" with public safety representatives "to ensure that public safety's needs and concerns are adequately considered in the selection of the Band Manager"); AASHTO May 15, 2023, Reply at 2–3 (stating that it favors a "majority or exclusive public safety participation in the Band Manager or the Selection Committee"); Cal OES May 15, 2023, Reply at 6 (urging "the Commission to limit the selection committee to representatives from incumbent public safety licensees"); Major Cities May 15, 2023, Reply at 2 (affirming support for "a public safety majority representing incumbent users on the band manager selection committee"); MTA May 15, 2023, Reply at 6 (urging that "the majority of the [Selection] Committee [should be] comprised of public safety members").

[71] American Petroleum Institute, Enterprise Wireless Alliance, Forestry Conservation Communications Association, International Municipal Signal Association, National Sheriffs' Association, Utilities Technology Council Apr. 13, 2023, Comments at 6 (Coalition) (suggesting the selection committee consist of "public safety, enterprise and CII entities"); EEI Apr. 13, 2023, Comments at 10 (stating that the "Commission should require that this selection committee includes diverse representation from key stakeholder, including non-public safety entities, such CII entities, like electric companies"); Federated Wireless Apr. 13, 2023, Comments at 6 (stating it believes "the Commission should continue to follow its historical practice and include representatives from the non-public safety community on its Band Manager selection committee"); iCERT Apr. 10, 2023, Comments at 5–6 (stating it "agree[s] that a nine-person Selection Committee would be appropriate, with five individuals representing the interests of public safety and four individuals representing the interests of non-public safety licensees"); UTC Apr. 13, 2023, Comments at 13 (stating that it "believes that nine representatives – five representing public safety and four representing non-public safety – would be sufficient"); WISPA Apr. 13, 2023, Comments at 18 (stating "the

(continued….)

17.    *PSSA Proposal.*  Throughout the course of this proceeding, the Public Safety Spectrum Alliance (PSSA) has advocated for the preservation of existing incumbent licensees' operations while also suggesting ways in which the Commission could increase utilization, enhance public safety coordination, and incorporate the latest commercially available technologies into the band.[72]  In comments to the *Ninth Further Notice*, PSSA, which describes itself as an "alliance amongst the nation's leading public safety officials and organizations", stated that it appreciated the Commission's decision to create "a nationwide framework" for the 4.9 GHz band which preserves "the integrity and priority of public safety communications within the band."[73]  Nonetheless, PSSA suggested that "several of the details as proposed for comment [in the *Ninth Further Notice*], if implemented in the manner suggested, will not necessarily accomplish the Commission's and public safety's goals effectively."[74]

18.    In a subsequent *ex parte*, PSSA suggested that all of these goals are attainable by integrating FirstNet's NPSBN into the 4.9 GHz band.[75]  PSSA further clarified its proposal by suggesting the Commission:  (1) assign a nationwide overlay license to a single Band Manager and adopt rules providing that the overlay licensee engage in a sharing agreement with FirstNet pursuant to section 2.103 of the Commission's rules; (2) ensure that the Band Manager selection committee adopts robust eligibility criteria to ensure that the entity chosen to serve as the Band Manager is well positioned to succeed; and (3) make targeted changes to section 2.103 to provide that FirstNet will have access to the 4.9 GHz band pursuant to a nationwide sharing arrangement with the Band Manager.[76]  Next, PSSA specified that the Commission should clarify that the Band Manager's responsibilities include:  (1) protecting incumbent operations from harmful interference; and (2) entering into a sharing arrangement with FirstNet.[77]  Finally, PSSA suggested that the Commission should maintain its freeze on new entrants into the band and should require incumbent licensees to surrender spectrum that they are not using.[78]  The Coalition for Emergency Response and Critical Infrastructure (CERCI)[79] submitted a response arguing against many of

---

(Continued from previous page)
selection committee should include representatives of non-public safety fixed wireless providers"); GWTCA May 11, 2023, Reply at 5 (affirming its belief "that the Selection Committee should include public safety and industrial representatives").

[72] *See, e.g.*, PSSA Apr. 12, 2023, Comments; PSSA May 15, 2023, Reply; Letter from Jeffrey D. Johnson, Public Safety Spectrum Alliance, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Apr. 23, 2024) (PSSA Apr. 23, 2024, *Ex Parte*); Letter from Jeffrey D. Johnson, Public Safety Spectrum Alliance, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Dec. 6, 2023) (PSSA Dec. 6, 2023, *Ex Parte*); Letter from Jeffrey D. Johnson, Public Safety Spectrum Alliance, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jul. 13, 2023) (PSSA Jul. 13, 2023, *Ex Parte*).

[73] PSSA Apr. 12, 2023, Comments at 1–2.

[74] *Id*. at 4.

[75] PSSA Apr. 23, 2024, *Ex Parte*.

[76] *Id*. at 2–4.  In *ex partes* expressing support for PSSA's proposal, NREMT and AT&T suggest that section 2.103(b) of the Commission's rules currently allows FirstNet access into the band.  Letter from Mike McEvoy, Board Chair, National Registry of EMTs, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed May 30, 2024) (NREMT May 30, 2024, *Ex Parte*); Letter from Michael P. Goggin, AT&T Services, Inc., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 20, 2024) (AT&T Jun. 20, 2024, *Ex Parte*).

[77] PSSA Apr. 23, 2024, *Ex Parte* at 4.

[78] *Id*.

[79] CERCI's members include the California State Sheriffs' Association, Competitive Carriers Association, Edison Electric Institute, iCERT, Major Cities Chiefs Association, National Association of Women Law Enforcement Executives, the National Sheriffs' Association, National Rural Electric Cooperative Association, T-Mobile USA, Inc., UScellular, and Verizon.  *See* Letter from Kenneth Corey, et al., Chairman, Coalition for Emergency Response and Critical Infrastructure, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100, at 7–8 (filed Feb 6, 2024) (CERCI Feb. 6, 2024, *Ex Parte*).

Federal Communications Commission                                   FCC 24-114

PSSA's proposals and raising a number of concerns were it to be implemented.[80]  Since then, there have been significant exchanges in the record between CERCI and other entities supportive of its views,[81] and PSSA and filers aligned with its proposal.[82]

---

[80] CERCI May 10, 2024, *Ex Parte*.

[81] *See, e.g.,* Letter from Jonathan F. Thompson, Executive Director and CEO, National Sheriffs' Association, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed May 14, 2024); Letter from Jim Tymon, Executive Director, Operations Security & Emergency Response Policy, American Petroleum Institute, et al., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed May 20, 2024); Letter from Jonathan F. Thompson, Executive Director and CEO, National Sheriffs' Association, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 28, 2024) (NSA Jun. 28, 2024, *Ex Parte*); Letter from Kenneth Corey, et al., Chairman, Coalition for Emergency Response and Critical Infrastructure, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 3, 2024) (CERCI Jun. 3, 2024, *Ex Parte*); Letter from William Chapman, Statewide Interoperability Coordinator, Oregon Department of Emergency Management, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 3, 2024) (SWI Jun. 3, 2024, *Ex Parte*); Letter from Laura Cooper, Executive Director, Major Cities Chiefs Association, et al., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 3, 2024) (MCCA et al. Jun. 3, 2024, *Ex Parte*); Letter from Kenneth Corey, et al., Chairman, Coalition for Emergency Response and Critical Infrastructure, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 6, 2024) (CERCI Jun. 6, 2024, *Ex Parte*); Letter from William H. Johnson, Senior Vice President, Federal Regulatory & Legal Affairs, Verizon, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 11, 2024) (Verizon Jun. 11, 2024, *Ex Parte*); Letter from Ferdinand Milanes, Chief, Office of Radio Communications, State of California, Department of Transportation, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 19, 2024); Letter from Kenneth Corey, et al., Chairman, Coalition for Emergency Response and Critical Infrastructure, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 25, 2024) (CERCI Jun. 25, 2024, *Ex Parte*); Letter from William H. Johnson, Senior Vice President, Federal Regulatory & Legal Affairs, Verizon, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jul. 1, 2024) (Verizon Jul. 1, 2024, *Ex Parte*); Letter from Kenneth Corey, et al., Chairman, Coalition for Emergency Response and Critical Infrastructure, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jul. 7, 2024) (CERCI Jul. 7, 2024, *Ex Parte*); Letter from Aryeh B. Fishman, Associate General Counsel, Edison Electric Institute, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jul. 9, 2024) (EEI Jul. 9, 2024, *Ex Parte*); Letter from Louis Peraertz, Vice President of Policy, WISPA, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jul. 11, 2024) (WISPA Jul. 11, 2024, *Ex Parte*).  In addition, numerous parties expressed opposition to PSSA's proposal by submitting form-like letters in this proceeding. *See, e.g.*, Letter from Wade Kapszukiewicz, Mayor, City of Toledo, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed May 21, 2024).

[82] *See, e.g.,* PSSA Apr. 23, 2024, *Ex Parte* at 2–4; Letter from Gary David Gray, et al., Former Presidents of APCO International, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Apr. 5, 2024) (Former Presidents of APCO Apr. 5, 2024, *Ex Parte*); Letter from Kevin Green, Counsel, First Responder Network Authority, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Apr. 8, 2024) (FirstNet Apr. 8, 2024, *Ex Parte*); Letter from Jeff Johnson, Public Safety Spectrum Alliance, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed May 24, 2024) (PSSA May 24, 2024, *Ex Parte*); Letter from John S. Butler, President and Board Chair, International Association of Fire Chiefs, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed May 28, 2024); NREMT May 30, 2024, *Ex Parte*; AT&T Jun. 20, 2024, *Ex Parte*; Letter from Earnest Malone, President, Metropolitan Fire Chiefs Association, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jul. 8, 2024) (MFCA Jul. 8, 2024, *Ex Parte*); Letter from Claude Cummings, Jr., President, et al., Communications Workers of America, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Aug. 1, 2024) (CWA Aug. 1, 2024, *Ex Parte*); Letter from Jonathan Kanzigg, President, Southeastern Association of Fire CHiefs, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Aug. 4, 2024).  In addition, numerous parties expressed support for PSSA's proposal by submitting form-like letters in this proceeding. *See, e.g.*, Letter from Chad Russell, President, Kansas State Association of Fire Chiefs, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Mar. 5, 2024).

## III.      EIGHTH REPORT AND ORDER

19.      In the *Seventh Report and Order*, the Commission adopted rules that created a comprehensive and coordinated nationwide approach to the 4.9 GHz band, centralizing management in a single Band Manager, while creating a mechanism to potentially leverage new technologies, lower equipment costs, attract new users, facilitate effective frequency coordination and interference protection, and promote interoperability.[83]  As discussed above, in the corresponding *Ninth Further Notice* the Commission sought comment on the implementation of many of the policy determinations made in the *Seventh Report and Order*, including the ultimate rights and responsibilities of the nationwide Band Manager.

20.      Today, we find that our topline goals of preserving and expanding use to a variety of primary public safety operations would be best served by assigning a nationwide overlay license to the Band Manager.  Rather than directly operating in the band, the Band Manager, once selected, will be authorized to enter into a sharing agreement with FirstNet to enable use of unassigned portions of the 4.9 GHz band as part of FirstNet's NPSBN in a manner that protects incumbent operations.  We also clarify that FirstNet remains free to enter into additional sharing agreements with incumbent licensees to operate within their service areas consistent with section 90.1203(b) of the Commission's rules.  After review of the record, we conclude that allowing the Band Manager to enter into a sharing agreement with FirstNet to enable broader access into the band by FirstNet's NPSBN, while also working with public safety licensees to coordinate and rationalize their use of the band, can enable greater public safety use, including for 5G, and has the potential to free up new opportunities for expanded use in the band in the near term.[84]  In addition, after review of the record, we also find that public safety entities would be better served by clarifying the Band Manager's primary responsibilities and revise section 90.1217 of our rules accordingly.

### A.      Nationwide Overlay License

21.      In the *Eighth* and *Ninth Further Notices* the Commission sought comment on the best ways to increase utilization in areas where there are no operations in the band while also preserving the public safety nature of the band and incumbent licensee use.[85]  In particular, in the *Eighth Further Notice* the Commission sought comment on establishing a national license for the band and on what spectrum rights would be associated with the license.[86]  The Commission also asked questions relating to the establishment of an overlay license, such as how a licensing framework could be combined with different access models, and how an overlay license could work with future public safety operations in the band.[87]  The Commission then sought general comment on how to address future licensing of the band, given the decision in the *Seventh Report and Order* to establish a Band Manager and taking into consideration the variety of different implementation issues on which comment was sought in the *Ninth Further Notice*.[88]

---

[83] *Seventh Report and Order*, 38 FCC Rcd at 711–23, paras. 18–49.

[84] *Eighth Further Notice*, 36 FCC Rcd at 15050–51, paras. 51–53.

[85] *Id.* at 15042–62, paras. 27–89; *Ninth Further Notice*, 38 FCC Rcd at 737–43, 748–49, paras. 93–123, 148–51.

[86] *Eighth Further Notice*, 36 FCC Rcd at 15050–51, paras. 51–53; *see also id.* at 15050, para. 53 ("If we were to adopt this approach, what rights and responsibilities over the band should be associated with the national license, and what rights should be reserved for state, local, tribal, or regional public safety licensees?  As proposed above, we envision that incumbent licensees in the band would retain spectrum rights and would be entitled to protection of their facilities.  Would all other spectrum rights be invested in the national licensee?  If yes, what obligation should the national licensee have to ensure access to the band by sub-national public safety entities?").

[87] *Id.* at 15059, paras. 81–83; *see also id.* at 15059, para. 83 (asking "[w]hat types of entities should be eligible for overlay licenses" and whether there are "any other considerations regarding the use of overlay licensing for the 4.9 GHz band").

[88] *Ninth Further Notice*, 38 FCC Rcd at 748–49, paras. 148–51.

After review of the record, we conclude that the best mechanism for putting unassigned spectrum to use as quickly and efficiently as possible is to assign a nationwide overlay license to the Band Manager, once the selection committee makes its recommendation and that recommendation is confirmed by the Commission, pursuant to the public safety radio services exemption in section 309(j) of the Communications Act.[89]  As further discussed below, the Band Manager will also be authorized to enter into a spectrum sharing agreement with FirstNet to allow FirstNet to operate in unassigned portions of the band.  Pursuant to any sharing agreement executed with FirstNet, the Band Manager will be responsible for ensuring that FirstNet's operations are coordinated with, and do not cause harmful interference to, existing public safety operations in the band.

22.     PSSA suggests that assigning a nationwide overlay license to the Band Manager could "increase the band's usage," "preserv[e] incumbent operations," "maximize the benefit of the band for the greatest number of America's first responders," and "meet public safety's growing need for advanced and dedicated 5G-enabled communications."[90]  Similarly, the National Fraternal Order of Police, IAFF, and IACP state that the most efficient and cost-effective way to achieve the goal of ensuring that incumbent licensees are protected and expeditiously deploying 5G services in the band is to utilize an approach like the one proposed by PSSA.[91]  Other commenters, including BART, EWA, and WISPA, have historically opposed the creation of a nationwide overlay license, due in part to a concern that a nationwide licensee would force the incumbents out of the band.[92]  Based on our review of this record, we are persuaded that

---

[89] 47 U.S.C. § 309(j)(2)(A) ("The competitive bidding authority granted by this subsection shall not apply to licenses or construction permits issued by the Commission—(A) for public safety radio services, including private internal radio services used by State and local governments and non-government entities and including emergency road services provided by not-for-profit organizations, that—(i) are used to protect the safety of life, health, or property; and (ii) are not made commercially available to the public.").

[90] PSSA Apr. 23, 2024, *Ex Parte*; PSSA May 24, 2024, *Ex Parte* at 2 (stating its proposal "offers the chance to dramatically increase utilization of and lower costs for the band in a manner that is well-grounded in existing statutory authority"); *see also* AT&T Jun. 20, 2024, *Ex Parte* at 1–4 (explaining that allowing FirstNet to access the band "to support 5G services will allow [FirstNet] to further improve network speed and capacity for the benefit of the public safety community"); NREMT May 30, 2024, *Ex Parte* at 1–2 ("Consistent with the Commission's goals in this proceeding, the PSSA's sharing proposal 'will optimize public safety use and enable the integration of the latest commercially available technologies'"); FirstNet Apr. 8, 2024, *Ex Parte* at 1 (stating that FirstNet "is in a position to leverage the 4.9 GHz band for the benefit of public safety by using it to provide enhanced and innovative broadband communications services and capabilities to first responders on a nationwide basis"); Former Presidents of APCO Apr. 5, 2024, *Ex Parte* ("Inclusion of this spectrum into the existing FirstNet network would make it available to public safety users without bearing the cost of deployment and operations"); Letter from Patrick Yoes, National President, National Fraternal Order of Police, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100, at 2–3 (filed Feb. 13, 2024) (Fraternal Order of Police Feb. 13, 2024, *Ex Parte*) ("Speaking for our officers who use this technology, I can tell you that we have a real need for a dedicated 5G spectrum, and the 4.9 GHz band is uniquely positioned to meet this need both today and into the future.").  *See generally* CWA Aug. 1, 2024, *Ex Parte* at 1–2 ("Allocating the 4.9 GHz band to a single nationwide licensee rather than multiple commercial users would facilitate rapid and efficient nationwide deployment and stop the slow and fragmented approach that has led to prolonged underutilization of the band in the last 20 years.").

[91] Fraternal Order of Police, et al., Apr. 26, 2024, *Ex Parte*; AT&T Jun. 20, 2024, *Ex Parte* at 1–4; NREMT May 30, 2024, *Ex Parte* at 1–2; City of Stamford May 6, 2024, *Ex Parte* at 1.

[92] *See, e.g.*, EWA Nov. 29, 2021, Comments at 11; Maryland Apr. 13, 2023, Comments at 5; BART May 15, 2023, Reply at 3 ("No new licenses, should be used to interfere with current or proposed public safety uses, especially and including a proposed "overlay" nationwide license, or in the worst case scenario, drive any public safety users out of a band that was allocated to help meet essential public safety communications needs."); EWA Jan. 11, 2022, Reply at 3; iCERT May 11, 2023, Reply at 7; Maryland, et al., Jan. 11, 2022, Reply at 6 (citing EWA Nov. 29, 2021, Comments at 11 and NSA Dec. 3, 2021, Reply at 1); NSA Dec. 3, 2021, Reply at 1; Verizon Jan. 11, 2022, Reply at 3–5; WISPA May 15, 2023, Reply at 10; Major Cities May 15, 2023, Reply at 1; Maryland DoIT May 15, 2023, Reply at 4–5; MTA May 15, 2023, Reply at 6–7.

expanding the Band Manager's role and responsibilities to encompass a nationwide overlay license and a sharing agreement with FirstNet for any unassigned spectrum is the best approach to ensure that 4.9 GHz band spectrum is more fully utilized in the near term, while at the same time protecting existing incumbent licensee usage.[93]

23.     The Band Manager, once it has applied for and receives an overlay license, will obtain the rights to a nationwide geographic area license across the entire 50 megahertz of the band that is "overlaid" on top of the existing incumbent licenses and includes areas where spectrum is unassigned.[94] We find that this licensing structure, combined with authorizing the Band Manager to enter into a sharing agreement enabling FirstNet to operate where white spaces exist, is the best mechanism for increasing public safety operations in this band in the near term.[95]  This is akin to the framework that the Commission adopted in the *700 MHz Second Report and Order* in that the 4.9 GHz Band Manager will be prohibited from using the overlay license to provide its own services.[96]  We believe that this approach will quickly allow for a wider variety of public safety uses in a more dynamic fashion than is currently

---

[93] *See, e.g.,* Letter from Patrick Yoes, National President, Fraternal Order of Police, et al., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Apr. 26, 2024) (Fraternal Order of Police, et al., Apr. 26, 2024, *Ex Parte*); Former Presidents of APCO Apr. 5, 2024, *Ex Parte*; Letter from Steven Alonzo, Manager, Government Relations and Policy, International Association of Fire Chiefs, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Mar. 21, 2024); Letter from Steven Alonzo, Manager, Government Relations and Policy, International Association of Fire Chiefs, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Mar. 18, 2024) (IAFC Mar. 18, 2024, *Ex Parte*); Letter from Doug Chapman, Senior Vice President, Etherstack, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Mar. 18, 2024); Letter from Edward A. Kelly, General President, International Association of Fire Fighters, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Feb. 16, 2024) (IAFF Feb. 16, 2024, *Ex Parte*) ("it is imperative for the FCC to integrate the 4.9 GHz band into the Nationwide Public Safety Broadband Network (FirstNet)").  *See generally* APCO Apr. 13, 2023, Comments at 10–11 ("The band manager should explore a variety of opportunities to leverage excess spectrum and facilitate innovation in the band, including leasing spectrum to operators of broadband networks, so long as public safety licensees are fully protected."); IAFC Apr. 13, 2023, Comments at 2 ("In order to ensure integrated data flows on the incident scene, data and other communications on both the FirstNet network and the 4.9 band should be integrated to present a clear picture of the incident and the responding resources and personnel to the incident commander."); PSSA Apr. 12, 2023, Comments at 16 ("This will also ensure that priority and ruthless preemption for all public safety traffic, irrespective of which band is used, will operate consistently, seamlessly guaranteeing public safety communications are always protected from harmful interference."); FirstNet Apr. 13, 2023, Comments at 2–3; Corning May 15, 2023, Reply at 4 ("Integration of the 4.9 GHz band with the NPSBN must be seamless and automatic to provide end users with wireless communications free of delays which is paramount to the efficient and effective operation of public safety services."); KSA May 22, 2023, Reply at 1; American Ass'n of State Troopers May 18, 2023, Reply at 1; Nextivity May 15, 2023, Reply at 1 ("This will facilitate the availability of 5G and other advanced broadband communications and services, and ensure full interoperability of all public safety broadband communications nationwide, avoiding piecemeal, parallel networks.").

[94] The nationwide overlay license will include all unassigned spectrum subject to the exclusion of licensed geographic areas and frequencies held by an incumbent licensee eligible under section 90.1203(a) of the Commission's rules.

[95] *See, e.g.,* Former Presidents of APCO Apr. 5, 2024, *Ex Parte* ("Inclusion of this spectrum into the existing FirstNet network would make it available to public safety users without bearing the cost of deployment and operations."); IAFF Feb. 16, 2024, *Ex Parte* ("If the 4.9 GHz band is integrated into the FirstNet network however, public safety providers including fire service professionals, will be in charge of guiding and directing the operation and evolution of this technology and capability.").

[96] In the 700 MHz band, the Commission required the Guard Band Manager to act solely as a "spectrum broker" and "prohibited them from using spectrum for their own private internal communications or to provide telecommunications services . . . ."  *Service Rules for the 746–764 and 776–794 MHz Bands, and Revisions to Part 27 of the Commission's Rules,* WT Docket No. 99-168, Second Report and Order, 15 FCC Rcd 5299, 5311–23, paras. 25–51 (2000) (*700 MHz Second Report and Order*).

permitted in the band, which in turn will make this spectrum more responsive to market demands and technological innovations.[97]

24.    The Band Manager will also carry with it important responsibilities in conjunction with its overlay licensee role, paramount among them being the obligation to oversee use of the spectrum pursuant to the sharing agreement to ensure that FirstNet's operations on these frequencies do not interfere with incumbent operations.  The Band Manager will be authorized to enable FirstNet to operate anywhere within the geographic area of the overlay license, subject to the parameters of the sharing agreement and protection of incumbent licensees.[98]  If an incumbent licensee cancels or terminates its license, the Band Manager will be authorized to amend its sharing agreement with FirstNet, if necessary, to include the rights to operate in the geographic (or site-based) area and on the channel(s) of the cancelled license.[99]  For these reasons, we believe that this mechanism is the best method to make certain that the 4.9 GHz band remains a public safety band which is more fully utilized, including by existing incumbent licensees.  The Band Manager will ensure that incumbent licensees can continue their existing operations to suit their unique spectrum needs while simultaneously and separately authorizing FirstNet's operations in areas of the band where there are no incumbent operations.[100]  We clarify that FirstNet remains free to enter into additional sharing agreements with incumbent licensees to allow it to operate within the service areas of incumbent licensees consistent with section 90.1203(b) of the Commission's rules.[101]

25.    We also conclude that the future issuance of the Band Manager overlay license is consistent with our statutory authority under section 309(j) of the Communications Act.[102]  While section

---

[97] *Implementation of Sections 309(j) and 337 of the Communications Act of 1934 as amended, et al.*, WT Docket No. 99-87, et al., Report and Order and Further Notice of Proposed Rulemaking, 15 FCC Rcd 22709, 22729, para. 40 (2000) (*Section 309(j) Report and Order*).

[98] *See generally Transforming the 2.5 GHz Band*, WT Docket No. 18-120, Report and Order, 36 FCC Rcd 5446, 5473, para. 77 (2019) (implementing the rules for the Educational Broadband Service (EBS) overlay licenses).

[99] *Transforming the 2.5 GHz Band*, 36 FCC Rcd at 5473, para. 77, n.211 (citing *Amendment of Part 90 of the Commission's Rules to Facilitate Future Development of SMR Systems in the 800 MHz Frequency Band; Implementation of Sections 3(n) and 322 of the Communications Act Regulatory Treatment of Mobile Services; Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, First Report and Order, Eighth Report and Order, and Second Further Notice of Proposed Rulemaking, 11 FCC Rcd 1463, 1469, para. 3 (1995) (giving EA licensees the right to use any spectrum within the EA block that is recovered by the Commission from an incumbent SMR licensee in the event of termination of the incumbent's license)).

[100] We emphasize that the intent of our decision today is to allow the Band Manager to apply for a license for unassigned spectrum in the band and to coordinate any operations by FirstNet pursuant to a sharing agreement to ensure the protection of incumbent operations.  It does not otherwise confer authority on the Band Manager or FirstNet to modify or alter the existing license rights of incumbents.

[101] Under our current rules, 4.9 GHz licensees are permitted to enter into sharing arrangements for the use of spectrum with entities that do not meet the eligibility requirements for a license, and those entities must use the spectrum in support of public safety.  47 CFR § 90.1203(b).  These 4.9 GHz band sharing arrangements entered into by incumbent licensees will continue to be limited to supporting public safety operations and now will be subject to coordination by the Band Manager.

[102] 47 U.S.C. § 309(j)(2)(A).  The Commission has established that Band Manager licensing is consistent with our statutory authority.  *See Section 309(j) Report and Order*, 15 FCC Rcd at 22730, para. 42 (citing *700 MHz Second Report and Order*, 15 FCC Rcd at 5319–21, paras. 42–47) ("We previously concluded in the 700 MHz guard band proceeding that band manager licensing is fully consistent with our statutory spectrum management obligations"); *id.* (citing 47 U.S.C. § 309(a) (Commission authority to grant applications found to serve the public interest, convenience, and necessity)) ("because band managers are to be licensed and regulated by the Commission, the Commission fulfills its statutory obligation under Section 309(a) to determine whether licensing of spectrum will serve the public interest, convenience, and necessity.").

309(j) generally requires that the Commission assign initial licenses through use of competitive bidding when mutually exclusive applications for such licenses are accepted for filing,[103] an exception exists pursuant to section 309(j)(2)(A) of the Communications Act for public safety radio services.[104]  This exemption applies to radio services, rather than specific users, that the Commission specifically designates for the particular uses that Congress intended to benefit—services intended to protect the safety of life, health, or property.[105]  The Commission has determined that where the majority of users licensed in an existing service and within a given frequency band are qualified to obtain auction-exempt spectrum, future licensing for that service in that band will be exempt from auction unless the spectrum is being used for new services.[106]

26.     We find that this exemption applies to the 4.9 GHz band because the Commission specifically designated this band for services intended to protect the safety of life, health, or property.[107]  In the *Third Report and Order*, the Commission concluded that eligibility for entrance into and operations in the 4.9 GHz band are primarily limited to the provision of public safety services as defined in section 90.523 of the Commission's rules.[108]  We find that because a majority of users licensed in the 4.9 GHz

---

[103] 47 U.S.C. § 309(j)(1), (2).

[104] *Id.* § 309(j)(2)(A) ("The competitive bidding authority granted by this subsection shall not apply to licenses or construction permits issued by the Commission—(A) for public safety radio services, including private internal radio services used by State and local governments and non-government entities and including emergency road services provided by not-for-profit organizations, that—(i) are used to protect the safety of life, health, or property; and (ii) are not made commercially available to the public . . . .").

[105] *Id.*; *Section 309(j) Report and Order*, 15 FCC Rcd at 22740–52, paras. 63–88; *see also Implementation of Sections 309(j) and 337 of the Communications Act of 1934 as amended*, WT Docket No. 99-87, Memorandum Opinion and Order, 17 FCC Rcd 8359, 8367–75, paras. 19–38 (2002) (*Section 309(j) MO&O*); *Implementation of Sections 309(j) and 337 of the Communications Act of 1934 as amended*, WT Docket No. 99-87, Erratum (2002). The Commission also concluded that a radio service not allocated for traditional public safety uses will be deemed to be used to protect the safety of life, health or property within the meaning of section 309(j)(2)(A)(i) if the dominant use of the service is by entities that:  (1) have an infrastructure that they use primarily for the purpose of providing essential public services to the public at large; and (2) need, as part of their regular mission, reliable and available communications in order to prevent or respond to a disaster or crisis affecting the public at large.  *See Section 309(j) Report and Order*, 15 FCC Rcd at 22746–48, paras. 76–78.

[106] *Section 309(j) MO&O*, 17 FCC Rcd at 8367–68, para. 20 n.59 ("This 'dominant use' test applies only when we are considering licensing additional applicants in an existing service in the same frequency band" and "[i]t does not apply to new services . . ."); *see also id.* at 8375, para. 38.

[107] Pursuant to this exception, the Commission will expect the selection committee to identify the Band Manager selectee based on certain qualifications and parameters that will be set forth by the Bureaus in a public notice, as discussed below and in the *Seventh Report and Order*.  Because our intent is for the Band Manager to be assigned a Commission license, we emphasize that the Bureaus will confirm via order that the Band Manager selectee meets the Bureaus' established selection criteria, and delegate authority to the Bureaus to perform these duties.  Once the Bureaus have confirmed the Band Manager selectee meets the relevant selection criteria, only then will the selectee be allowed to apply for the 4.9 GHz nationwide overlay license pursuant to procedures to be established by the Bureaus as part of their delegated authority.  We believe that this selection process will be more efficient and effective in ensuring that the entity that applies for the license is the most qualified.  *See Section 309(j) Report and Order*, 15 FCC Rcd at 22713–14, para. 11; *see also Rainbow Broadcasting v. FCC*, 949 F.2d 405 (D.C. Cir. 1991) (the Commission is not required to open all frequencies for competing applications, as long as it provides a reasoned explanation of its decision not to do so).

[108] *4.9 GHz Third Report and Order*, 18 FCC Rcd at 9158–63, paras. 15–25; *see also* 47 CFR § 90.523; *id.* § 90.1203(a) ("Entities providing public safety services (as defined in § 90.523) are eligible to hold a Commission license for systems operating in the 4940–4990 MHz band. All of the requirements and conditions set forth in § 90.523 also govern authorizations in the 4940–4990 MHz band."), (b) ("4.9 GHz band licensees may enter into sharing agreements or other arrangements for use of the spectrum with entities that do not meet the eligibility

(continued....)

band are qualified to obtain auction-exempt spectrum, assigning a nationwide overlay license to the Band Manager is also exempt from auction.[109]  As explained *infra*, the primary use of the band—protecting the safety of life, health, or property—will not change by assigning an overlay license to the Band Manager and authorizing it to enter into a sharing agreement with FirstNet.  We also note that, even if the issuance of an overlay license could be seen as a new service, we believe that this service still meets the requirements of section 309(j)(2)(A) of the Act.[110]  The overlay license will enable FirstNet's public safety operations[111] in unassigned spectrum in the band, which will aid in expanding the provision of an important public service and further advance FirstNet's mission by making its service more reliable and putting available spectrum to use in order to prevent and/or respond to a disaster or crisis affecting the public.[112]  Thus, we find that it is appropriate and in the public interest to apply the public safety radio services exemption to this band to assign a nationwide overlay license to the 4.9 GHz Band Manager, once it is selected and has successfully applied for such a license.

**B.    Spectrum Sharing Agreement with FirstNet**

27.    In conjunction with issuance of a nationwide overlay license to the Band Manager, once selected, the Band Manager will be authorized to enter into a sharing agreement with FirstNet for use of the unassigned 4.9 GHz band spectrum that will be covered by the Band Manager's license.  Recognizing that FirstNet is an independent authority within the NTIA,[113] we anticipate that section 2.103(b) of the Commission's rules provides sufficient authority to enable any federal stations used by FirstNet to access the 4.9 GHz band pursuant to its sharing agreement with the Band Manager.[114]  As discussed *supra*, we believe that this sharing model combined with the Band Manager overlay license is the best way to preserve the public safety nature of the 4.9 GHz band, promote robust deployment in the band in the near term, and facilitate the development and deployment of new technologies and services for the public safety community.

---

(Continued from previous page) ────────────────

requirements in this section. However, all applications in the band are limited to operations in support of public safety.").

[109] *Section 309(j) MO&O*, 17 FCC Rcd at 8367–68, para. 20.

[110] *See supra* note 104.

[111] FirstNet Apr. 13, 2023, Comments at 2 ("as we look to further advance and evolve the network to continuously meet the operational needs of first responders and other public safety personnel across the country, the FirstNet Authority sees the 4.9 GHz spectrum as a potential avenue to provide enhanced broadband communications services, features, and capabilities—including 5G services—for public safety").

[112] *Implementation of Sections 309(j) and 337 of the Communications Act of 1934 as amended*, WT Docket No. 99-87, Second Memorandum Opinion and Order, 18 FCC Rcd 8519, 8920, para. 3 (2003) (*Section 309(j) Second MO&O*) (citing *Section 309(j) Report and Order*, 15 FCC Rcd at 22746, paras. 76–78) ("the Commission concluded that a radio service not allocated for traditional public safety uses will be deemed to be used to protect the safety of life, health or property within the meaning of Section 309(j)(2)(A)(i) if the dominant use of the service is by entities that (1) have an infrastructure that they use primarily for the purpose of providing essential public services to the public at large; and (2) need, as part of their regular mission, reliable and available communications in order to prevent or respond to a disaster or crisis affecting the public at large."); *Section 309(j) MO&O*, 17 FCC Rcd at 8367–75, paras. 19–38.; *see also* FirstNet Apr. 8, 2024, *Ex Parte* at 2 ("FirstNet Authority is in a position to leverage the 4.9 GHz band for the benefit of public safety by using it to provide enhanced and innovative broadband communications services and capabilities to first responders on a nationwide basis"); AT&T Jun. 20, 2024, *Ex Parte* at 1–3 ("permitting the FNA access to 4.9 GHz mid-band spectrum, as the PSSA and other leading public safety associations have proposed, will allow the FNA to upgrade and improve the NPSBN so that first responders can harness the life-saving capabilities of 5G").

[113] *See* 47 U.S.C. § 1424(a) ("There is established as an independent authority within the NTIA the 'First Responder Network Authority' or 'FirstNet'").

[114] 47 CFR § 2.103(b).

17

28.     In the *Ninth Further Notice*, the Commission noted PSSA's original proposal that the nationwide Band Manager should evaluate "potential integration" of the 4.9 GHz band "with the Nationwide Public Safety Broadband Network" and sought broad comment on exploring ways in which the band might be used in conjunction with broadband networks used by public safety.[115]  The Commission specifically noted that it previously sought comment in 2012 on how the 4.9 GHz band could complement the 700 MHz public safety broadband network, and that since that time, a number of commercial networks have integrated public safety operations into their broadband networks.[116]  The Commission then tentatively concluded that the Band Manager should explore opportunities to lease spectrum to operators of broadband networks used by public safety in other frequency bands.[117]  In addition, the Commission generally asked whether there is existing statutory authority that would permit the integration of the 4.9 GHz band into public safety broadband networks.[118]

29.     In response, many stakeholders expressed support for enabling access to the 4.9 GHz band by FirstNet's NPSBN in one form or another, with proposals ranging from direct licensed access by FirstNet, to other more indirect means such as PSSA's recent Band Manager proposal detailed *supra*.[119]  Corning expresses its support for FirstNet's use of the Band and advocates that any such access "must be seamless and automatic to provide end users with wireless communications free of delays which is paramount to the efficient and effective operation of public safety services."[120]  Similarly, the National

---

[115] *Ninth Further Notice*, 38 FCC Rcd at 736, paras. 87–88; *see also* PSSA Nov. 29, 2021, Comments at 9.

[116] *Ninth Further Notice*, 38 FCC Rcd at 736, para. 87; *Amendment of Part 90 of the Commission's Rules*; *Implementing a Nationwide, Broadband, Interoperable Public Safety Network in the 700 MHz Band*; *Service Rules for the 698–746, 747–762 and 777–792 MHz Bands*, WP Docket No. 07-100, WP Docket No. 06-229, WT Docket No. 06-150, Fourth Report and Order and Fifth Further Notice of Proposed Rulemaking, 27 FCC Rcd 6577, 6594–95, para. 47 (2012); *see also, e.g.*, T-Mobile, *T-Mobile for Government*, https://www.t-mobile.com/business/government/public-safety (last visited Oct. 7, 2024); Press Release, T-Mobile Introduces 'T-Priority' Featuring the World's First Network Slice for First Responders, T-Mobile (Sept. 18, 2024), https://www.t-mobile.com/news/business/t-priority-network-slice-for-first-responders; Verizon, *Verizon Frontline*, https://www.verizon.com/business/solutions/public-sector/public-safety/ (last visited Oct. 7, 2024).

[117] *Ninth Further Notice*, 38 FCC Rcd at 736, paras. 87–88.

[118] *Id.* at 736, paras. 87–88.

[119] *See. e.g.*, APCO Apr. 13, 2023, Comments at 10–11 (stating that the Band Manager should explore a variety of opportunities to leverage excess spectrum and facilitate innovation in the band, including leasing spectrum to operators of broadband networks, so long as public safety licensees are fully protected); IAFC Apr. 13, 2023, Comments at 2 ("In order to ensure integrated data flows on the incident scene, data and other communications on both the FirstNet network and the 4.9 GHz band should be integrated to present a clear picture of the incident and the responding resources and personnel to the incident commander."); FirstNet Apr. 13, 2023, Comments at 2–3; PSSA Apr. 12, 2023, Comments at 16 ("This will also ensure that priority and ruthless preemption for all public safety traffic, irrespective of which band is used, will operate consistently, seamlessly guaranteeing public safety communications are always protected from harmful interference."); American Ass'n of State Troopers May 18, 2023, Reply at 1; Corning May 15, 2023, Reply at 4; KSA May 22, 2023, Reply at 1; IAFC Apr. 11, 2024, *Ex Parte*; Nextivity May 15, 2023, Reply at 1 ("This will facilitate the availability of 5G and other advanced broadband communications and services, and ensure full interoperability of all public safety broadband communications nationwide, avoiding piecemeal, parallel networks."); FirstNet Apr. 8, 2024, *Ex Parte*; Former Presidents of APCO International Apr. 5, 2024, *Ex Parte*; Letter from Mark Heine, President, California Fire Chiefs Association, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Mar. 27, 2024) (CalChiefs Mar. 27, 2024, *Ex Parte*); Letter from Brad Hardin, President, Southwestern Division of the International Association of Fire Chiefs Southwestern Fire Chiefs Association, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Feb. 22, 2024) (SWD Feb. 22, 2024, *Ex Parte*); IAFF Feb. 16, 2024, *Ex Parte*; IACP Feb. 14, 2024, *Ex Parte*; Letter from Leslie S. Barnes, Senior Director, Government Affairs, Qualcomm, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 30, 2023); PSSA Apr. 23, 2024, *Ex Parte* at 2–4; Fraternal Order of Police Feb. 13, 2024, *Ex Parte*.

[120] Corning May 15, 2023, Reply at 4.

**Federal Communications Commission**                                        **FCC 24-114**

Fraternal Order of the Police states that the "4.9 GHz band is very much underutilized nationwide" and "making the 4.9 GHz spectrum available for nationwide FirstNet 5G deployment is the most expedient and impactful way we can operationalize" the spectrum.[121]

30.    Other stakeholders oppose use of the band by FirstNet, arguing that the band should remain separate from, and in any case a license should not be directly assigned to, FirstNet.[122]  In a related vein, T-Mobile raises concerns that "the Commission should not allow a single entity that represents only one contemplated use of the band, such as FirstNet, to become the Band Manager."[123]  Some commenters argue that FirstNet is not statutorily authorized to hold a 4.9 GHz license.[124]  While we address our authority to assign a license to the Band Manager pursuant to section 309(j)(2)(A) of the Communications Act above, we need not address stakeholders' concerns as they specifically pertain to FirstNet's statutory authority to hold a nationwide overlay license, as we are not directly assigning a nationwide license to FirstNet through our decision today.  Notwithstanding this distinction, CERCI also argues that even if the Band Manager, rather than FirstNet, holds a nationwide overlay license for the 4.9 GHz band, the Commission lacks authority to grant FirstNet indirect access to the band through a sharing agreement with the Band Manager.[125]  Specifically, CERCI claims that FirstNet's statutory authority is limited to operation in the 700 MHz band "to the exclusion of all other bands."[126]  Several commenters—and FirstNet—disagree.  PSSA notes that while the Spectrum Act directed the Commission to issue a license

---

[121] Fraternal Order of Police Feb. 13, 2024, *Ex Parte* at 1–3.

[122] *See, e.g.*, AASHTO Apr. 10, 2023, Comments at 4–5; BART Mar. 30, 2023, Comments at 11; Maryland Apr. 13, 2023, Comments at 4–5; BART May 15, 2023, Reply at 2; William Bratton et al., May 15, 2023, Reply at 3–6, 7–8; iCert May 11, 2023, Reply at 5, 7; Maryland DoIT May 15, 2023, Reply at 4–5; NSA May 15, 2023, Reply at 1–2; T-Mobile May 15, 2023, Reply at 2, 10–15; Verizon May 15, 2023, Reply at 11–15; Comments from William "Clint" McDonald, Executive Director, Southwest Border Sheriffs' Coalition, et al., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Apr. 26, 2024); CERCI Apr. 15, 2024, *Ex Parte*; Letter from Julian Gehman, American Association of State Highway and Transportation Officials, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jan. 24, 2024) (AASHTO Jan. 24, 2024, *Ex Parte*); Letter from Laura Cooper, Executive Director, Major Cities Chiefs Association, et al., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Dec. 20, 2023); Coalition Jul. 21, 2023, *Ex Parte*; Letter from Greg Kunkle, Counsel to Metropolitan Transportation Authority, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jun. 30, 2023); Letter from Budge Currier, Assistant Director, California Office of Emergency Services, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Jan. 16, 2024).

[123] T-Mobile May 15, 2023, Reply at 2 ("That is especially true when an entity – like FirstNet – would potentially take a national approach to managing the band, frustrating the needs of the broader community of public safety users, which remain local.").

[124] *See, e.g.*, CERCI May 10, 2024, *Ex Parte* ("[N]either the [Spectrum] Act nor any other statute authorizes the Commission to assign a nationwide license of the 4.9 GHz band to [FirstNet]."); CERCI Apr. 15, 2024, *Ex Parte*; CERCI Jun. 3, 2024, *Ex Parte* at 4; CERCI Jul. 10, 2024, *Ex Parte* at 4.  *But see* FirstNet Apr. 13, 2023, Comments at 1–3 ("The FirstNet Authority believes it would have the authority under the [Spectrum] Act to access and use the 4.9 GHz band spectrum for the NPSBN given the band is designated as public safety"); FirstNet Apr. 8, 2024, *Ex Parte* ("the FirstNet Authority is in a position to leverage the 4.9 GHz band for the benefit of public safety by using it to provide enhanced and innovative broadband communications services and capabilities to first responders on a nationwide basis"); PSSA May 24, 2024, *Ex Parte* at 2–6 (stating that "[t]he [Spectrum] Act further directs the establishment of a "nationwide interoperable public safety broadband network"—and, in defining the term "nationwide public safety broadband network," does not limit the "network" to the particular spectrum required to be licensed to the FirstNet Authority" and noting that the Spectrum Act "makes clear that the FirstNet Authority is not limited to spectrum subject to the mandatory license" and "authorizes the Commission to 'take any action necessary to assist the First Responder Network Authority in effectuating its duties and responsibilities under this subchapter.'"); AT&T Jun. 20, 2024, *Ex Parte* at 6–7.

[125] *See* CERCI May 10, 2024, *Ex Parte*.

[126] *Id*. at 2.

19

for the 700 MHz band to FirstNet, nothing in the statutory language limits the operation of FirstNet's NPSBN to that band.[127]   AT&T argues that, in fact, the text of the Spectrum Act demonstrates Congress' expectation that FirstNet's NPSBN would keep pace with technological advancements to ensure that first responders would be able to benefit from innovations in communications services and technologies.[128]

31.    In its comments to the *Ninth Further Notice*, FirstNet stated that it is authorized to use the 4.9 GHz band pursuant to the Spectrum Act.[129]   FirstNet reasoned that pursuant to section 1422(b) of the Spectrum Act, Congress provided flexibility for the growth of FirstNet's NPSBN, providing that the network should "initially" consist of a core network that "provides connectivity between . . . the radio access network; and . . . the public Internet or the public switched network, or both" and that it should "evolve with technological advancements."[130]   In addition, the Spectrum Act gives the Commission broad

---

[127] PSSA May 24, 2024, *Ex Parte* at 5 ("in defining the term "nationwide public safety broadband network," [the Spectrum Act] does not limit the "network" to the particular spectrum required to be licensed to the FirstNet Authority"); *see also* AT&T Jun. 20, 2024, *Ex Parte* at 6 (citing CERCI Jun. 6, 2024, *Ex Parte* at 3) ("The fact that the Spectrum Act includes 'multiple references to the 700 MHz band and its corresponding license' does not mean that [FirstNet] can only ever use the 700 MHz band . . . Rather, it simply reflects the reality that Congress directed the FCC to grant [FirstNet] a license for Band 14 to start 'development' of its NPSBN.").  FirstNet has stated that it is already operating outside the 700 MHz band on the commercial spectrum licensed to its partner, AT&T.  *FirstNet Renewal Order*, 39 FCC Rcd at 4994–95, para. 14 ("FirstNet's contract with AT&T has provided public safety NPSBN users with access to AT&T's LTE network while buildout of the Band 14 network continues."); *see also* GAO, Public-Safety Broadband Network:  Congressional Action Required to Ensure Network Continuity, GAO 22-104915 at 11 (Feb. 2022 GAO Report) ("According to FirstNet officials, FirstNet currently has negotiated access to AT&T's 5G-capable licensed commercial spectrum to begin 5G services on [FirstNet's NPSBN]."); *An Update on FirstNet: Hearing Before the Subcommittee on Communications, Technology, Innovation, and the Internet*, S. Hrg. 115-479, at 35 (Jul. 20, 2017) (discussing plans to allow FirstNet to operate on all of AT&T's licensed spectrum to "see the benefits of FirstNet on all spectrum bands"); *id.* at 51 ("Public safety has been told for many years that the magic of FirstNet happens on Band Class 14, and that's . . . not correct anymore . . . The magic happens on the AT&T network . . . [W]e've extended it far beyond the Band Class 14 to our entire network."); NSA Jun. 28, 2024, *Ex Parte* at 5 (stating FirstNet's "users have access to all AT&T's bands").

[128] AT&T Jun. 20, 2024 *Ex Parte* at 7; NREMT May 30, 2024, *Ex Parte* at 2 ("Congress . . . expressly contemplated that the NPSBN would receive upgrades as technology and spectrum resources evolved over time"); *see also* CWA Aug. 1, 2024, *Ex Parte* at 2 ("Congress intended [FirstNet] to maintain, upgrade, and improve its network.  The 4.9 GHz spectrum does precisely that by providing the needed mid-band spectrum to successfully position FirstNet as a 5G and 6G communications services provider while protecting the operations of incumbent licensees under sharing arrangements.").

[129] FirstNet Apr. 13, 2023, Comments at 2, n.9 ("The FirstNet Authority believes it would have the authority under the Spectrum Act to access and use the 4.9 GHz band spectrum for the NPSBN given the band is designated as public safety spectrum.").

[130] 47 U.S.C. § 1422(b); *see also First Responder Network Authority; Final Interpretations of Parts of the Middle Class Tax Relief and Job Creation Act of 2012*, Notice, 80 FR 63523-01, 63526 (FirstNet/DOC/NTIA 2015) ("FirstNet stated that its "interpretations of both the core network and RAN are inclusive of the language of 47 U.S.C. § 1422(b) that specifically states the national architecture must 'evolve[] with technological advancements and initially consists of' the stated core network and RAN components.  The use of the term 'initially' and the phrase 'evolve with technological advancements' in 47 U.S.C. § 1422(b) indicate that Congress understood that the definitions of the core network and RAN could not be static.  Rather, the definitions of such terms would need to be modified throughout the life of the network in order to help ensure that public safety would have a network capable of supporting and providing access to new and evolving technologies.").  The Spectrum Act also requires FirstNet to "ensure the maintenance, operation and improvement" of its NPSBN, "including by ensuring that [FirstNet] updates and revises any policies . . . to take into account new and evolving technologies" and to reinvest funds received from fees "by using such funds only for constructing, maintaining, operating or improving" the network.  47 U.S.C. §§ 1426(c)(4), 1428(d).  *But see* CERCI Jul. 10, 2024, *Ex Parte* at 6–7 (arguing that that these provisions of the Spectrum Act "cannot be read to authorize an expansion of [FirstNet's] NPSBN beyond the bounds described in the Act").

discretion to assist FirstNet in furtherance of its statutory mandate.[131] Upon review of FirstNet's analysis of its authorizing statute, rather than reading a restriction on FirstNet's authority to operate in bands other than the 700 MHz band, we concur that one of the Spectrum Act's goals is to ensure that FirstNet's NPSBN advances and evolves and that restricting FirstNet's NPSBN to the 700 MHz band would not be in line with this goal. Accordingly, we reject the argument that the Commission lacks authority to allow FirstNet to indirectly access the 4.9 GHz band through a sharing agreement.[132]

32.     CERCI further suggests that FirstNet's structure raises constitutional questions that would render it "unwise" for the Commission to grant it authority to operate in the 4.9 GHz band.[133] Even assuming *arguendo* that it is appropriate for the Commission to opine on such matters with respect to an entity housed within another agency,[134] we disagree. CERCI first argues that FirstNet's self-funding mechanism may violate the Appropriations Clause based on the "same logic" that resulted in the Fifth Circuit's holding that the Consumer Financial Protection Bureau's (CFPB) funding mechanism violated the Appropriations Clause.[135] The Supreme Court, however, recently reversed the Fifth Circuit's decision and upheld the CFPB's funding mechanism.[136] We thus find that CERCI's first argument regarding FirstNet's constitutionality lacks merit.

33.     CERCI also claims that the structure of FirstNet's Board violates the Appointments Clause because the Board's members are "Officers of the United States" and are not meaningfully supervised by a presidential appointee confirmed by the Senate.[137] NREMT and AT&T disagree, arguing that the Board's members lack the kind of "significant authority" needed to be considered officers because their decisions cannot bind others.[138] Moreover, they argue that even if FirstNet's board members were officers they would be inferior officers because they are subject to supervision by NTIA and the Secretary of Commerce.[139] As an initial matter, we agree with NREMT and AT&T as we do not believe FirstNet's Board members would be considered principal officers of the United States under the Appointments Clause. As AT&T notes, FirstNet is an independent authority housed within NTIA, which itself is an agency within the Department of Commerce.[140] In a recent report, the U.S. Government Accountability Office (GAO) observed that FirstNet "officials and Board members" stated that they were

---

[131] 47 U.S.C. § 1433 (providing that the Commission "may take any action necessary to assist" FirstNet "in effectuating its duties and responsibilities").

[132] In acknowledgement of CERCI's arguments regarding FirstNet's statutory authority to expand its spectrum, we emphasize that our decision today merely clarifies that FirstNet may access the 4.9 GHz band via a sharing agreement with the Band Manager and pursuant to section 2.103(b) of the Commission's rules. *See* CERCI Jul. 10, 2024, *Ex Parte* at 6–7. Any such sharing agreement will be subject to, and must be in accordance with, the regulatory framework of the Spectrum Act.

[133] CERCI May 10, 2024, *Ex Parte* at 9.

[134] If the Commission were to accede to CERCI's request—to treat FirstNet for purposes of this *Eighth Report and Order* as an entity that is not authorized to exist, let alone hold licenses or lease spectrum—such treatment would also logically require that the Commission disregard its Congressionally mandated responsibilities regarding licensing spectrum to FirstNet.

[135] CERCI May 10, 2024, *Ex Parte* at 10–11 (citing *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 638–39 (5th Cir. 2022)).

[136] *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, No. 22-448, 2024 WL 2193873 (May 16, 2024).

[137] CERCI May 10, 2024, *Ex Parte* at 9–10.

[138] NREMT May 30, 2024, *Ex Parte* at 5–6; AT&T Jun. 20, 2024, *Ex Parte* at 11–13.

[139] NREMT May 30, 2024, *Ex Parte* at 5–6; AT&T Jun. 20, 2024, *Ex Parte* at 11–13.

[140] *Id.* (contrasting NTIA's broad mandate to administer the federal use of spectrum with FirstNet's "single public safety mandate to build, deploy, and operate" the nationwide public safety broadband network using specific spectrum bands).

required to follow NTIA's procedures, limiting their ability to engage in independent decision-making "in operational and planning issues."[141]  As CERCI acknowledges, courts have found persons to be inferior, rather than principal, officers when they are subject to the supervision of a presidential appointee confirmed by the Senate.[142]  Moreover, FirstNet Board members, including its Chair, are subject to removal by the Secretary of Commerce at any time, with or without cause.[143]  Notwithstanding this reasoning, we likewise agree with AT&T that this issue is not relevant to the current proceeding because permitting FirstNet to access the 4.9 GHz band would not affect whether the members of the FirstNet Board should be considered officers of the United States.[144]  Absent a judicial finding that FirstNet's structure is unconstitutional or equivalent guidance from Congress, we do not find FirstNet's structure to pose a constitutional impediment.

34.      Finally, certain commenters oppose use of the 4.9 GHz band by FirstNet's NPSBN on the basis that FirstNet has not made a showing evidencing a need for additional spectrum.[145]  Other

---

[141] Feb. 2022 GAO Report at 17.  Board members also reported that it was unclear whether FirstNet's CEO and staff were accountable to the Board or to NTIA.

[142] CERCI May 10, 2024, *Ex Parte* at 9–10; *see Edmond v. United States*, 520 U.S. 651, 662–63 (1997) ("Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President:  Whether one is an 'inferior' officer depends on whether he has a superior," with an inferior officer's work "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."); *cf. United States v. Arthrex, Inc.*, 594 U.S. 1, 3 (2021) (finding certain administrative patent judges were unlawfully appointed in violation of the Appointments Clause because they could render final decisions without supervision by a politically accountable officer).

[143] FirstNet Authority Bylaws Section 3.07 (Nov. 2021), https://firstnet.gov/sites/default/files/Board%20Bylaws%2C%20November%202021.pdf.  Although the Bylaws can be amended by a majority vote of the Board, any modifications that affect the powers of the Secretary of Commerce under the Spectrum Act "shall be approved by the Commerce Secretary or his or her designee."  *Id.* at Section 6.01.  In *Edmond v. United States*, the Court found that the official in question was an inferior officer because he was subject to removal in addition to lacking power "to render a final decision on behalf of the United States unless permitted to do so by other Executive officers."  520 U.S. at 665; *see also Morrison v. Olsen*, 487 U.S. 654, 671 (1988) (acknowledging that "the line between 'inferior' and 'principal' officers is one that is far from clear," but finding that independent counsel named by a special DOJ court created by statute for such purpose was "clearly" an inferior officer because she was subject to removal by a higher Executive Branch official; was empowered by statute to perform only certain, limited duties; was limited in jurisdiction; and was limited in tenure); *In re Grand Jury Investigation*, 916 F.3d 1047, 1052–53 (D.C. Cir. 2019) (finding that a special counsel was an inferior officer because the Attorney General had plenary authority to revise regulations that protected special counsel from oversight and removal; because special counsel served at the pleasure of an Executive Branch officer, "the control thereby maintained means [he] is an inferior officer").

[144] AT&T Jun. 20, 2024, *Ex Parte* at 12–13.

[145] MCCA et al. Jun. 3, 2024, *Ex Parte* at 2; Verizon Jun. 11, 2024, *Ex Parte* at 2 ("Nothing in the record documents that FirstNet lacks access to sufficient spectrum to meet its statutory role."); NSA Jun. 28, 2024, *Ex Parte* at 5 ("FirstNet clearly does not need more spectrum, given its users have access to all AT&T's bands"); Verizon Jul. 1, 2024, *Ex Parte*; CERCI Jul. 10, 2024, *Ex Parte* at 2–3; Letter from Michael Calabrese, Director, New America's Open Technology Institute, et al., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100, at 5 (filed Jul. 23, 2024) (OTI & PK Jul. 23, 2024, *Ex Parte*); Letter from Michael Calabrese, Director, New America's Open Technology Institute, et al., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Aug. 7, 2024) (OTI & PK Aug. 7, 2024, *Ex Parte*).  Commenters citing the Department of Commerce's Inspector General report also stated that FirstNet should "focus on fixing its coverage problem, not expanding its spectrum holdings."  *See, e.g.*, MCCA et al. Jun. 3, 2024, *Ex Parte* at 2; CERCI Jun. 25, 2024, *Ex Parte* at 1–4; Inspector General, U.S. Department of Commerce, Final Report No. OIG-24-027-A, FirstNet Authority's Lack of Contract Oversight for Device Connection Targets Puts the NPSBN at Risk of Impacting First Responders' Use of the Network (Jun. 12, 2024) (OIG Report); CERCI Jul. 10, 2024, *Ex Parte* at 12–13; Letter from Kenneth Corey, et al., Chairman, Coalition for Emergency Response and Critical Infrastructure et al., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100, at 1–2 (filed Aug. 13, 2024).  As background, the OIG Report is the result of an audit conducted

(continued….)

commenters such as iCERT state that FirstNet's operation in the 4.9 GHz band would be "incompatible with existing or future public safety uses of the band."[146]  Similarly, AASHTO argues that access by FirstNet would disrupt existing public safety operations, take away current priority treatment in the 4.9 GHz band, and also remove state and local public safety's ability to design their own networks.[147]  As an initial matter, we disagree with commenters suggesting that such a showing is needed as there are multiple public interest benefits that will flow from FirstNet's future access, including furtherance of FirstNet's statutory mission,[148] providing additional support and services to its public safety subscribers,[149] and maximizing the overall use of 4.9 GHz band.[150]  FirstNet has stated that, if authorized to operate in

(Continued from previous page) ─────────────────

by the Department of Commerce "[d]ue to the importance of maintaining and growing public safety adoption of the NPSBN" and to ensure FirstNet's adequate oversight of AT&T.  OIG Report at 3–4.  Upon completing its review, the Assistant Secretary of Commerce and the NTIA were asked to direct FirstNet to comply with three recommendations.  *See* OIG Report at 12.  NTIA "concur[ring] with all of the recommendations" stated that it will prepare a formal action plan upon issuance of the OIG's final report.  OIG Report, Appx. B (NTIA's Response to the Draft OIG Report).  We find that NTIA's response to the draft OIG Report is sufficient to show that the NTIA will ensure that FirstNet satisfies the three recommendations.  *See* NTIA's Response to the Draft OIG Report; *see also* MFCA Jul. 8, 2024, *Ex Parte* at 2 (explaining that FirstNet "faces a robust oversight environment").  Because of this, we also find that the OIG Report does not impact our decision to allow FirstNet to integrate the 4.9 GHz band into its NPSBN at this time.  We direct FirstNet to notify us when it has met the OIG's outstanding recommendations.  We will continue to monitor AT&T's performance under the contract and FirstNet's oversight of AT&T under FirstNet's license.  *See, e.g.*, *February 22, 2024 AT&T Mobility Network Outage Report and Findings*, Report (PSHSB Jul. 22, 2024).

[146] iCERT May 11, 2023, Reply at 5; *see also* Letter from George Kelemen, Executive Director, Industry Council for Emergency Response Technologies, Inc., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Feb. 7, 2024) (iCERT Feb. 7, 2024, *Ex Parte*); EEI Jul. 9, 2024, *Ex Parte* at 2.  *See also* Letter from Charlie Vazquez, President, The Florida Police Chiefs Association, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Sept. 5, 2024) (FPCA Sept. 5, 2024, *Ex Parte*) (arguing that dedicated public safety spectrum that is not currently in use is important for redundancy); Letter from Don Barnes, President, California State Sheriffs' Association, et al., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Sept. 23, 2024) (citing FPCA Sept. 5, 2024, *Ex Parte*); Letter from Edgardo Grajales, Director of Volunteer Firefighting Services, Florida State Firefighters Association, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Sept. 27, 2024).

[147] AASHTO Jan. 24, 2024, *Ex Parte*.

[148] PSSA May 24, 2024, *Ex Parte* at 1 (stating that granting FirstNet access gives it "the ability to comply with its statutory mandate to create a nationwide interoperable public safety network that meets the life-saving, mission-critical technological needs of first responders").

[149] Several commenters note that "many 4.9 GHz incumbents are already subscribers on [FirstNet's] NPSBN or are eligible to be subscribers."  AASHTO Jan. 24, 2024, *Ex Parte* at 1; *see also* MFCA Jul. 8, 2024, *Ex Parte* at 2 ("the FirstNet Authority has a network of more than 6 million users and relationships with the commercial vendor community, which will foster the Commission's goal of greater utilization of the 4.9 GHz network"); MFCA Jul. 8, 2024, *Ex Parte* at 2 ("the FirstNet Authority provides local control to its members, allowing them to directly control priority levels for their personnel and for all personnel responding to incidents in their jurisdiction"); IAFC Apr. 11, 2024, *Ex Parte* at 1 ("FirstNet can eliminate the burden of local communities trying to build out their own public safety communications network. This fact is especially important in rural areas that are geographically larger to cover and have less funding to pay for a local network.").

[150] *See, e.g.*, NREMT May 30, 2024, *Ex Parte* at 1–2 ("A diverse array of public safety stakeholders have confirmed that deploying 4.9 GHz spectrum on the NPSBN will maximize the use of the band to support public safety use, including 5G."); PSSA May 24, 2024, *Ex Parte* at 7 ("Such an arrangement will be the most-efficient way of implementing such use and ensuring the full utilization of the band, while still protecting incumbent licensees across the band from harmful interference."); FirstNet Apr. 13, 2023, Comments at 3 n.12 ("The FirstNet Authority's mission is in alignment with the FCC's objectives for the 4.9 GHz band to spur innovative uses in the band and provide increased access to rural, tribal, and other underserved areas."); IAFC Apr. 11, 2024, *Ex Parte* at 2 ("To ensure greater use of the 4.9 GHz band, it will be helpful to have devices that operate on the 4.9 GHz and FirstNet's

(continued….)

the band, it sees the 4.9 GHz band as a "potential avenue to provide enhanced broadband communication services, features, and capabilities—including 5G—for public safety."[151]  Commenters likewise stated that authorizing FirstNet's access in the band would not only aid FirstNet in ensuring that it continues the operation, maintenance, and improvement of its NPSBN, but also in meeting public safety's need for dedicated 5G spectrum.[152]

35.    Based upon the statutory requirement that FirstNet promote competition and utilize equipment that is interoperable and backward-compatible with existing commercial networks, we do not believe that enabling FirstNet's operations in the band will be incompatible with existing use of the band by incumbent public safety licensees.[153]  We also believe that our decision today will not disrupt existing public safety operations, take away current priority treatment in the 4.9 GHz band, or remove public safety's ability to design their own networks as our decision today does not authorize the Band Manager or FirstNet to alter or eliminate the rights of incumbent licensees.[154]  Instead, our decision authorizes the Band Manager to share the currently unassigned spectrum with FirstNet in a manner that protects

---

(Continued from previous page) ————————————————

700 MHz band.  Also, it is much more convenient for first responders in emergency situations to access capabilities on the 4.9 GHz and 700 MHz bands on one device.").

[151] FirstNet Apr. 13, 2023, Comments at 2; *id.* at 4 ("First responders nationwide rely on FirstNet to better serve their communities, and opportunities to leverage the 4.9 GHz spectrum to enhance the broadband tools available to and he network experience for the public safety community would undoubtedly further the public interest."); *see also* FirstNet Apr. 8, 2024, *Ex Parte*.

[152] FirstNet Apr. 13, 2023, Comments at 1; AT&T Jun. 20, 2024, *Ex Parte* at 5; MFCA Jul. 8, 2024, *Ex Parte* at 1 ("The 4.9 GHz band is a mid-band spectrum that can be used to support FirstNet 5G services while protecting incumbent uses in the band.  For the fire and emergency service, the 5G spectrum presents an opportunity to develop technology to track firefighters in buildings; support Unmanned Aerial Systems and robots; and improve the data available to an incident commander on the scene in a major incident."); *see also* Feb. 2022 GAO Report at 11 ("FirstNet officials and AT&T stated that additional spectrum may be required in the future to upgrade the network to 5G and maintain parity with other carriers, as 5G data capabilities function better at spectrum frequencies higher than Band 14.").

[153] *See* 47 U.S.C. § 1426(b)(2)(B); *FirstNet Renewal Order*, 38 FCC Rcd at 4999–50, para. 28.

[154] *See generally* MFCA Jul. 8, 2024, *Ex Parte* at 2 (explaining FirstNet's "focus on priority and ruthless preemption ensures that public safety communications will be completed no matter the size of the disaster area or the status of commercial networks."); *id.* ("the FirstNet Authority provides local control to its members, allowing them to directly control priority levels for their personnel and for all personnel responding to incidents in their jurisdiction" and "FirstNet users would be able to utilize the 4.9 GHz band alongside its existing operations on the 700 MHz band on one device").  We also note that some stakeholders oppose FirstNet's access to the 4.9 GHz band based on its contractual relationship with its network partner AT&T, pursuant to which as consideration in that contract, AT&T may use excess network capacity on FirstNet's NPSBN on a secondary, interruptible basis.  *See, e.g.*, CERCI Jun. 25, 2024, *Ex Parte* at 4; Verizon Jun. 11, 2024, *Ex Parte* at 2–3; EEI Jul. 9, 2024, *Ex Parte* at 2; Letter from Russell P. Hanser, Deputy Chief Legal Officer, NCTA, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100, at 2–3 (filed Jul. 9, 2024) (NCTA Jul. 9, 2024, *Ex Parte*); OTI & PK Jul. 23, 2024, *Ex Parte* at 3–5; OTI & PK Aug. 7, 2024, *Ex Parte* at 1–2.  Similarly, other stakeholders oppose access by FirstNet arguing that providing such access would require incumbents to compete with a commercial entity.  *See, e.g.*, Letter from Monte McClain, Vice Chairman, Wyoming Public Safety Communications Commission, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Sept. 27, 2024); *See also* Letter from Kenneth Corey, et al., Chairman, Coalition for Emergency Response and Critical Infrastructure, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100 (filed Oct. 7, 2024).  As AT&T stated, under the model we adopt today, it is not receiving a "license, lease, or other spectrum use authorization for any 4.9 GHz band spectrum."  AT&T Jun. 20, 2024, *Ex Parte* at 13–14.  Further, AT&T acknowledges that while it has "secondary, interruptible use rights" as consideration for maintaining and operating FirstNet's NPSBN, the primary benefit of the Band Manager sharing model we adopt is that "the Band Manager would allow [FirstNet] to use the 4.9 GHz band to support upgrades to the NPSBN."  *Id.*

incumbent licensees' existing operations.[155]  In sum, we believe that this decision and the Band Manager's oversight role in this process will increase overall utilization of the band, enhance public safety coordination, and allow incorporation of the latest commercially available technologies into the band.[156]

36.    In furtherance of this model, we clarify that section 2.103(b) of the Commission's rules may enable any federal stations used by FirstNet to operate in the band pursuant to its anticipated sharing agreement with the Band Manager.[157]  Similarly, we also clarify that this section may enable any federal stations used by FirstNet to operate in the band pursuant to a sharing agreement with incumbent licensees where that agreement is also consistent with section 90.1203(b) of our rules.[158]  While federal entities generally are not authorized by the Commission to use non-federal frequencies, limited exceptions exist

---

[155] T-Mobile argues that the Commission must add the 4.9 GHz band to the spectrum screen if it finds that the band should be "added to FirstNet's license" and suggests that AT&T's secondary access means the spectrum will be "principally *available* for mobile broadband services."  *See* T-Mobile May 15, 2023, Reply at 15–16.  We disagree. The current standard for evaluating whether bands should be included in the spectrum screen is whether the spectrum is "suitable" and "available" for the provision of mobile telephony/mobile broadband services.  *Policies Regarding Mobile Spectrum Holdings; Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, WT Docket No. 12-269, GN Docket No. 12-268, Report and Order, 29 FCC Rcd 6133, 6170, para. 75 (2014) (*MSH Report and Order*).  In the *MSH Report and Order*, the Commission reasoned that because the Upper 700 MHz spectrum reallocated to FirstNet is designated for public safety purposes, it "is [not] suitable and available for the provision of mobile telephony/mobile broadband services" and "[w]e will not add to the screen any of this spectrum merely because FirstNet has entered into leasing arrangements contemplated by the [Spectrum] Act." *Id.* at 6188, paras. 129–30.  Consistent with this past precedent, we will not include the 4.9 GHz band in the spectrum aggregation screen as the 4.9 GHz band is primarily allocated for public safety and is therefore not suitable and available for the provision of mobile telephony/mobile broadband services in the same manner as other spectrum bands that currently are included in the Commission's spectrum screen.

[156] *See, e.g.*, iCERT May 11, 2023, Reply at 5; Fraternal Order of Police, et al., Apr. 26, 2024, *Ex Parte* at 1–3 ("The most efficient and cost-effective way to achieve this goal is to grant a nationwide license to FirstNet, or similarly alternative means that are found to be procedurally appropriate, which may include the sharing agreement as articulated by PSSA."); CalChiefs Mar. 27, 2024 *Ex Parte* at 2; SWD Feb. 22, 2024, *Ex Parte* ("FirstNet is vitally important to interoperability"); IAFC Feb. 16, 2024, *Ex Parte*; IAFF Feb. 16, 2024, *Ex Parte*; Fraternal Order of Police Feb. 13, 2024, *Ex Parte*.

[157] CERCI argues that FirstNet cannot lease or otherwise receive usage rights for the 4.9 GHz band from a Band Manager without violating the Anti-Deficiency Act (ADA).  *See* CERCI May 10, 2024, *Ex Parte* at 5–7 ("The ADA provides, in relevant part, that 'an officer or employee of the United States Government' may not 'involve [the U.S.] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.'"); *id.* ("But Congress has not appropriated funds for [FirstNet] to lease a nationwide spectrum band worth approximately $15 billion. Nor has Congress otherwise 'authorized by law' that [FirstNet] may undertake such a leasing arrangement or commit itself to constructing and operating facilities using that spectrum."); *see also* 31 U.S.C. § 1341(a)(1)(B).  FirstNet, as an independent establishment within NTIA, has been given broad general powers by Congress.  47 U.S.C. § 1426(a).  How a separate agency satisfies the applicable requirements of Title 31 of the U.S. Code, including the ADA, consistent with its organic grant of authority from Congress is not within the FCC's purview.  That said, we note that FirstNet has been given broad general powers by Congress in support of its NPSBN, with authority to "obtain grants and funds from and make contracts with" various entities; to "accept, hold, administer, and utilize gifts, donations, and bequests of property"; to "spend funds" for purposes that will advance or enhance public safety communications; and to "take such other actions as may be necessary" to further its statutory mission.  47 U.S.C. § 1426(a); *see also* PSSA May 24, 2024, *Ex Parte* at 5; NREMT May 30, 2024, *Ex Parte* at 4 (arguing that Congress did not need to appropriate specific funds for FirstNet operations in the 4.9 GHz band because FirstNet is authorized by law to use the 4.9 GHz band in support of the nationwide public safety broadband network).  Moreover, as CERCI acknowledges, details about any sharing arrangement between the Band Manager and FirstNet have not been finalized, making any ADA challenge premature.  *See* CERCI Jun. 6, 2024, *Ex Parte* at 5; CERCI Jul. 10, 2024, *Ex Parte* at 7.

[158] 47 CFR § 90.1203(b).

where the Commission finds that doing so would be in the public interest, as codified in section 2.103.[159] The Commission has found that both federal and non-federal public safety entities "could benefit from the same broadband communications technologies contemplated for this band."[160] Thus, we agree that the current structure of section 2.103 permits federal stations meeting certain conditions to operate on non-Federal spectrum and may in the instant scenario permit federal stations used by FirstNet to access the Band Manager's licensed spectrum pursuant to the anticipated sharing agreement.[161]

37.     Although we are not making a determination today regarding whether all of the requirements in section 2.103(b) of our rules are met—as that determination would be premature given the Band Manager and FirstNet have yet to enter into a sharing agreement—we anticipate that section 2.103(b) would enable any federal stations used by FirstNet to access the 4.9 GHz band pursuant to such future sharing agreement and direct the Band Manager, once selected, and FirstNet to follow the relevant procedures established in the 700 MHz context.[162] We believe that this approach closely aligns with our decision in the *Third Report and Order* to allow licensees to enter into agreements with federal entities, and in the *700 MHz Service Rules Report and Order* where we permitted federal government use of 700 MHz public safety spectrum.[163]

### C.     Band Manager Responsibilities

38.     Based on the record in response to the *Ninth Further Notice* and our decision today, we clarify that the Band Manager will continue to be tasked with the responsibilities that the Commission assigned to it in the *Seventh Report and Order*.[164] We also amend our rules to give the Band Manager

---

[159] *See 4.9 GHz Third Report and Order*, 18 FCC Rcd at 9163, para. 25 n.76 (citing *700 MHz Second Report and Order*, 15 FCC Rcd at 5313, paras. 64–66) ("Although Section 305 of the Act precludes the Commission from licensing stations belonging to and operated by the federal Government, NTIA, the entity empowered with managing federal use of spectrum, agrees that such restrictions do not bar federal entities from use of spectrum managed by the Commission.").

[160] *4.9 GHz Third Report and Order*, 18 FCC Rcd at 9163, para. 25.

[161] *See* 47 CFR § 2.103(b); *see also* AT&T Jun. 20, 2024, *Ex Parte* at 4 ("[FirstNet] could obtain access to the band under this rubric today because its stations would be used for interoperability, the Band Manager would provide approval on behalf of incumbent licensees, operation would be in accordance with applicable rules, and [FirstNet] is authorized by the [2012] Act to enter into any necessary agreements with the Band Manager"); NREMT May 30, 2024, *Ex Parte* at 1–2, 3; PSSA May 24, 2024, *Ex Parte* at 6–7. We note that CERCI's arguments as it pertains to its opposition of PSSA's proposal to amend section 2.103 does not apply to our decision today because we are not amending that rule. *See* CERCI May 10, 2024, *Ex Parte* at 2–4.

[162] *See generally The Development of Operational, Technical and Spectrum Requirements for Meeting Federal, State and Local Public Safety Agency Communication Requirements Through the Year 2010*, WT Docket No. 96-86, First Report and Order and Third Notice of Proposed Rulemaking, 14 FCC Rcd 152, 185, para. 67 (1998) (*700 MHz Service Rules Report and Order*) ("Requests for Federal use of 700 MHz band frequencies must be filed with the Commission by the state or local governmental licensee (for the 700 MHz band frequencies involved) that supports the Federal use. Additionally, Federal entities must submit their requests to use non-Government spectrum with NTIA in accordance with Section 305 of the Act."); *The Development of Operational, Technical and Spectrum Requirements for Meeting Federal, State and Local Public Safety Agency Communication Requirements Through the Year 2010*, WT Docket No. 96-86, Second Memorandum Opinion and Order, 15 FCC Rcd 16844, 16866–69, paras. 47–54 (2000) (*700 MHz Second MO&O*).

[163] *4.9 GHz Third Report and Order*, 18 FCC Rcd at 9163, para. 25; *see also 700 MHz Service Rules Report and Order*, 14 FCC Rcd at 184–87, paras. 63–69 ("Although we conclude herein that Federal entities are ineligible for Commission licensing in the 700 MHz band, they are eligible to receive authorization to use this spectrum in accordance with the requirements set forth in Section 2.103 of our rules for Government use of non-Government spectrum."); *700 MHz Service Rules Report and Order*, 14 FCC Rcd at 186, para. 67; *700 MHz Second MO&O*, 15 FCC Rcd at 16863–68, paras. 41–54.

[164] *See Seventh Report and Order*, 38 FCC Rcd at 713–14, paras. 23–24; *see also* 47 CFR § 90.1217(a)–(c) ("The 4.9 GHz Band Manager will have the following three primary responsibilities:  (a) Frequency coordination for

(continued....)

additional responsibilities to effectively implement the licensing and sharing regime described above.[165] Thus, the Band Manager's primary responsibilities will now include: (1) frequency coordination and interference protection for the operations of existing incumbent public safety licensees; (2) managing a spectrum sharing agreement with FirstNet; (3) incentivizing the use of the latest commercially available technologies; (4) facilitating non-public safety access through leasing; and (5) submitting an annual report to the Commission. We also decline to make a determination as it pertains to allowing non-public safety operations in the band through a Band Manager-facilitated leasing model as this is not the best method of increasing utilization of the band at this time.

### 1.    Frequency Coordination and Interference Protection for Incumbent Licensees

39.    In the *Seventh Report and Order*, the Commission stated that the Band Manager would be responsible for performing the frequency coordination function for public safety applicants seeking to license new or modify existing facilities in the band, thus ensuring the efficient assignment and use of spectrum by public safety licensees.[166] In doing so, the Commission noted that the Band Manager is responsible for advising and helping public safety licensees to design their deployments in order to promote efficient and robust use of the band and prevent harmful interference to other licensees.[167] The Commission explicitly stated that the Band Manager does not have the authority to disallow proposed public safety operations or otherwise limit public safety operations once a public safety entity is licensed to operate in the band.[168] Instead, notwithstanding the current administrative freeze on new public safety license applications and modifications,[169] the Band Manager will provide public safety licensees and applicants with recommendations for the technical characteristics of a proposed system, subject to Commission review in the case of any objections to such recommendations.[170]

40.    The Commission also stated in the *Seventh Report and Order* that the Band Manager will perform its frequency coordination duties consistent with the Commission's rules and with input from public safety licensees and applicants to ensure that they are able to access sufficient spectrum for their operations.[171] In establishing that the Band Manager is responsible for frequency coordination and management of the public safety operations, the Commission sought comment on issues related to the scope and implementation of the Band Manager's frequency coordination responsibilities.[172] While commenters are divided on whether and when the Commission should adopt specific interference

---

(Continued from previous page) ⸻

public safety applications; (b) Incentivizing the use of the latest commercially available technologies, including 5G; and (c) Facilitating non-public safety use of the 4.9 GHz band.").

[165] Specifically, our decision today does not eliminate the three primary responsibilities assigned to the Band Manager, but rather adds to the Band Manager's responsibilities in an effort to increase public safety use of the band. *See generally* WISPA Jul. 11, 2024, *Ex Parte* at 5 ("Requests for the Commission to appoint a nationwide licensee are essentially a late-filed petition for reconsideration that ask the Commission to revisit the Band Manager model and eliminate the three primary responsibilities assigned to the Band Manager."); *see also* OTI & PK Jul. 23, 2024, *Ex Parte* at 2; OTI & PK Aug. 7, 2024, *Ex Parte* at 2.

[166] *Seventh Report and Order*, 38 FCC Rcd at 713–14, paras. 23–24.

[167] *Id.* at 713–14, paras. 23–24.

[168] *Id.* at 713–14, paras. 23–24.

[169] *See infra*, section III(E).

[170] *Seventh Report and Order*, 38 FCC Rcd at 713–14, paras. 23–24.

[171] *Id.* at 713–14, 718–21, paras. 23–24, 36–43; *Ninth Further Notice*, 38 FCC Rcd at 732–36, paras. 73–86.

[172] *Ninth Further Notice*, 38 FCC Rcd at 732–36, paras. 73–86.

criteria,[173] a majority of commenters generally support the adoption of rules that require the Band Manager to protect incumbent users.[174]  For example, CERCI notes that protection of incumbent users is a critical need because "public-safety systems must be tailor-made to best fit the needs of each jurisdiction" and public safety licensees must continue to have the right to "build, own, and operate locally implemented public-safety systems to meet local needs."[175]  Similarly, the National Fraternal Order of Police, IAFF, and IACP, in expressing support for allowing FirstNet to access the band, ask the Commission to ensure that "[i]ncumbent 4.9 GHz licensee operations [are] protected and continue without any interference to existing communication networks."[176]

41.    After review of the record, we revise the Band Manager's responsibilities such that it will be responsible for frequency coordination and interference protection for incumbent public safety licensees, as outlined in our current and any future rules that may be adopted for this band.[177]  With

---

[173] *See, e.g.*, AASHTO Apr. 10, 2023, Comments at 4; APCO Apr. 13, 2023, Comments at 10; BART Mar. 30, 2023, Comments at ii, 4; EEI Apr. 13, 2023, Comments at 11; Federated Wireless Apr. 13, 2023, Comments at 18–19; Qualcomm Apr. 13, 2023, Comments at 11–12 (the adoption of specific interference criteria "may unduly constrain the Band Manager's ability to improve the band's utilization for enhanced public safety while supporting non-public safety applications"); *id.* ("The Band Manager should be empowered to ensure public safety operations are protected from interference."); TDD Apr. 13, 2023, Comments at 4–5; Motorola Apr. 13, 2023, Comments at 7 ("Fundamentally, the process should be accommodating to a multiplicity of technologies and network deployments including fixed, point-to-point, point-to-multipoint, and mobile operations.  [Motorola] sees no reason to standardize technology usage in the band or mandate the use of any particular spectrum."); GWTCA May 1, 2023, Reply at 2; Cal OES May 15, 2023, Reply at 3 ("In the case of frequency use that must be coordinated along state borders, the Band Manager can make recommendations to mitigate interface and maximize the use of the band to support each state's plan."); Federated Wireless May 15, 2023, Reply at 5–6 ("There is established precedent for the Commission to define the interference protection criteria."); MTA May 15, 2023, Reply at 5 (citing BART Mar. 30, 2023, Comments); NCTA May 15, 2023, Reply at 1–4 (adopting a band-specific definition "is unnecessary and would set a problematic precedent that could inhibit efficient coexistence in other spectrum bands"); WISPA May 15, 2023, Reply at 18–19 (reiterating the definition of "harmful interference" from section 90.7).

[174] *See, e.g.*, iCERT Apr. 10, 2023, Comments at 3 ("The Band Manager's inclusion is necessary to ensure it can adequately fulfill its responsibilities for promoting band sharing arrangements that support the interests of all affected licensees."); BART Mar. 30, 2023, Comments at 4–6 (proposing that "[t]he 4.9 GHz Band Manager will be responsible for protecting incumbent licensees from harmful interference"); PSSA Apr. 12, 2023, Comments at 17 ("[PSSA] believes all oversight, enforcement, and dispute resolution with respect to the 4.9 GHz Band should be handled by the Nationwide Licensee with the assistance of the band manager through processes determined by the Nationwide Licensee."); EEI Apr. 13, 2023, Comments at 11; Cal OES May 15, 2023, Reply at 3; Federated Wireless May 15, 2023, Reply at 5–6; MTA May 15, 2023, Reply at 5 (citing BART Mar. 30, 2023, Comments).

[175] CERCI Feb. 6, 2024, *Ex Parte* at 3–4; *see also* Letter from Greg Kunkle, Counsel to Metropolitan Transportation Authority, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100, at 1–2 (filed Jun. 11, 2023) (MTA Jun. 11, 2024, *Ex Parte*); CalChiefs Mar. 27, 2024, *Ex Parte* at 2 ("Frequency coordination can mitigate the threat of interference, while simultaneously allowing for the 4.9 GHz spectrum to be operationalized" by FirstNet); IACP Feb. 14, 2024, *Ex Parte* at 2 (urging "the Commission to protect and preserve the 4.9 GHz spectrum for public safety use" and "protect incumbent public safety users"); CalChiefs Mar. 27, 2024, *Ex Parte* at 2 ("Where the band is in use today by state and local entities, we recommend the FCC adopts reforms to preserve priority access to the band for incumbent licensees, so they can continue their existing operations."); SWI Jun. 3, 2024, *Ex Parte* at 1 ("emphasiz[ing] the need to retain the 4.9 GHz spectrum for direct public safety use and to protect existing licensees' operations"); PSSA Apr. 23, 2024, *Ex Parte* at 4 (asking the Commission to clarify that one of the Band Manager's responsibilities includes "protecting incumbent operations from harmful interference").

[176] Fraternal Order of Police, et al., Apr. 26, 2024, *Ex Parte* at 1.

[177] *See* 47 CFR § 90.1217(a).  We have not made a determination as it pertains to the implementation of the criteria for harmful interference and mediation that we sought comment on in the *Ninth Further Notice.*  38 FCC Rcd at 732–36, paras. 75–86.  Consequently, since we are declining to adopt a definition for harmful interference at this time, we remove a cross-reference in section 90.175(g)(2) of our rules which refers to the Band Manager performing its frequency coordination duties according to an interference standard adopted by the Commission.  We remind all

(continued….)

respect to protecting incumbent public safety licensees from harmful interference, we emphasize the importance of the collection of granular technical data that the Commission initiated in the *Seventh Report and Order* as the results will aid the Band Manager in identifying specific frequency usage across all deployments in the band, performing its role as frequency coordinator, and pinpointing potentially unused channels within areas covered by certain geographic licenses.[178]  Consistent with the Commission's decision in the *Seventh Report and Order*, and notwithstanding the limitations imposed by the current administrative freeze on public safety license applications and modifications, incumbent licensees will be given the opportunity to work with the Band Manager to optimize and coordinate their spectrum use.  Moreover, we also require the Band Manager to consider the incumbents' input when performing its frequency coordination duties and when authorizing operations in the band, including pursuant to the Band Manager's sharing agreement with FirstNet.[179]  We believe that this decision will best advance our goal of preserving and expanding use to a variety of primary public safety operations while also ensuring adequate protections for incumbent operations.

## 2. Managing a Spectrum Sharing Agreement with FirstNet

42.    For the reasons set forth in greater detail *supra*, we intend to issue a nationwide overlay license to the Band Manager, once selected, and authorize the Band Manager to enter into a sharing agreement with FirstNet for use of unassigned spectrum in the band.[180]  Consistent with this responsibility, the Band Manager will be authorized to share its licensed spectrum with FirstNet, enabling it to operate on any otherwise unassigned channel in the 4.9 GHz band pursuant to the current section 2.103(b) and new section 90.1207(h) of the Commission's rules and the terms of the sharing agreement.[181]  To ensure the efficient use of the band, we also find it appropriate to establish parameters that the Band Manager must abide by when entering into its sharing agreement with FirstNet.  PSSA proposes that FirstNet's operations pursuant to the sharing agreement should be contingent upon FirstNet's compliance with the Commission's rules governing this band, inclusion of any conditions agreed upon by the Commission and the NTIA, and prevention and mitigation of any harmful interference to incumbent licensees.[182]  After review of the record, we agree that any sharing agreement entered into by FirstNet and

---

(Continued from previous page)
licensees that they should continue to utilize the definition of "harmful interference" that is already defined in the Commission's part 90 rules.  47 CFR § 90.7 (defining harmful interference as "any emission, radiation, or induction which specifically degrades, obstructs, or interrupts the services provided by such stations").

[178] *See Seventh Report and Order*, 38 FCC Rcd at 717–18, para. 34; *see* 47 CFR § 90.1207(e)(1)–(2).  CERCI argues that prior to the Commission implementing "any plan to transfer the 4.9 GHz band from local public safety to [FirstNet]," it must first conduct the granular licensing data collection "which is presumably a prerequisite for the Commission to ensure adequate, enforceable, and lasting protection for" incumbent licensees. Letter from Roger C. Sherman, CERCI Policy Advisor, Coalition for Emergency Response and Critical Infrastructure et al., to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100, at 1–2 (filed Sept. 18, 2024) (CERCI Sept. 18, 2024, *Ex Parte*). While we believe that the results of the granular licensing data collection will be a vital tool that will aid the Band Manager in performing its frequency coordination and interference protection duties, the results of the data collection are not required for us to authorize the overlay licensing process and sharing agreement framework described herein.

[179] *Seventh Report and Order*, 38 FCC Rcd at 713–14, paras. 23–24.  Our decision today clarifies that the Band Manager and FirstNet may enter into a sharing agreement pursuant to section 2.103(b) of our rules.  Thus, in accordance with that section, we will only require the consent of the licensee that is entering into the sharing agreement with FirstNet.  *See generally* MTA Jun. 11, 2024, *Ex Parte* at 1–2 ("to the extent FirstNet engaged in the shared use of unused portions of the 4.9 GHz band, that it be required to obtain consent from potentially impacted incumbent licensees, such as MTA").

[180] *See supra*, sections III(A), (B).

[181] *See, e.g.*, 47 CFR § 90.1203, *et seq.*

[182] *See supra* note 174 (citing PSSA Apr. 12, 2023, Comments at 17).

the Band Manager should be contingent upon compliance with these requirements. We believe that this will ensure that incumbent licensees are protected from interference, that the sharing agreement comports with section 2.103(b) of the Commission's rules, and that FirstNet operates in accordance with the Commission's rules governing operation in the band.

43.    Prior to entering into its sharing agreement with FirstNet, the Band Manager will be required to make a filing associated with its license in ULS certifying to the Commission that the sharing agreement will be consistent with sections 2.103(b) and 90.1207(h) of the Commission's rules, and operations undertaken per the sharing agreement will not cause harmful interference to incumbent licensees.[183]  If such interference occurs, the Band Manager must require FirstNet to immediately cease operations. We will also require the Band Manager to certify that FirstNet has placed stations in operation within twelve months from the execution date of the sharing agreement.[184]  We believe that this decision is consistent with our decision in the *Seventh Report and Order* to harmonize the construction deadlines for the 4.9 GHz band with the deadlines of section 90.155, which is the analogous rule for the majority of part 90 radio services.[185]  We delegate authority and direct the Bureaus to establish the form and process for the submission of the required certifications detailed *supra*.[186]  Finally, we find that the existing renewal standards and requirements that apply to our part 90 licenses will apply to the nationwide overlay license.[187]

### 3.    Technological Innovation

44.    In the *Seventh Report and Order*, the Commission found that the Band Manager would be responsible for determining and recommending, as part of a spectrum plan for the band and for the benefit of any interested licensees and lessees, how best to incorporate the latest commercially available technologies, including 5G, into the 4.9 GHz band in a manner that supports and protects public safety operations.[188]  The Commission also sought comment in the *Ninth Further Notice* on how to encourage the widespread deployment of the latest commercially available technologies in a way that would promote

---

[183] In its *ex parte*, CERCI argues that "[u]nder the private non-delegation doctrine, 'a private entity may wield government power only if it 'functions subordinately' to an agency with 'authority and surveillance' over it.'" CERCI May 10, 2024, *Ex Parte* at 8–9 (citing *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 881 (5th Cir. 2022)); *see also* CERCI Jul. 10, 2024, *Ex Parte* at 9–10.  CERCI further states that "Congress or an agency may delegate governmental authority to a private entity only if that entity's 'role is merely 'as an aid' to a government agency that retains the discretion to 'approve[], disapprove[], or modif[y]' them.'" *Id.* (citing *Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*, 721 F.3d 666, 671 (D.C. Cir. 2013) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940)), *vacated and remanded on other grounds*, 575 U.S. 43 (2015)).  Our decision today does not "delegate governmental authority" to the Band Manager in a manner that allows the Band Manager to make decisions without Commission oversight.  Instead, the Band Manager would operate as an FCC licensee, to whom the Commission would issue a nationwide overlay license.  Prior to entering into a sharing agreement for use of spectrum pursuant to that license, the Band Manager will be required to make a filing in ULS that includes certifications to the Commission.

[184] *See* 47 CFR § 90.1209(d) ("Stations must be placed into operation within twelve (12) months from the date of grant in accordance with § 90.155.  Licensees of temporary fixed stations must place at least one such station in operation within twelve months of license grant.").

[185] *Seventh Report and Order*, 38 FCC Rcd at 729, para. 66 (citing 47 CFR § 90.155).

[186] We likewise direct the Bureaus to utilize the Commission's recent decision as a guide when establishing the form and process for this certification.  *See Single Network Future: Supplemental Coverage from Space, Space Innovation*, WP Docket No. 23-65 and IB Docket No. 22-271, Report and Order and Further Notice of Proposed Rulemaking, FCC 24-28, at 44–46, paras. 105–09 (rel. Mar. 15, 2024) (*SCS Report and Order*).

[187] *See* 47 CFR § 1.949 (application for renewal of authorization).

[188] *Seventh Report and Order*, 38 FCC Rcd at 714–15, paras. 25–27.

interoperability while also lowering equipment costs.[189]  In keeping with our ultimate goal of protecting public safety operations, we want to reemphasize that in the *Seventh Report and Order* the Commission declined to mandate the use of such technologies in the band.  We also want to remind stakeholders that the Commission required the Band Manager to seek input from and work with incumbent licensees to facilitate the deployment of advanced wireless technologies in a manner that supports and protects public safety users.  We believe that in addition to designating the Band Manager to develop this spectrum plan, our decision today to enable FirstNet's access to unassigned portions of the band is another step towards reaching our goal of incentivizing use of the latest commercially available technologies in the band.  We agree with commenters, such as the National Fraternal Order of the Police, IAFC, and IAFF, that leveraging FirstNet's NPSBN is one of the most "efficient and cost-effective way[s] to reach this goal."[190]

### 4.    Non-Public Safety Access through Leasing

45.    In the *Seventh Report and Order*, the Commission determined that it would open up the band to include non-public safety operations which would rely on a Band Manager-facilitated spectrum leasing framework premised on the Band Manager's analysis of where, when, and at what frequencies non-public safety operations can take place without impacting public safety operations.[191]  The Commission tasked the Band Manager with the responsibility of identifying, based on consultation with relevant public safety licensees and its own expertise, situations where there are unused spectrum access opportunities.[192]  The Commission reasoned that this cooperative process would enable the Band Manager to take advantage of both its expertise on 4.9 GHz band public safety operations and its extensive links with the public safety community to identify spectrum access opportunities potentially available to non-public safety entities with flexibility to permit regional variation and maximize spectrum use, but also enough consistency to ensure full protection for current and future public safety operations.[193]

46.    To implement the non-public safety leasing framework, the Commission sought comment on two possible means of enabling Band Manager-coordinated non-public safety leasing, as well as general considerations for creating an effective leased access model for the band, in particular, the need to ensure non-discriminatory treatment of potential lessees.[194]  Stakeholders were divided in the record with some commenters advocating for Model 1[195] and some for Model 2.[196]  Other commenters did not express

---

[189] *Ninth Further Notice*, 38 FCC Rcd at 737, paras. 89–90.

[190] Fraternal Order of Police, et al., Apr. 26, 2024, *Ex Parte* at 1–3; Fraternal Order of Police Feb. 13, 2024, *Ex Parte* ("making the 4.9 GHz spectrum available for nationwide FirstNet 5G deployment is the most expedient and impactful way we can operationalize the 4.9 GHz spectrum"); *see also* CalChiefs Mar. 27, 2024, *Ex Parte* at 1–2; NREMT May 30, 2024, *Ex Parte* at 3 (allowing the integration of the NPSBN into the band will "facilitate improved 5G capabilities for a wide range of public safety users in the band").

[191] *Seventh Report and Order*, 38 FCC Rcd at 714–15, 721–23, paras. 25–27, 44–49.

[192] *Id.* at 714–15, 723, paras. 25–27, 48.

[193] *Id.*

[194] *Ninth Further Notice*, 38 FCC Rcd at 737–45, paras. 93–134.  Under Model 1, the Band Manager would lease spectrum access rights directly from public safety licensees and would, in turn, be permitted to sublease those rights to non-public safety entities.  *Id.* at 738, paras. 95–96.  Under Model 2, public safety licensees would be permitted to lease directly to non-public safety entities so long as those leases are coordinated through and approved by the Band Manager.  *Id.* at 738–39, paras. 97–99.

[195] *See, e.g.,* APCO Apr. 13, 2023, Comments at 5–8 (noting that "Model 1, in which the band manager serves as a lessee/sublessor, has some advantages," but arguing that the Band Manager should only have to notify affected licensees of prospective leases, because obtaining individual consents would be inefficient, and licensees should not have veto power over leasing arrangements); MTA May 15, 2023, Reply at 8 ("MTA's primary concern is the ongoing viability of the Band Manager.  Of the two models proposed by the FCC (direct lease by licensees vs. Band Manager as lessor), the model in which the Band Manager leases spectrum directly seems to most likely to achieve this goal.").

strong support for either model, and instead offered views on how the Commission should change or ultimately stray away from the proposed models.[197]  The record was also divided on whether the Commission should allow leasing to non-public safety entities, and if so, whether the Commission should limit the type of non-public safety entities that were eligible to gain access.[198]

47.    In light of this divided record, and the strong support for maintaining and strengthening the public safety nature of this band, we decline to further implement a non-public safety leasing framework at this time.  In making this determination, we remain committed to increasing use of this band and to decreasing equipment costs and encouraging greater innovation.  We also recognize that this spectrum hosts important public safety uses, and that protecting and expanding these uses requires a regulatory regime that is clear, predictable, and nationwide.  Based on the lack of consensus in the record at this time, selecting one of the proposed leasing frameworks over another may not achieve our intended goals.  For the reasons outlined above, we therefore decline to adopt additional rules establishing a non-public safety leasing framework at this time.  However, we remain open to the possibility of future non-public safety operations in the band, and reserve the right to revisit this issue at a later date.  Until such time as the Commission takes further action on this issue, the Band Manager's responsibility to facilitate non-public safety leasing shall be a review of the overall status of the band as part of its annual reporting requirement discussed *infra*.

### 5.    Annual Reporting Requirement

48.    In the *Seventh Report and Order* the Commission adopted an annual reporting requirement that will allow the Commission to oversee the Band Manager, ensure its activities advance the Commission's stated goals for this band, and provide greater transparency, certainty, and predictability in the 4.9 GHz band.[199]  In the *Ninth Further Notice* the Commission sought comment on

[196] *See, e.g.*, AASHTO Apr. 10, 2023, Comments at 6–7; BART Mar. 30, 2023, Comments at 13; Caltrans Apr. 11, 2023, Comments at 5–6 (recommending that the Commission supply more specifics regarding Model 2); EEI Apr. 13, 2023, Comments at 11–13; FPL Apr. 13, 2023, Comments at 6; Motorola Apr. 13, 2023, Comments at 4–5; UTC Apr. 13, 2023, Comments at 5–6; BART May 15, 2023, Reply at 3; William Bratton et al. May 15, 2023, Reply at 6; Maryland DoIT May 15, 2023, Reply at 1–2, 7–9; Verizon May 15, 2023, Reply at 8–9.

[197] *See, e.g.*, BART Mar. 30, 2023, Comments at 15; EEI Apr. 13, 2023, Comments at 12; iCERT Apr. 10, 2023, Comments at 5 ("While facilitating spectrum leases is a primary role of the Band Manager, incumbent public safety licensees should not be denied the right to negotiate directly with those interested in using the band for non-public safety purposes."); Maryland Apr. 13, 2023, Comments at 6–8 (the Band Manager's authority should also include "coordinating operations, including by approving the transfers of lessee deployments to ensure no harmful interference is created"); *id.* at 6–7 ("adoption of both models allowing licensees to choose as between the two, will best enable the Commission to achieve its goals in this proceeding"); Motorola Apr. 13, 2023, Comments; PSSA Apr. 12, 2023, Comments at 9; UTC Apr. 13, 2023, Comments at 5; WISPA Apr. 13, 2023, Comments at 9–10, 12–13 (In the context of competing leases, WISPA states that "[a]llowing the Band Manager to make an arbitrary decision would lead to disputes . . ."); Cal OES May, 15, 2023, Reply at 5 (opposing non-public safety use of the band but "[w]ith Model 2, Cal OES recommends that the state use of the band supersede federal plans when determining how the 4.9 GHz spectrum will be used to support public safety in each state."); GWTCA May 1, 2023, Reply at 4; Maryland DoIT May 15, 2023, Reply at 1–2; WISPA Jul. 11, 2024, *Ex Parte* at 6.

[198] *See, e.g.*, AASHTO Apr. 10, 2023, Comments at 6; APCO Apr. 13, 2023, Comments at 17; Coalition Apr. 13, 2023, Comments at 3; EEI Apr. 13, 2023, Comments at 9; iCERT Apr. 10, 2023, Comments at 2; TDD Apr. 13, 2023, Comments at 6; BART May 15, 2023, Reply at 4; GWTCA May 1, 2023, Reply at 3; iCERT May 11, 2023, Reply at 2; Motorola May 15, 2023, Reply at 5; WISPA May 15, 2023, Reply at 2; EEI Jul. 9, 2024, *Ex Parte* at 2–3; WISPA Jul. 11, 2024, *Ex Parte* at 2–3; Letter from Brett Kilbourne, Senior Vice President and General Counsel, Utilities Technology Council, to Marlene H. Dortch, Secretary, FCC, WP Docket No. 07-100, at 2 (filed Jul. 19, 2024) (UTC Jul. 19, 2024, *Ex Parte*).

[199] *Seventh Report and Order*, 38 FCC Rcd at 725, paras. 55–56.  The Commission noted that band managers in other frequency bands, such as the 700 MHz Guard Band licensee and 220 MHz band manager, are required to submit annual reports.  *Id.* at 725, para. 55 n.141; *see also* 47 CFR § 27.607; *see also Annual Guard Band Reports*,

(continued….)

what information should be included in the annual reports, and tentatively concluded that the annual report should include certain detailed descriptions of the Band Manager's efforts.[200]  In support of this requirement, the Coalition and APCO agreed that the Band Manager should submit annual reports as indicated by the Commission.[201]  The Coalition also suggested that the reports include "the speed with which coordination requests are processed, any instances of reported interference, how and how quickly such instances were resolved, an inventory of leases approved, and other matters that bear on the band manager's performance of its duties."[202]

49.     We continue to believe that the annual reporting requirement will facilitate Commission oversight, improve transparency, and help to ensure that the 4.9 GHz band is put to its highest and best use.[203]  Although we believe a review of the overall status of the band is one important element in any such report, we believe it would be premature to establish the specific form and content of the reports at this time.  Accordingly, we direct the Bureaus to establish the specific form and content of the annual reports, including by issuing public notices as necessary to obtain additional comment.  We likewise direct the Bureaus to use the Commission's past decisions as a guide when implementing this responsibility.[204]  The Commission reserves the right to impose more stringent reporting requirements on the Band Manager in the future based on feedback from impacted stakeholders and as events warrant.  The Commission will make the annual reports available to the public in order to create greater transparency, certainty, and predictability in the 4.9 GHz band.  We also reserve the right to subject the Band Manager to audits using in-house and contract resources.  For all the reasons noted above and in the *Seventh Report and Order*, we conclude that our imposition of a reporting requirement constitutes an effective safeguard and performance requirement for the Band Manager.

---

(Continued from previous page) ——————————————————

FCC (Aug. 2, 2022), https://www.fcc.gov/wireless/bureau-divisions/mobility-division/700-mhz-guard-bands/annual-guard-band-reports.

[200] *Ninth Further Notice*, 38 FCC Rcd at 737, paras. 91–92.  The Commission also sought general comment on the role the Commission and the Bureaus should play in overseeing the Band Manager's decisions.  *Id.* at 747–48, paras. 143–47.

[201] Coalition Apr. 13, 2023, Comments at 8; APCO Apr. 13, 2023, Comments at 11.  The Commission did not receive any other comments supporting or opposing the annual reporting requirement.

[202] Coalition Apr. 13, 2023, Comments at 8.

[203] *Seventh Report and Order*, 38 FCC Rcd at 725, paras. 55–56.  The Commission noted that band managers in other frequency bands, such as the 700 MHz Guard Band licensee and 220 MHz band manager, are required to submit annual reports.  *Id.* at 725, para. 55 n.141; *see also* 47 CFR § 27.607; *see also Annual Guard Band Reports*, FCC (Aug. 2, 2022), https://www.fcc.gov/wireless/bureau-divisions/mobility-division/700-mhz-guard-bands/annual-guard-band-reports.  We also believe that this decision aligns with views expressed by commenters that the Commission should oversee the Band Manager's responsibilities.  *See, e.g.*, BART Mar. 30, 2023, Comments at 11–12 ("the report also should address how the [Band] Manager is supporting the original purpose of the 4.9 GHz band—making sure that uses by the public safety community are protected against harmful interference . . ."); *id.* ("The [Band] Manager also should demonstrate in the Annual Report how they address the local and regional needs of the public safety community, such as establishing advisory roles for representatives on a geographically diverse basis."); APCO Apr. 13, 2023, Comments at 17; Joint Apr. 13, 2023, Comments at 8; Caltrans Apr. 11, 2023, Comments at 7; IAFC Apr. 13, 2023, Comments at 2; iCERT Apr. 10, 2023, Comments at 4–5; GWTCA May 1, 2023, Reply at 7–8; WISPA May 15, 2023, Reply at 10.

[204] *See generally Service Rules for the 746–764 and 776–794 MHz Bands, and Revisions to Part 27 of the Commission's Rules*, WT Docket No. 99-168, Second Report and Order, 15 FCC Rcd 5299, 5332–33, paras. 75–80 (2000); *Access 220, LLC Request for Waivers to Provide Band Management Services Utilizing Licenses in the 220–222 MHz Band*, WT Docket No. 02-224, Memorandum Opinion and Order, 17 FCC Rcd 20464, 20470, para. 17 (2002); *SCS Report and Order*, FCC 24-28, at 44–46, paras. 105–9 (adopting 47 CFR § 1.9047(e)).

### D.    Selection of the Band Manager

50.    In the *Seventh Report and Order*, the Commission concluded that the Band Manager would be identified by a selection committee to be named by the Commission and it sought comment on the nature of that committee and its processes in the *Ninth Further Notice*.[205]  In particular, the Commission sought comment on whether it should "direct specific organizations to designate a representative to serve on the selection committee" and whether the committee should include representatives of non-public safety users of the band in addition to public safety representatives.[206]  The Commission also tentatively concluded in the *Ninth Further Notice* that the selection committee should be "composed of an odd number of representatives to prevent deadlock."[207]  As part of the Commission's oversight of the selection committee, it proposed that the committee establish selection criterial based on the functions of the Band Manager.[208]

51.    Public safety entities overwhelmingly support the idea of the selection committee being comprised solely or mostly of public safety representatives.[209]  For instance, Cal OES "urges the Commission to limit the selection committee to representatives from incumbent public safety licensees as those users will be most impacted by changes to the band's composition."[210]  Similarly, IAFC states that "the selection committee should have a clear majority of public safety representatives, who have experience in use of new public safety technologies on the nation's incident scenes."[211]  Other commenters state that the selection committee should be comprised of diverse, key stakeholders, including non-public safety entities such as electric companies or other critical infrastructure entities.[212]  Commenters further submitted a variety of perspectives on the applicability of the Federal Advisory Committee Act[213] and what actions, if any, the Commission should take to comply with that Act.[214]

---

[205] *Seventh Report and Order*, 38 FCC Rcd at 712, para. 21; *Ninth Further Notice*, 38 FCC Rcd at 745–47, paras. 135–42.

[206] *Ninth Further Notice*, 38 FCC Rcd at 745–46, para. 136.

[207] *Id.* at 746, para. 137.

[208] *Id.* at 747, para. 141.

[209] APCO Apr. 13, 2023, Comments at 22 (stating that "[i]f the Commission concludes that non-public safety entities should be represented, the public safety members of the committee should comprise a supermajority"); IAFC Apr. 13, 2023, Comments at 2 (stating "the selection committee should have a clear majority of public safety representatives, who have experience in use of new public safety technologies on the nation's incident scenes"); Maryland Apr. 13, 2023, Comments at 2 (stating the selection committee should be "heavily weighted" with public safety representatives "to ensure that public safety's needs and concerns are adequately considered in the selection of the Band Manager"); AASHTO May 15, 2023, Reply at 2–3 (stating it favors a "majority or exclusive public safety participation in the Band Manager or the Selection Committee"); Cal OES May 15, 2023, Reply at 6 (urging "the Commission to limit the selection committee to representatives from incumbent public safety licensees"); Major Cities May 15, 2023, Reply at 2 (stating it supports "a public safety majority representing incumbent users on the band manager selection committee"); MTA May 15, 2023, Reply at 6 (stating it believes "the majority of the [Selection] Committee [should be] comprised of public safety members").

[210] Cal OES May 15, 2023, Reply at 6.

[211] IAFC Apr. 13, 2023, Comments at 2.

[212] iCERT Apr. 10, 2023, Comments at 5–6; UTC Apr. 13, 2023, Comments at 13; *see also* EEI May 15, 2023, Reply at 7 (citing iCERT Apr. 10, 2023, Comments); TDD May 15, 2023, Reply at 5 (citing iCERT Apr. 10, 2023, Comments).

[213] 5 U.S.C. Ch.10 ("FACA").

[214] CERCI argues that the implementation of a selection committee like the one proposed by PSSA would be subject to the Federal Advisory Commission Act (FACA).  *See* CERCI May 10, 2024, *Ex Parte* at 7–8 (citing PSSA Apr. 24, 2024, *Ex Parte* at 3) ("the selection committee should be comprised of seven current or former first responder

(continued….)

52.    Because our decision today is geared towards maintaining the public safety nature of the band, we give deference to the views expressed by that community.  We conclude, however, that it is unnecessary to resolve the issues raised in the comments at this time.  Instead, we delegate broad authority to the Bureaus to establish the procedures by which a selection committee will be chosen, identify representatives to sit on the selection committee, determine the requisite number of selection committee members, identify the applicable selection criteria, and establish the appropriate procedures and appropriate oversight for the selection process as part of choosing the Band Manager.[215]  We instruct the Bureaus to consider the record in this proceeding in exercising their delegated authority.

### E.    4.9 GHz Band Freeze

53.    Under the current freeze on applications for new licenses in the 4.9 GHz band, no new licensees may enter the band, but incumbents may file to modify their licenses or to license new sites in a fixed system.[216]  In the *Ninth Further Notice*, the Commission sought comment on whether to lift the freeze.[217]  APCO requests the Commission fully lift the freeze "[a]s soon as licensees populate ULS with detailed information about their operations[.]"[218]  PSSA, on the other hand, requests the Commission "reinstitute the freeze on new entrants into the band and preserve access to the band for those licensees that are actually using the band."[219]  We note that a freeze on new entrants has been in effect since 2020.[220]  We also continue to believe that issuing licenses to new entrants before the Commission has collected granular data from incumbent licensees would further complicate the spectrum environment and undermine the Band Manager's flexibility to provide for efficient use of this spectrum.[221]

stakeholders that represent the public safety community, including the FOP, IACP, IAFF, NOBLE and IAFC"); CERCI Jul. 10, 2024, *Ex Parte* at 8–9.  *But see* NREMT May 30, 2024, *Ex Parte* at 4–5; AT&T Jun. 20, 2024, *Ex Parte* at 8–10.

[215] *Seventh Report and Order*, 38 FCC Rcd at 712–13, para. 22 ("We delegate to the Bureaus the authority to manage the process of determining the selection committee's responsibilities, including by issuing public notices as necessary to obtain additional comment to address questions regarding the selection committee.").  We also note that today's decision does not address funding of the Band Manager.  *See Ninth Further Notice*, 38 FCC Rcd 743–44, paras. 124–29 (seeking comment on Band Manager funding).  In addition, we delegate to the Bureaus the authority to manage the process of determining the appropriate Band Manager funding mechanism(s), including by issuing public notices as necessary to obtain additional comment to address questions pertaining to funding.

[216] *2021 Order on Reconsideration*, 36 FCC Rcd at 15042, paras. 25–26; *Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Modify Temporary Filing Freeze on the Acceptance and Processing of Certain Part 90 Applications for the 4940–4990 MHz Band*, WP Docket No. 07-100, Public Notice, 36 FCC Rcd 15185 (PSHSB/WTB 2021) (*Freeze Modification Public Notice*).

[217] *Ninth Further Notice*, 38 FCC Rcd at 748, para. 149.

[218] APCO Apr. 13, 2023, Comments at 22 (stating "[a]s soon as licensees populate ULS with detailed information about their operations, the Commission should fully lift the freeze and require all new and modified operations to undergo public safety frequency coordination"); *see also Seventh Report and Order*, 38 FCC Rcd at 717–18, paras. 33–34.

[219] PSSA Apr. 24, 2024, *Ex Parte* at 4; NREMT May 30, 2024, *Ex Parte* at 3.  *But see* CERCI Jul. 10, 2024, *Ex Parte* at 9–10.

[220] S*ee Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau Announce Temporary Filing Freeze on the Acceptance and Processing of Certain Part 90 Applications for the 4940–4990 MHz Band*, WP Docket No. 07-100, Public Notice, 35 FCC Rcd 9522, 9523 (PSHSB/WTB 2020) (*Freeze Public Notice*); s*ee also generally* CERCI May 10, 2024, *Ex Parte* at 4–5 (discussing the freeze on new entrants into the band).

[221] *See Seventh Report and Order*, 38 FCC Rcd at 717, para. 33.  The Commission directed the Bureaus to announce by public notice when ULS is prepared to accept the more granular data on public safety operations in the 4.9 GHz band.  *Id*. at 717, para. 34.

54.     While this process is ongoing, we find that freezing expansions, additions to, or modification of other technical parameters applicable to incumbent licensees is also necessary in light of our decision here to enable expanded public safety access to the band through the Band Manager's nationwide overlay license and sharing agreement with FirstNet.  We are cognizant that some incumbent licensees, in reliance on the existing state of the freeze prior to today's decision, may have invested in systems that they hoped to use to modify or expand current operations.[222]  However, we believe that a stable spectrum landscape reflecting the current state of operations in the band will better facilitate analysis of the upcoming granular data collection of licensed operations by the Commission, the Band Manager, and other interested parties.  We also remind applicants and current licensees facing special circumstances that they may seek a waiver of the freeze pursuant to section 1.925 of the Commission's rules.[223]

55.     Accordingly, until further notice, we retain the freeze for all applicants who are not already 4.9 GHz licensees, and we reinstate the freeze as it applies to incumbent licensees that was lifted pursuant to the *2021 Order on Reconsideration* and the *Freeze Modification Public Notice*.[224] Specifically, we reinstate the freeze that was lifted on incumbents adding new licenses or modifying existing licenses unless otherwise authorized,[225] and unless incumbents are filing certain types of applications to comply with the granular data collection.  We direct the Bureaus to implement this change to the freeze via public notice within 30 days of the adoption of this order.  The Bureaus will retain jurisdiction to manage and implement the freeze in the future, and we clarify that this freeze shall not apply to any necessary filings associated with issuance of the Band Manager's nationwide overlay license.[226]

## F.     Future Licensing of the Band

56.     In the *Seventh Report and Order* the Commission adopted its proposal to collect additional technical data on public safety operations stating that the submission of this data will improve interference protection and give public safety licensees more confidence in the band.[227]  The Commission also determined it would require incumbent licensees to supply complete microwave path data for fixed links, and to obtain a license for base stations (currently authorized under the geographic license scheme) on a site-by-site basis.[228]  The Bureaus will issue a Public Notice that will give incumbent licensees 6 months to make the appropriate filings in our Universal Licensing System.[229]  In connection with this decision, the Commission sought comment in the *Ninth Further Notice* on whether incumbent licensees should be allowed to retain their geographic-area licenses after they have been issued site-based licenses.[230]  PSSA recommends that the Commission convert all current public safety geographic-area

---

[222] *See* CERCI May 10, 2024, *Ex Parte* at 4–5.

[223] 47 CFR § 1.925.

[224] *Seventh Report and Order*, 38 FCC Rcd at 731, para. 70.

[225] *2021 Order on Reconsideration*, 36 FCC Rcd at 15042, paras. 25–26; *Freeze Public Notice*, 35 FCC Rcd at 9522–23 (listing "affected applications" subject to the freeze and "excepted applications" not subject to the freeze).

[226] Commission action on the freeze at this time is not intended to affect the authority that the Bureaus have to implement this or other band freezes, as appropriate.

[227] *Seventh Report and Order*, 38 FCC Rcd at 716–18, paras. 30–35.

[228] *Id.* at 717, para. 34.

[229] *Id.*

[230] *Ninth Further Notice*, 38 FCC Rcd at 742, paras. 117–18.

licenses to site-based authorizations "to protect existing point-to-point and geographic licenses."[231] APCO, on the other hand, supports retaining some element of the geographic-area license.[232]

57.    The Commission also sought general comment on the future licensing of the band, noting our decision in the *Seventh Report and Order* to adopt a Band Manager regime and taking into consideration the questions regarding implementation.[233]  Commenters were generally divided on this issue.  For example, AT&T proposes that the Commission should adopt license conditions for existing licenses in the band that require licensees to share any 4.9 GHz spectrum that is not in use with FirstNet.[234]  Similarly, PSSA requests that the Commission require incumbent licensees to surrender any 4.9 GHz spectrum that they are not using.[235]  In response, CERCI argues that PSSA's proposal would "strip today's 4.9 GHz public safety licensees' right to expand their systems by forcing 'incumbent licensees to surrender spectrum they are not using.'"[236]  Additionally, CERCI contends that PSSA's proposal "would disrupt the serious reliance interests of existing state and local 4.9 GHz public-safety licensees."[237]

58.    We note that geographic licenses permit the licensee to use any channel in the band,[238] while site-based licenses are frequency-specific.[239]  The results of the collection of granular technical data that the Commission initiated in the *Seventh Report and Order* will require the incumbent licensees to complete a thorough review of their current operations under their active PA licenses.[240]  The incumbents will then use ULS to create new licenses (with granular data) in newly created radio service codes PB (public safety licensees performing base/mobile, mobile-only or temporary fixed operations) and PF (public safety licensees operating fixed links).[241]  We find that the incumbent licensees' current PA licenses will be cancelled once the incumbents apply for and are authorized under the newly created radio service codes.  We remind incumbents that this decision to cancel the former licenses once the new licenses have been created does not modify or alter incumbents' rights to operate their existing networks.  Instead, we believe that this decision aligns with the intent of our decision in the *Seventh Report and Order* to collect more granular data such that it will "improve interference mitigation efforts and bolster

---

[231] PSSA Apr. 12, 2023, Comments at 5, 16–17.  *But see* iCERT May 11, 2023, Reply at 8 (explaining that it opposes PSSA's proposal as it "would effectively foreclose any local use of the 4.9 GHz band by public safety entities (and critical infrastructure as well)").

[232] APCO Apr. 13, 2023, Comments at 19–20 (stating it supports "retaining some element of geographic area licensing to accommodate public safety operations that are not well-suited for site-based licensing (*e.g.*, vehicular local area networks)").

[233] *Ninth Further Notice*, 38 FCC Rcd at 748, para. 148.

[234] AT&T Jun. 20, 2024, *Ex Parte* at 5.

[235] PSSA Apr. 24, 2024, *Ex Parte* at 4.

[236] CERCI May 10, 2024, *Ex Parte* at 2 (citing PSSA Apr. 23, 2024, *Ex Parte* at 4) ("The PSSA cannot claim to serve existing licensees' interests by taking away their rights to grow their capabilities by serving more public-safety users, covering more areas, and/or increasing capacity.").

[237] *Id*. at 4 ("In reliance on the Commission's existing policies, these entities may have invested in fixed and mobile systems that they hoped to modify or expand as they secured additional funding or gained additional experience in operating within the 4.9 GHz band . . . [c]hanging the public-safety landscape can strand investment, upend strategic planning, and impose operational and legal uncertainties on state and local governments.").

[238] 47 CFR § 90.1207(a).

[239] *Id*. § 90.1207(e)(1)–(2).

[240] *Seventh Report and Order*, 38 FCC Rcd at 716–18, paras. 30–35.

[241] *Id.* at 716–18, paras. 30–35.

public safety confidence in the band"[242] and is the best approach to ensure that ULS does not contain duplicative or inaccurate licenses once the incumbents have received their new radio service codes.

59.     We likewise believe that the collection of this granular technical data will help the Band Manager identify specific frequency usage across all deployments in the band,[243] and thus potentially unused channels within areas covered by certain geographic licenses.  While PSSA's and AT&T's proposals to require that incumbent licensees surrender to the Band Manager or share with FirstNet any unused spectrum could potentially make more spectrum available to FirstNet and increase overall spectrum efficiency in the band, we defer any consideration of those proposals until after the Commission has completed its collection and analysis of granular technical data on incumbent licensed public safety operations in the band.[244]

## IV.    PROCEDURAL MATTERS

60.     *Paperwork Reduction Act Analysis*.  This *Eighth Report and Order* may contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13.  All such requirements will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA.  OMB, the general public, and other federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding.  In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. § 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.

61.     In this present document, we have assessed the effects of our creation of a new Band Manager overlay license, and find that it will have a small impact on small governmental entities which are currently 4.9 GHz licensees, mainly related to the collection of data about existing 4.9 GHz deployments.

62.     *Regulatory Flexibility Act*.  The Regulatory Flexibility Act of 1980, as amended (RFA)[245] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[246]  Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in this *Eighth Report and Order* on small entities.  The FRFA is set forth in Appendix B.

63.     *Congressional Review Act*.  The Commission will submit this draft *Eighth Report and Order* to the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, for concurrence as to whether this rule is "major" or "non-major" under the Congressional Review Act, 5 U.S.C. § 804(2).  The Commission will send a copy of this *Eighth Report and Order* to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

---

[242] *Seventh Report and Order*, 38 FCC Rcd at 716, paras. 30.

[243] In particular, the Commission required incumbent licensees to supply complete microwave path data for fixed links, and required incumbent licenses to obtain site-by-site licenses, which includes, *inter alia*, frequency and bandwidth information, for stations currently authorized under the geographic license scheme.  *Seventh Report and Order*, 38 FCC Rcd at 717–18, para. 34; *see* 47 CFR § 90.1207(e)(1)–(2).

[244] We likewise defer any consideration of CERCI's arguments as it pertains to PSSA's proposal that the Commission require incumbent licensees surrender unused spectrum.  *See generally* CERCI May 10, 2024, *Ex Parte* at 4–5.

[245] 5 U.S.C. §§ 601–612.  The RFA has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[246] 5 U.S.C. § 605(b).

64.    *Ex Parte Presentations.* The proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules. Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must: (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda, or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

65.    *People with Disabilities.* To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the FCC's Consumer and Governmental Affairs Bureau at 202-418-0530 (voice).

66.    *Additional Information.* For additional information on this proceeding, contact Paul Powell of the Wireless Telecommunications Bureau, Mobility Division, at 202-418-1613 or Paul.Powell@fcc.gov, or Brian Marenco of the Public Safety and Homeland Security Bureau at 202-418-0838 or Brian.Marenco@fcc.gov.

## V.    ORDERING CLAUSES

67.    Accordingly, IT IS ORDERED that, pursuant to the authority found in sections 4(i), 4(j), 302, 303(b), 303(f), 303(g), 303(r), 309(j) and 405 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 302a, 303(b), 303(f), 303(g), 303(r), 309(j), and 405, as well as section 1.429 of the Commission's rules, 47 CFR § 1.429, that this *Eighth Report and Order* IS HEREBY ADOPTED.

68.    IT IS FURTHER ORDERED that this *Eighth Report and Order* SHALL BE EFFECTIVE 30 days after publication in the Federal Register.

69.    IT IS FURTHER ORDERED that the Commission's Office of the Secretary, SHALL SEND a copy of this *Eighth Report and Order*, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

70.    IT IS FURTHER ORDERED that the Commission SHALL SEND a copy of this *Eighth Report and Order* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, see 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

## APPENDIX A

### Final Rules

For the reasons discussed in the document above, the Federal Communications Commission amends 47 CFR parts 0 and 90 as follows:

## Part 0 – COMMISSION ORGANIZATION

     1.     The authority citation for part 0 continues to read as follows:

**Authority:** 47 U.S.C. 151, 154(i), 154(i), 155, 225, and 409, unless otherwise noted.

     2.     Section § 0.331 is amended by adding paragraph (h) to read as follows:

**§ 0.331 Authority delegated.**

* * * * *

     (h) The Chief of the Wireless Telecommunications Bureau is delegated authority jointly with the Chief of the Public Safety and Homeland Security Bureau to administer provisions of §§ 90.1203, 90.1207, 90.1209, and 90.1217 of this chapter.  The Chief of the Wireless Telecommunications Bureau is also delegated authority to establish the procedures by which a Band Manager selection committee will be chosen; identify representatives to sit on the selection committee; determine the requisite number of selection committee members; identify the applicable selection criteria; confirm that the Band Manager selectee meets the selection criteria; and establish the appropriate procedures and oversight for the selection process as part of choosing the Band Manager.  The Chief of the Wireless Telecommunications Bureau is also delegated authority to develop the form and procedures pursuant to which the Band Manager will submit certifications required by §§ 90.1207(h)(3) and 90.1209(e) to the Commission; to manage the process of determining the appropriate Band Manager funding mechanisms; and to perform oversight and any other functions for the administration of the Band Manager and its responsibilities.

     3.     Section § 0.392 is amended by adding paragraph (k) to read as follows:

**§ 0.392 Authority delegated.**

* * * * *

     (k) The Chief of the Public Safety and Homeland Security Bureau is delegated authority jointly with the Chief of the Wireless Telecommunications Bureau to administer provisions of §§ 90.1203, 90.1207, 90.1209, and 90.1217 of this chapter.  The Chief of the Public Safety and Homeland Security Bureau is also delegated authority to establish the procedures by which a Band Manager selection committee will be chosen; identify representatives to sit on the selection committee; determine the requisite number of selection committee members; identify the applicable selection criteria; confirm that the Band Manager selectee meets the selection criteria; and establish the appropriate procedures and oversight for the selection process as part of choosing the Band Manager.  The Chief of the Public Safety and Homeland Security Bureau is also delegated authority to develop the form and procedures pursuant to which the Band Manager will submit certifications required by §§ 90.1207(h)(3) and 90.1209(e) to the Commission; to manage the process of determining the appropriate Band Manager funding mechanisms; and to perform oversight and any other functions for the administration of the Band Manager and its responsibilities.

**PART 90 – PRIVATE LAND MOBILE RADIO SERVICES**

4.      The authority citation for part 90 continues to read as follows:

**Authority:**  47 U.S.C. 154(i), 161, 303(g), 303(r), 332(c)(7), 1401–1473.

5.      Section § 90.175 is amended by revising paragraph (g)(2) to read as follows:

**§ 90.175 Frequency coordinator requirements.**

* * * * *

(g) * * *

(1) * * *

(2) ***For frequencies between 4940–4990 MHz:***  A statement is required from the nationwide band manager recommending the most appropriate channel(s), bandwidth, operating power, and any other technical parameter which promotes robust and efficient use of the band while minimizing interference.

6.      Section § 90.1203 is amended by revising paragraph (b) and adding paragraph (c) to read as follows:

**§ 90.1203 Eligibility.**

* * * * *

(b) 4.9 GHz band licensees eligible pursuant to paragraph (a) may enter into sharing agreements or other arrangements for use of the spectrum with entities that do not meet the eligibility requirements in this section.  However, all applications in the band are limited to operations in support of public safety.

(c) The 4.9 GHz Band Manager is eligible to hold a nationwide overlay license in the 4940–4990 MHz band consistent with the requirements of § 90.1207(h) of this part.

7.      Section § 90.1207 is amended by revising paragraphs (a), (b), (c), and (e) and adding paragraph (h) to read as follows:

**§ 90.1207 Licensing.**

(a) A 4940–4990 MHz band license held by an entity eligible under § 90.1203(a) of this part gives the licensee authority to operate on any authorized channel in this band within its licensed area of operation.  See § 90.1213.  A 4940–4990 MHz band license will be issued for the geographic area encompassing the legal jurisdiction of the licensee or, in case of a nongovernmental organization, the legal jurisdiction of the state or local governmental entity supporting the nongovernmental organization.

(b) Subject to § 90.1209, a 4940–4990 MHz band license held by an entity eligible under § 90.1203(a) of this part gives the licensee authority to construct and operate any number of base stations anywhere within the area authorized by the license, except as follows:

(1)–(2) * * *

(c) A 4940–4990 MHz band license held by an entity eligible under § 90.1203(a) of this part gives the licensee authority to operate base and mobile units (including portable and handheld units) and

operate temporary (1 year or less) fixed stations anywhere within the area authorized by the license. Such licensees may operate base and mobile units and/or temporary fixed stations outside their authorized area to assist public safety operations with the permission of the jurisdiction in which the radio station is to be operated. Base and temporary fixed stations are subject to the requirements of paragraph (b) of this section.

(d) * * *

(e) Applications for license in the 4940–4990 MHz band by an entity eligible under § 90.1203(a) of this part must include the following technical information.

(1)–(2) * * *

(f)–(g) * * *

(h) The 4.9 GHz Band Manager is eligible under § 90.1203(c) of this part to hold a nationwide overlay license for the 4940–4990 MHz band, subject to the exclusion of licensed geographic areas and frequencies held by an incumbent entity eligible under § 90.1203(a) of this part. The 4.9 GHz Band Manager:

(1) shall not be eligible to independently operate stations in the 4940–4990 MHz band;

(2) consistent with §§ 90.1217(a), (d) and 2.103(b), may allow the First Responder Network Authority, pursuant to a sharing agreement, to construct and operate stations at any geographic site within the Band Manager's licensed area and on any channel for which the Band Manager is licensed, subject to the exclusions in § 90.1207(h) and provided such stations do not cause harmful interference to incumbent licensees and otherwise comply with Commission rules and coordination requirements;

(3) shall certify to the Wireless Telecommunications Bureau and Public Safety and Homeland Security Bureau prior to entering into any sharing agreement with the First Responder Network Authority that such agreement meets the requirements of §§ 2.103(b) and 90.1207(h);

(4) shall certify to the Wireless Telecommunications Bureau and Public Safety and Homeland Security Bureau when stations have been placed in operation pursuant to § 90.1209(e); and

(5) shall ensure that stations operating pursuant to a sharing agreement in this subpart comply with the relevant technical and licensing rules governing operations in the 4940–4990 MHz band in §§ 90.1205, 90.1209(b)–(c), (e), 90.1213, and 90.1215.

8.      Section § 90.1209 is amended by revising paragraphs (a) and (d) and adding paragraph (e) to read as follows:

**§ 90.1209 Policies governing the use of the 4940–4990 MHz band.**

(a) Channels in this band licensed to any entity eligible under § 90.1203(a) are available on a shared basis only and will not be assigned for the exclusive use of any licensee.

(b)–(c) * * *

(d) Stations used by an entity eligible under § 90.1203(a) of this part must be placed into operation within twelve (12) months from the date of grant in accordance with § 90.155. Licensees of temporary fixed stations must place at least one such station in operation within twelve months of license grant.

(e) Stations used by an entity eligible under § 90.1203(h) of this part must be placed into operation within twelve (12) months from the date that the Band Manager and the First Responder Network Authority execute a sharing agreement pursuant to §§ 90.1207(h) and 2.103(b) of this chapter.

9.    Section § 90.1217 is amended by revising the introductory text and paragraphs (a) and (b) and adding paragraphs (d) and (e) to read as follows:

**§ 90.1217 4.9 GHz Band Manager.**

The 4.9 GHz Band Manager will have the following primary responsibilities:

(a) Frequency coordination and interference protection for 4.9 GHz band incumbent public safety operations;

(b) Incentivizing the use of the latest commercially available technologies, including 5G;

(c) * * *

(d) Managing a sharing agreement with the First Responders Network Authority pursuant to §§ 90.1207(h) and 2.103(b) of this chapter; and

(e) Filing an annual report with the Commission.

**APPENDIX B**

**Final Regulatory Flexibility Analysis**

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Eighth Further Notice of Proposed Rulemaking* (*Eighth Further Notice*) released in October 2021,[2] and *Ninth Further Notice of Proposed Rulemaking* (*Ninth Further Notice*) released in January 2023.[3]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *Eighth* and *Ninth Further Notices*, including comment on the IRFA.  No comments were filed addressing the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[4]

### A.        Need for, and Objectives of, the Report and Order

2.        In the *Eighth Report and Order*, the Commission seeks to meet its objectives of ensuring efficient and effective utilization of the 4940–4990 MHz band (4.9 GHz band) in support of public safety missions nationwide.  To achieve these objectives, the *Eighth Report and Order* bolsters the coordinated nationwide approach to the band that the Commission established in its *Seventh Report and Order*, in which it adopted a nationwide Band Manager framework to coordinate operations in the 4.9 GHz band, optimize public safety use, and facilitate the integration of the latest commercially available technologies, including 5G, for the benefit of public safety users.  To further these goals and to ensure efficient use of the 4.9 GHz band nationwide, the 4.9 GHz Band Manager, once selected, will be eligible to apply for a nationwide overlay license and authorized to enter into a sharing agreement with the First Responder Network Authority (FirstNet).  Pursuant to this sharing agreement, FirstNet may be permitted to use unassigned spectrum in the 4.9 GHz band as part of its nationwide public safety broadband network (NPSBN) in a manner that fully protects incumbent operations.  In addition to expanding the Band Manager's responsibilities to include entering into a sharing agreement with FirstNet and establishing rules governing the nationwide Band Manager overlay license, the adopted rules in the *Eighth Report and Order* also reaffirm the Commission's commitment to the nationwide Band Manager framework and clarify the Band Manager's responsibilities.

### B.        Summary of Significant Issues Raised by Public Comments in Response to the IRFA

3.        There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

### C.        Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

4.        Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601–612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996, (SBREFA) Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Order on Reconsideration and Eighth Further Notice of Proposed Rulemaking, 36 FCC Rcd 15032 (2021) (*2021 Order on Reconsideration* or *Eighth Further Notice*); *see also Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Erratum (2021).

[3] *Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Seventh Report and Order and Ninth Further Notice of Proposed Rulemaking, 38 FCC Rcd 704 (2023) (*Seventh Report and Order* or *Ninth Further Notice*); *see also Amendment of Part 90 of the Commission's Rules*, WP Docket No. 07-100, Erratum (2023).

[4] 5 U.S.C. § 604.

proposed rules as a result of those comments.[5]  The Chief Counsel did not file any comments in response to the proposed rules or policies in this proceeding.

### D.    Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

5.          The RFA directs agencies to provide a description of, and where feasible, an estimate of, the number of small entities that may be affected by the rules adopted herein.[6]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[7]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[8]  A "small business concern" is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[9]

6.          *Small Businesses, Small Organizations, Small Government Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[10]  First, while there are industry specific size standards for businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[11]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[12]

7.          Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[13]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[14]  Nationwide, for tax year 2022, there

---

[5] *Id.* § 604(a)(3).

[6] *Id.* § 604(a)(4).

[7] *Id.* § 601(6).

[8] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[9] 15 U.S.C. § 632.

[10] *See* 5 U.S.C. § 601(3)–(6).

[11] *See* SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf (Mar. 2023).

[12] *Id.*

[13] *See* 5 U.S.C. § 601(4).

[14] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description.  *See* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

were approximately 530,109 small exempt organizations in the U.S. reporting revenue of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[15]

8.       Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[16]  U.S. Census Bureau data from the 2022 Census of Governments[17] indicate there were 90,837 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[18]  Of this number, there were 36,845 general purpose governments (county,[19] municipal, and town or township[20]) with populations of less than 50,000 and 11,879 special purpose governments (independent school districts[21]) with enrollment populations of less than 50,000.[22]  Accordingly, based on the 2022 U.S. Census of Government data, we estimate that at least 48,724 entities fall into the category of "small government jurisdictions."[23]

---

[15] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.  The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2022 with revenue less than or equal to $50,000 for Region 1-Northeast Area (71,897), Region 2-Mid-Atlantic and Great Lakes Areas (197,296), and Region 3-Gulf Coast and Pacific Coast Areas (260,447) that includes the continental U.S., Alaska, and Hawaii.  This data includes information for Puerto Rico (469).

[16] *See* 5 U.S.C. § 601(5).

[17] *See* 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, https://www.census.gov/programs-surveys/economic-census/year/2022/about.html.

[18] *See* U.S. Census Bureau, 2022 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2022 [CG2200ORG02], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG2200ORG02 Table Notes_Local Governments by Type and State_2022.

[19] *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2022 [CG2200ORG05], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 2,097 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[20] *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2022 [CG2200ORG06], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 18,693 municipal and 16,055 town and township governments with populations less than 50,000.

[21] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2022 [CG2200ORG10], https://www.census.gov/data/tables/2022/econ/gus/2022-governments.html.  There were 11,879 independent school districts with enrollment populations of less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2022 [CG2200ORG04], CG2200ORG04 Table Notes_Special Purpose Local Governments by State_Census Years 1942 to 2022.

[22] While the special purpose governments category also includes local special district governments, the 2022 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[23] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,845) and the number of special purpose governments—independent school districts with enrollment populations of less than 50,000 (11,879)—from the 2022 Census of Governments - Organizations tbls. 5, 6 & 10.

9.    *Frequency Coordinators*.  Frequency coordinators are entities or organizations certified by the Commission to recommend frequencies for use by licensees in the Private Land Mobile Radio (PLMR) Services that will most effectively meet the applicant's needs while minimizing interference to licensees already operating within a given frequency band.  Neither the Commission nor the SBA have developed a small business size standard specifically applicable to spectrum frequency coordinators.  Business Associations,[24] which comprises establishments primarily engaged in promoting the business interests of their members, is the closest applicable industry with a SBA small business size standard.[25]

10.    The SBA small business size standard for Business Associations classifies firms with annual receipts of $8 million or less as small.[26]  For this industry, U.S. Census Bureau data for 2017 show that there were 14,540 firms that operated for the entire year.[27]  Of these firms, 11,215 had revenue of less than $5 million.[28]  Based on this data, the majority of firms in the Business Associations industry can be considered small.  However, the Business Associations industry is very broad and does not include specific figures for firms that are engaged in frequency coordination.  Thus, the Commission is unable to ascertain exactly how many of the frequency coordinators are classified as small entities under the SBA size standard.  According to Commission data, there are 13 entities certified to perform frequency coordination functions under part 90 of the Commission's rules.[29]  For purposes of this FRFA, the Commission estimates that a majority of the 13 FCC-certified frequency coordinators are small.

11.    *Private Land Mobile Radio Licensees*.  PLMR systems serve an essential role in a vast range of industrial, business, land transportation, and public safety activities.  Companies of all sizes operating in all U.S. business categories use these radios.  Wireless Telecommunications Carriers (*except* Satellite)[30] which encompasses business entities engaged in radiotelephone communications, is the closest industry with an SBA small business size standard applicable to these services.  The SBA small size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[31]  U.S. Census

---

[24] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*813910 Business Associations,*" https://www.census.gov/naics/?input=813910&year=2017&details=813910.

[25] *See* 13 CFR § 121.201, NAICS Code 813910.

[26] *Id.*

[27] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors:  Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017*, Table ID: EC1700SIZEREVFIRM, NAICS Code 813910, https://data.census.gov/cedsci/table?y=2017&n=813910&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[28] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We note that the U.S. Census Bureau withheld publication of the number of firms that operated with sales/value of shipments/revenue in the individual category for less than $100,000, to avoid disclosing data for individual companies (see Cell Notes for the sales/value of shipments/revenue in this category).  Therefore, the number of firms with revenue that meet the SBA size standard would be higher than noted herein.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

[29] The Commission's records indicate that there are currently 13 frequency coordinators that would be affected by this rulemaking.  *See* https://www.fcc.gov/wireless-bureau-divisions/mobility-division/industrial-business/industrial-business-licensing#frequency-coordinators.

[30] *See* U.S. Census Bureau, *2017 NAICS Definition*, *"517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[31] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[32] Of this number, 2,837 firms employed fewer than 250 employees.[33] Thus, under the SBA size standard, the Commission estimates licensees in this industry can be considered small.

12.        Based on Commission data as of December 14, 2021, there are approximately 387,370 active PLMR licenses.[34]  Active PLMR licenses include 3,577 licenses in the 4.9 GHz band;[35] 19,011 licenses in the 800 MHz band;[36] and 2,716 licenses in the 900 MHz band.[37]  Since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard.  Nevertheless, the Commission believes that a substantial number of PLMR licensees are small entities.

13.        *Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing*.  This industry comprises establishments primarily engaged in manufacturing radio and television broadcast and wireless communications equipment.[38]  Examples of products made by these establishments are:  transmitting and receiving antennas, cable television equipment, GPS equipment, pagers, cellular phones, mobile communications equipment, and radio and television studio and broadcasting equipment.[39]  The SBA small business size standard for this industry classifies businesses having 1,250 employees or less as small.[40]  U.S. Census Bureau data for 2017 show that there were 656

---

[32] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data is not available.

[33] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[34] Based on a FCC Universal Licensing System search on December 14, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp.  Search parameters:  Service Group = All, "Match only the following radio service(s)", Radio Service = GB, GE, GF, GI, GJ, GO, GP, GU, IG, IQ, PA, PW, QM, QQ, RS, SG, SL, SP, SY, YB, YE, YF, YG, YI, YJ, YO, YP, YU, YW; Authorization Type = All; Status = Active.  We note that the number of active licenses does not equate to the number of licensees.  A licensee can have one or more licenses.

[35] Based on a FCC Universal Licensing System search on December 14, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp.  Search parameters:  Service Group = All, "Match only the following radio service(s)", Radio Service = PA; Authorization Type = All; Status = Active.  We note that the number of active licenses does not equate to the number of licensees.  A licensee can have one or more licenses.

[36] Based on a FCC Universal Licensing System search on December 14, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp.  Search parameters:  Service Group = All, "Match only the following radio service(s)", Radio Service = GB, GE, GF, GJ, GM, GO, GP, YB, YE, YF, YJ, YM, YO, YP, YX; Authorization Type = All; Status = Active.  We note that the number of active licenses does not equate to the number of licensees.  A licensee can have one or more licenses.

[37] Based on a FCC Universal Licensing System search on December 14, 2021, https://wireless2.fcc.gov/UlsApp/UlsSearch/searchAdvanced.jsp.  Search parameters:  Service Group = All, "Match only the following radio service(s)", Radio Service = GI, GR, GU, YD, YS, YU; Authorization Type = All; Status = Active.  We note that the number of active licenses does not equate to the number of licensees.  A licensee can have one or more licenses.

[38] *See* U.S. Census Bureau, *2017 NAICS Definition, "334220 Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing,"* https://www.census.gov/naics/?input=334220&year=2017&details=334220.

[39] *Id*.

[40] *See* 13 CFR § 121.201, NAICS Code 334220.

firms in this industry that operated for the entire year.[41]  Of this number, 624 firms had fewer than 250 employees.[42]  Thus, under the SBA size standard, the majority of firms in this industry can be considered small.

14.    *Wireless Telecommunications Carriers (except Satellite)*.  This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[43]  Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless Internet access, and wireless video services.[44]  The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[45]  U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[46]  Of that number, 2,837 firms employed fewer than 250 employees.[47]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services.[48]  Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees.[49]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

### E.    Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

15.    The Commission anticipates that the rule changes adopted in the *Eighth Report and Order* will create *de minimis* new compliance requirements for small entities.  The adopted rules will cause the 4.9 GHz Band Manager, once selected, to become eligible to apply for a nationwide overlay license and will authorize the Band Manager to enter into a sharing agreement with FirstNet.  Pursuant to this sharing agreement, FirstNet may be permitted to use unassigned spectrum in the 4.9 GHz band as part of its NPSBN.  Once selected, the Band Manager's primary responsibilities will include:  (1) frequency coordination and interference protection for incumbent public safety licensees; (2) managing a spectrum sharing agreement with FirstNet; (3) incentivization of the use of the latest commercially available technologies; (4) facilitating non-public safety access through leasing; and (5) submitting an annual report to the Commission.  The Commission notes that the rules adopted in the *Eighth Report and Order* do not create any significant additional compliance requirements for small entities.  However, in assessing the

---

[41] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 334220, https://data.census.gov/cedsci/table?y=2017&n=334220&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data is not available.

[42] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[43] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[44] *Id.*

[45] *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[46] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.  At this time, the 2022 Economic Census data is not available.

[47] *Id*.  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[48] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[49] *Id.*

cost of compliance for small entities, at this time the Commission is not in a position to determine whether these actions will require small entities to hire professionals to comply, and cannot quantify the cost of compliance with the rule changes that were adopted.  Nevertheless, the Commission believes the benefits gained from the adopted rules by 4.9 GHz licensees and more optimized use of the band outweigh potential compliance costs incurred.

> **F.     Steps Taken to Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered**

16.     The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[50]

17.     In the *Eighth Report and Order*, the Commission adopts measures to further promote use of the 4.9 GHz band for a variety of primary public safety operations.  In doing so, it makes the 4.9 GHz Band Manager eligible to apply for a nationwide overlay license and authorizes the Band Manager to enter into a sharing agreement with FirstNet to enable use of the 4.9 GHz band as part of its NPSBN in a manner that fully protects incumbent operations.  In this context, the Band Manager will be required to work with public safety licensees to rationalize their use.  The Commission's actions do not alter any of the actions that the Commission adopted in the *Seventh Report and Order* as they pertain to requiring small and other public safety incumbents and future applicants for the 4.9 GHz band to submit data on FCC Form 601.  As we noted in the *Seventh Report and Order*, collecting the additional technical data on public safety operations will benefit public safety licensees operating in the band because it will improve interference protection and give public safety licensees more confidence in the band without adding a significant economic or administrative burden on licensees or applicants to submit the data.  The Commission considered alternative approaches, however, the record reflects support from commenters, some of which include or represent small entities, that agree our adopted approach in the *Eighth Report and Order* could have the effect of increasing band usage for first responders and other public safety missions, while preserving incumbent operations.[51]

18.     While small and other public safety applicants seeking to license facilities in the 4.9 GHz band will be subject to formal frequency coordination procedures, the economic impact will be minimized through the *Eighth Report and Order*'s adoption of a frequency coordination process with which public safety licensees operating PLMR facilities in other frequency bands are familiar.  Once in place, the formal frequency coordination process will ensure the efficient assignment and use of spectrum while minimizing interference to incumbents.  Consequently, the frequency coordination process will improve interference protection and give public safety licensees more confidence in the band without adding a significant economic burden on applicants.

19.     Finally, all other Commission actions related to the Band Manager in the *Eighth Report and Order*, such as the Band Manager's responsibility to identify unused spectrum access opportunities, do not create a significant economic impact on small entities.

> **G.     Report to Congress**

20.     The Commission will send a copy of the *Eighth Report and Order*, including this FRFA, in a report to Congress pursuant to the Congressional Review Act.[52]  In addition, the Commission will send a copy of the *Eighth Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of

---

[50] 5 U.S.C. § 604(a)(6).

[51] *See Eighth Report and Order*, para. 22.

[52] 5 U.S.C. § 801(a)(1)(A).

the SBA.  A copy of the *Eighth Report and Order*, and FRFA (or summaries thereof) will also be published in the *Federal Register*.[53]

---

[53] *Id.* § 604(b).

Exhibit B

## X. Statutory and Executive Order Reviews

The Office of Management and Budget (OMB) has exempted this action from the requirements of Executive Order 12866 (58 FR 51735, October 4, 1993) and 13563 (76 FR 3821, January 21, 2011). This action authorizes State requirements for the purpose of RCRA section 3006 and imposes no additional requirements beyond those imposed by State law. Therefore, this action is not subject to review by OMB. This action is not an Executive Order 14094 (88 FR 21879, April 11, 2023) regulatory action because actions such as the authorization of Tennessee's revised hazardous waste program under RCRA are exempted under Executive Order 12866. Accordingly, I certify that this action will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). Because this action authorizes pre-existing requirements under State law and does not impose any additional enforceable duty beyond that required by State law, it does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538). For the same reason, this action also does not significantly or uniquely affect the communities of Tribal governments, as specified by Executive Order 13175 (65 FR 67249, November 9, 2000). This action will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132 (64 FR 43255, August 10, 1999), because it merely authorizes State requirements as part of the State RCRA hazardous waste program without altering the relationship or the distribution of power and responsibilities established by RCRA. This action also is not subject to Executive Order 13045 (62 FR 19885, April 23, 1997), because it is not economically significant, and it does not make decisions based on environmental health or safety risks. This action is not subject to Executive Order 13211, ''Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use'' (66 FR 28355, May 22, 2001), because it is not a significant regulatory action under Executive Order 12866.

Under RCRA section 3006(b), the EPA grants a State's application for authorization as long as the State meets the criteria required by RCRA. It would thus be inconsistent with applicable law for the EPA, when it reviews a State authorization application, to require the use of any particular voluntary consensus standard in place of another standard that otherwise satisfies the requirements of RCRA. Thus, the requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) do not apply. As required by section 3 of Executive Order 12988 (61 FR 4729, February 7, 1996), in issuing this rule, the EPA has taken the necessary steps to eliminate drafting errors and ambiguity, minimize potential litigation, and provide a clear legal standard for affected conduct. The EPA has complied with Executive Order 12630 (53 FR 8859, March 18, 1988), by examining the takings implications of this action in accordance with the ''Attorney General's Supplemental Guidelines for the Evaluation of Risk and Avoidance of Unanticipated Takings'' issued under the Executive order. This action does not impose an information collection burden under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). ''Burden'' is defined at 5 CFR 1320.3(b). Executive Order 12898 (59 FR 7629, February 16, 1994) establishes Federal executive policy on environmental justice. Its main provision directs Federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations in the United States. Because this action authorizes pre-existing State rules which are at least equivalent to, and no less stringent than existing Federal requirements, and imposes no additional requirements beyond those imposed by State law, and there are no anticipated significant adverse human health or environmental effects, this rule is not subject to Executive Order 12898.

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. The EPA will submit a report containing this document and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2). This final action will be effective January 21, 2025.

## List of Subjects in 40 CFR Part 271

Environmental protection, Administrative practice and procedure, Confidential business information, Hazardous waste, Hazardous waste transportation, Intergovernmental relations, Penalties, Reporting and recordkeeping requirements.

**Authority:** This action is issued under the authority of sections 2002(a), 3006, and 7004(b) of the Solid Waste Disposal Act as amended, 42 U.S.C. 6912(a), 6926, and 6974(b).

Dated: November 6, 2024.

**Jeaneanne Gettle,**

*Acting Regional Administrator, Region 4.*

[FR Doc. 2024–26922 Filed 11–19–24; 8:45 am]

**BILLING CODE 6560–50–P**

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Parts 0 and 90

[PS Docket No. 07–100; FCC 24–114; FR ID 258077]

### Improving Public Safety Communications in the 4.9 GHz Band

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule.

**SUMMARY:** In this document, the Federal Communications Commission (Commission) takes another major step towards ensuring that the 4940–4990 MHz band (4.9 GHz band) is efficiently and intensely utilized in support of public safety missions nationwide. To that end, the Commission bolsters the coordinated nationwide approach to the band that it established in its *Seventh Report and Order,* FCC 23–3, in which it adopted a nationwide Band Manager framework to coordinate operations in the 4.9 GHz band, optimize public safety use, and facilitate the integration of the latest commercially available technologies, including 5G, for the benefit of public safety users. To further these goals—and ensure that the 4.9 GHz band is put to more robust use nationwide in the near term—the 4.9 GHz Band Manager, once selected, will be eligible to apply for a nationwide

overlay license and authorized to enter into a sharing agreement with the First Responder Network Authority (FirstNet). Pursuant to this sharing agreement, FirstNet may be permitted to use unassigned spectrum in the 4.9 GHz band as part of its nationwide public safety broadband network (NPSBN) in a manner that protects incumbent operations. In addition to expanding the Band Manager's responsibilities to include entering into a sharing agreement with FirstNet and establishing rules governing the nationwide Band Manager overlay license, the Commission also reaffirms its commitment to the nationwide Band Manager framework and clarifies the Band Manager's responsibilities to address the new rules we adopt herein.

**DATES:** Effective December 20, 2024.

**ADDRESSES:** Federal Communications Commission, 45 L St. NE, Washington, DC 20554.

**FOR FURTHER INFORMATION CONTACT:** For additional information on this proceeding, contact Paul Powell of the Wireless Telecommunications Bureau, Mobility Division, at 202–418–1613 or *Paul.Powell@fcc.gov,* or Brian Marenco of the Public Safety and Homeland Security Bureau at 202–418–0838 or *Brian.Marenco@fcc.gov.*

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's Eighth Report and Order in WP Docket No. 07–100; FCC 24–114, adopted on October 18, 2024, and released on October 22, 2024. The full text of this document is available for public inspection online at *https://www.fcc.gov/document/fcc-adopts-new-rules-public-safety-49-ghz-band.*

**Synopsis**

1. In the *Eighth Report and Order,* the Commission finds that its topline goals of preserving and expanding use to a variety of primary public safety operations would be best served by assigning a nationwide overlay license to the Band Manager. Rather than directly operating in the band, the Band Manager, once selected, will be authorized to enter into a sharing agreement with FirstNet to enable use of unassigned portions of the 4.9 GHz band as part of FirstNet's NPSBN in a manner that protects incumbent operations. The Commission also clarifies that FirstNet remains free to enter into additional sharing agreements with incumbent licensees to operate within their service areas consistent with § 90.1203(b) of the Commission's rules. After review of the record, the Commission concludes that allowing the Band Manager to enter into a sharing agreement with FirstNet to

enable broader access into the band by FirstNet's NPSBN, while also working with public safety licensees to coordinate and rationalize their use of the band, can enable greater public safety use, including for 5G, and has the potential to free up new opportunities for expanded use of the band in the near term. In addition, after review of the record, the Commission also finds that public safety entities would be better served by clarifying the Band Manager's primary responsibilities and revise § 90.1217 of our rules accordingly.

2. *Nationwide Overlay License.* Based on the Commission's review of this record, it is persuaded that expanding the Band Manager's role and responsibilities to encompass a nationwide overlay license and a sharing agreement with FirstNet for any unassigned spectrum is the best approach to ensure that 4.9 GHz band spectrum is more fully utilized in the near term, while at the same time protecting existing incumbent licensee usage. The Band Manager, once it has applied for and receives an overlay licensee, will obtain the rights to a nationwide geographic area license across the entire 50 megahertz of the band that is "overlaid" on top of the existing incumbent licenses and includes areas where spectrum is unassigned. The Commission finds that this licensing structure, combined with authorizing the Band Manager to enter into a sharing agreement enabling FirstNet to operate where white spaces exist, is the best mechanism for increasing public safety operations in this band in the near term.

3. The Band Manager will also carry with it important responsibilities in conjunction with its overlay licensee role, paramount among them being the obligation to oversee use of the spectrum pursuant to the sharing agreement to ensure that FirstNet's operations on these frequencies do not interfere with incumbent operations. The Band Manager will be authorized to enable FirstNet to operate anywhere within the geographic area of the overlay license, subject to the parameters of the sharing agreement and protection of incumbent licensees. If an incumbent licensee cancels or terminates its license, the Band Manager will be authorized to amend its sharing agreement with FirstNet, if necessary, to include the rights to operate in the geographic (or site-based) area and on the channel(s) of the cancelled license. For these reasons, the Commission believes that this mechanism is the best method to make certain that the 4.9 GHz band remains a public safety band which is more fully utilized, including

by existing incumbent licensees. The Band Manager will ensure that incumbent licensees can continue their existing operations to suit their unique spectrum needs while simultaneously and separately authorizing FirstNet's operations in areas of the band where there are no incumbent operations. The Commission clarifies that FirstNet remains free to enter into additional sharing agreements with incumbent licensees to allow it to operate within the service areas of incumbent licensees consistent with § 90.1203(b) of the Commission's rules.

4. The Commission also concludes that the future issuance of the Band Manager overlay license is consistent with our statutory authority under section 309(j) of the Communications Act. The Commission finds that this exemption applies to the 4.9 GHz band because the Commission specifically designated this band for services intended to protect the safety of life, health, or property. In the *Third Report and Order,* FCC 11–6, published at 76 FR 54977, September 6, 2011, the Commission concluded that eligibility for entrance into and operations in the 4.9 GHz band are primarily limited to the provision of public safety services as defined in § 90.523 of the Commission's rules. The Commission finds that because a majority of users licensed in the 4.9 GHz band are qualified to obtain auction-exempt spectrum, assigning a nationwide overlay license to the Band Manager is also exempt from auction. As explained in the *Eighth Report and Order,* the primary use of the band— protecting the safety of life, health, or property—will not change by assigning an overlay license to the Band Manager and authorizing it to enter into a sharing agreement with FirstNet. Thus, the Commission finds that it is appropriate and in the public interest to apply the public safety radio services exemption to this band to assign a nationwide overlay license to the 4.9 GHz Band Manager, once it is selected and has successfully applied for such a license.

5. *Spectrum Sharing Agreement with FirstNet.* In conjunction with issuance of a nationwide overlay license to the Band Manager, once selected, the Band Manager will be authorized to enter into a sharing agreement with FirstNet for use of the unassigned 4.9 GHz band spectrum that will be covered by the Band Manager's license. In furtherance of this model, the Commission clarifies that § 2.103(b) of the Commission's rules may enable any federal stations used by FirstNet to operate in the band pursuant to its anticipated sharing agreement with the Band Manager. Similarly, the Commission also clarifies that this

section may enable any federal stations used by FirstNet to operate in the band pursuant to a sharing agreement with incumbent licensees where that agreement is also consistent with § 90.1203(b) of our rules. While federal entities generally are not authorized by the Commission to use non-federal frequencies, limited exceptions exist where the Commission finds that doing so would be in the public interest, as codified in § 2.103. The Commission has found that both federal and non-federal public safety entities "could benefit from the same broadband communications technologies contemplated for this band." Thus, the Commission agrees that the current structure of § 2.103 permits federal stations meeting certain conditions to operate on non-Federal spectrum and may in the instant scenario permit federal stations used by FirstNet to access the Band Manager's licensed spectrum pursuant to the anticipated sharing agreement.

6. *Band Manager Responsibilities.* Based on the record in response to the *Ninth Further Notice* and the Commission's decision in the *Eighth Report and Order,* the Commission clarifies that the Band Manager will continue to be tasked with the responsibilities that the Commission assigned to it in the *Seventh Report and Order,* published at 88 FR 12565, February 28, 2023. The Commission also amends its rules to give the Band Manager additional responsibilities to effectively implement the licensing and sharing regime described above. Thus, the Band Manager's primary responsibilities will now include: (1) frequency coordination and interference protection for the operations of existing incumbent public safety licensees; (2) managing a spectrum sharing agreement with FirstNet; (3) incentivizing the use of the latest commercially available technologies; (4) facilitating non-public safety access through leasing; and (5) submitting an annual report to the Commission. The Commission also declines to make a determination as it pertains to allowing non-public safety operations in the band through a Band Manager-facilitated leasing model as this is not the best method of increasing utilization of the band at this time.

7. Prior to entering into its sharing agreement with FirstNet, the Band Manager will be required to make a filing associated with its license in ULS certifying to the Commission that the sharing agreement will be consistent with §§ 2.103(b) and 90.1207(h) of the Commission's rules, and operations undertaken per the sharing agreement will not cause harmful interference to

incumbent licensees. If such interference occurs, the Band Manager must require FirstNet to immediately cease operations. The Commission will also require the Band Manager to certify that FirstNet has placed stations into operation within twelve months from the execution date of the sharing agreement. The Commission believes that this decision is consistent with our decision in the *Seventh Report and Order* to harmonize the construction deadlines for the 4.9 GHz band with the deadlines of § 90.155, which is the analogous rule for the majority of part 90 radio services. The Commission delegates authority and directs the Public Safety and Homeland Security Bureau and Wireless Telecommunications Bureau (collectively, the Bureaus) to establish the form and process for the submission of the required certifications detailed in the *Eighth Report and Order.* Finally, the Commission finds that the existing renewal standards and requirements that apply to our part 90 licenses will apply to the nationwide overlay license.

8. *Selection of the Band Manager.* In the *Seventh Report and Order,* the Commission concluded that the Band Manager would be identified by a selection committee to be named by the Commission and it sought comment on the nature of that committee and its processes in the *Ninth Further Notice.* In particular, the Commission sought comment on whether it should "direct specific organizations to designate a representative to serve on the selection committee" and whether the committee should include representatives of non-public safety users of the band in addition to public safety representatives. The Commission also tentatively concluded in the *Ninth Further Notice* that the selection committee should be "composed of an odd number of representatives to prevent deadlock." As part of the Commission's oversight of the selection committee, it proposed that the committee establish selection criterial based on the functions of the Band Manager.

9. Because the Commission's decision in the *Eighth Report and Order* is geared towards maintaining the public safety nature of the band, we give deference to the views expressed by that community. The Commission concludes, however, that it is unnecessary to resolve the issues raised in the comments at this time. Instead, the Commission delegates broad authority to the Bureaus to establish the procedures by which a selection committee will be chosen, identify representatives to sit on the selection committee, determine the

requisite number of selection committee members, identify the applicable selection criteria, and establish the appropriate procedures and appropriate oversight for the selection process as part of choosing the Band Manager. The Commission instructs the Bureaus to consider the record in this proceeding in exercising their delegated authority.

10. *4.9 GHz Band Freeze.* Under the current freeze on applications for new licenses in the 4.9 GHz band, no new licensees may enter the band, but incumbents may file to modify their licenses or to license new sites in a fixed system. In the *Ninth Further Notice,* the Commission sought comment on whether to lift the freeze. We note that a freeze on new entrants has been in effect since 2020. We also continue to believe that issuing licenses to new entrants before the Commission has collected granular data from incumbent licensees would further complicate the spectrum environment and undermine the Band Manager's flexibility to provide for efficient use of this spectrum.

11. While this process is ongoing, the Commission finds that freezing expansions, additions to, or modification of other technical parameters applicable to incumbent licensees is also necessary in light of our decision here to enable expanded public safety access to the band through the Band Manager's nationwide overlay license and sharing agreement with FirstNet. The Commission is cognizant that some incumbent licensees, in reliance on the existing state of the freeze prior to the decision in the *Eighth Report and Order,* may have invested in systems that they hoped to use to modify or expand current operations. However, the Commission believes that a stable spectrum landscape reflecting the current state of operations in the band will better facilitate analysis of the upcoming granular data collection of licensed operations by the Commission, the Band Manager, and other interested parties. The Commission also reminds applicants and current licensees facing special circumstances that they may seek a waiver of the freeze pursuant to § 1.925 of the Commission's rules.

12. Accordingly, until further notice, the Commission retains the freeze for all applicants who are not already 4.9 GHz licensees, and we reinstate the freeze as it applies to incumbent licensees that was lifted pursuant to the *2021 Order on Reconsideration,* FCC 21–106, published at 86 FR 59868, October 29, 2021, and the *Freeze Modification Public Notice.* Specifically, the Commission reinstates the freeze that was lifted on incumbents adding new

licenses or modifying existing licenses unless otherwise excepted, and unless incumbents are filing certain types of applications to comply with the granular data collection. The Commission directs the Bureaus to implement this change to the freeze via public notice within 30 days of the adoption of the *Eighth Report and Order.* The Bureaus will retain jurisdiction to manage and implement the freeze in the future, and we clarify that this freeze shall not apply to any necessary filings associated with issuance of the Band Manager's nationwide overlay license.

13. *Future Licensing of the Band.* In the *Seventh Report and Order* the Commission adopted its proposal to collect additional technical data on public safety operations stating that the submission of this data will improve interference protection and give public safety licensees more confidence in the band. The Commission also determined it would require incumbent licensees to supply complete microwave path data for fixed links, and to obtain a license for base stations (currently authorized under the geographic license scheme) on a site-by-site basis. The Bureaus will issue a Public Notice that will give incumbent licensees 6 months to make the appropriate filings in our Universal Licensing System. In connection with this decision, the Commission sought comment in the *Ninth Further Notice* on whether incumbent licensees should be allowed to retain their geographic-area licenses after they have been issued site-based licenses. The Commission also sought general comment on the future licensing of the band, noting our decision in the *Seventh Report and Order* to adopt a Band Manager regime and taking into consideration the questions regarding implementation.

14. We note that geographic licenses permit the licensee to use any channel in the band, while site-based licenses are frequency-specific. The results of the collection of granular technical data that the Commission initiated in the *Seventh Report and Order* will require the incumbent licensees to complete a thorough review of their current operations under their active PA licenses. The incumbents will then use ULS to create new licenses (with granular data) in newly created radio service codes PB (public safety licensees performing base/mobile, mobile-only or temporary fixed operations) and PF (public safety licensees operating fixed links). The Commission finds that the incumbent licensees' current PA licenses will be cancelled once the incumbents apply for and are authorized under the newly created

radio service codes. The Commission reminds incumbents that this decision to cancel the former licenses once the new licenses have been created does not modify or alter incumbents' rights to operate their existing networks. Instead, the Commission believes that this decision aligns with the intent of our decision in the *Seventh Report and Order* to collect more granular data such that it will "improve interference mitigation efforts and bolster public safety confidence in the band" and is the best approach to ensure that ULS does not contain duplicative or inaccurate licenses once the incumbents have received their new radio service codes.

15. The Commission likewise believes that the collection of this granular technical data will help the Band Manager identify specific frequency usage across all deployments in the band, and thus potentially unused channels within areas covered by certain geographic licenses. While PSSA's and AT&T's proposals to require that incumbent licensees surrender to the Band Manager or share with FirstNet any unused spectrum could potentially make more spectrum available to FirstNet and increase overall spectrum efficiency in the band, the Commission defers any consideration of those proposals until after the Commission has completed its collection and analysis of granular technical data on incumbent licensed public safety operations in the band.

## Procedural Matters

### Paperwork Reduction Act

16. The *Eighth Report and Order* may contain new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104–13. All such requirements will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA. OMB, the general public, and other Federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding. In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107–198, see 44 U.S.C. 3506(c)(4), we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.

17. In this present document, the Commission has assessed the effects of our creation of a new Band Manager overlay license, and find that it will

have a small impact on small governmental entities which are currently 4.9 GHz licensees, mainly related to the collection of data about existing 4.9 GHz deployments.

**Final Regulatory Flexibility Analysis**

18. The Regulatory Flexibility Act of 1980, as amended (RFA) requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." Accordingly, the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the possible impact of the rule changes contained in the *Eighth Report and Order* on small entities. The FRFA is set forth in appendix B of the *Eighth Report and Order.*

**Congressional Review Act**

19. The Commission will submit the *Eighth Report and Order* to the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, for concurrence as to whether this rule is "major" or "non-major" under the Congressional Review Act, 5 U.S.C. 804(2). The Commission will send a copy of the *Eighth Report and Order* to Congress and the Government Accountability Office pursuant to 5 U.S.C. 801(a)(1)(A).

**Final Regulatory Flexibility Analysis**

20. As required by the Regulatory Flexibility Act of 1980, as amended (RFA), an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Eighth Further Notice of Proposed Rulemaking (Eighth Further Notice)* released in October 2021, published at 86 FR 59934, October 29, 2021, and *Ninth Further Notice of Proposed Rulemaking (Ninth Further Notice)* released in January 2023, published at 88 FR 12637, February 28, 2023. The Federal Communications Commission (Commission) sought written public comment on the proposals in the *Eighth* and *Ninth Further Notices,* including comment on the IRFA. No comments were filed addressing the IRFA. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.

*A. Need for, and Objectives of, the Report and Order*

21. In the *Eighth Report and Order,* the Commission seeks to meet its objectives of ensuring efficient and effective utilization of the 4940–4990 MHz band (4.9 GHz band) in support of public safety missions nationwide. To

achieve these objectives, the *Eighth Report and Order* bolsters the coordinated nationwide approach to the band that the Commission established in its *Seventh Report and Order,* in which it adopted a nationwide Band Manager framework to coordinate operations in the 4.9 GHz band, optimize public safety use, and facilitate the integration of the latest commercially available technologies, including 5G, for the benefit of public safety users. To further these goals and to ensure efficient use of the 4.9 GHz band nationwide, the 4.9 GHz Band Manager, once selected, will be eligible to apply for a nationwide overlay license and authorized to enter into a sharing agreement with the First Responder Network Authority (FirstNet). Pursuant to this sharing agreement, FirstNet may be permitted to use unassigned spectrum in the 4.9 GHz band as part of its nationwide public safety broadband network (NPSBN) in a manner that fully protects incumbent operations. In addition to expanding the Band Manager's responsibilities to include entering into a sharing agreement with FirstNet and establishing rules governing the nationwide Band Manager overlay license, the adopted rules in the *Eighth Report and Order* also reaffirm the Commission's commitment to the nationwide Band Manager framework and clarify the Band Manager's responsibilities.

*B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA*

22. There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

*C. Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration*

23. Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments. The Chief Counsel did not file any comments in response to the proposed rules or policies in this proceeding.

*D. Description and Estimate of the Number of Small Entities to Which the Rules Will Apply*

24. The RFA directs agencies to provide a description of, and where feasible, an estimate of, the number of

small entities that may be affected by the rules adopted herein. The RFA generally defines the term ''small entity'' as having the same meaning as the terms ''small business,'' ''small organization,'' and ''small governmental jurisdiction.'' In addition, the term ''small business'' has the same meaning as the term ''small business concern'' under the Small Business Act. A ''small business concern'' is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.

25. *Small Businesses, Small Organizations, Small Government Jurisdictions.* Our actions, over time, may affect small entities that are not easily categorized at present. We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein. First, while there are industry specific size standards for businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees. These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.

26. Next, the type of small entity described as a ''small organization'' is generally ''any not-for-profit enterprise which is independently owned and operated and is not dominant in its field.'' The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations. Nationwide, for tax year 2022, there were approximately 530,109 small exempt organizations in the U.S. reporting revenue of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.

27. Finally, the small entity described as a ''small governmental jurisdiction'' is defined generally as ''governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand.'' U.S. Census Bureau data from the 2022 Census of Governments indicate there were 90,837 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States. Of this number, there were 36,845 general purpose governments (county, municipal, and town or township) with populations of less than 50,000 and 11,879 special purpose governments (independent school districts) with

enrollment populations of less than 50,000. Accordingly, based on the 2022 U.S. Census of Government data, we estimate that at least 48,724 entities fall into the category of ''small government jurisdictions.''

28. *Frequency Coordinators.* Frequency coordinators are entities or organizations certified by the Commission to recommend frequencies for use by licensees in the Private Land Mobile Radio (PLMR) Services that will most effectively meet the applicant's needs while minimizing interference to licensees already operating within a given frequency band. Neither the Commission nor the SBA have developed a small business size standard specifically applicable to spectrum frequency coordinators. Business Associations, which comprises establishments primarily engaged in promoting the business interests of their members, is the closest applicable industry with a SBA small business size standard.

29. The SBA small business size standard for Business Associations classifies firms with annual receipts of $8 million or less as small. For this industry, U.S. Census Bureau data for 2017 show that there were 14,540 firms that operated for the entire year. Of these firms, 11,215 had revenue of less than $5 million. Based on this data, the majority of firms in the Business Associations industry can be considered small. However, the Business Associations industry is very broad and does not include specific figures for firms that are engaged in frequency coordination. Thus, the Commission is unable to ascertain exactly how many of the frequency coordinators are classified as small entities under the SBA size standard. According to Commission data, there are 13 entities certified to perform frequency coordination functions under part 90 of the Commission's rules. For purposes of this FRFA, the Commission estimates that a majority of the 13 FCC-certified frequency coordinators are small.

30. *Private Land Mobile Radio Licensees.* PLMR systems serve an essential role in a vast range of industrial, business, land transportation, and public safety activities. Companies of all sizes operating in all U.S. business categories use these radios. Wireless Telecommunications Carriers (*except Satellite*) which encompasses business entities engaged *in radiotelephone communications,* is the closest industry with an SBA small business size standard applicable to these services. The SBA small size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S.

Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year. Of this number, 2,837 firms employed fewer than 250 employees. Thus, under the SBA size standard, the Commission estimates licensees in this industry can be considered small.

31. Based on Commission data as of December 14, 2021, there are approximately 387,370 active PLMR licenses. Active PLMR licenses include 3,577 licenses in the 4.9 MHz band; 19,011 licenses in the 800 MHz band; and 2,716 licenses in the 900 MHz band. Since the Commission does not collect data on the number of employees for licensees providing these services, at this time we are not able to estimate the number of licensees with active licenses that would qualify as small under the SBA's small business size standard. Nevertheless, the Commission believes that a substantial number of PLMR licensees are small entities.

32. *Radio and Television Broadcasting and Wireless Communications Equipment Manufacturing.* This industry comprises establishments primarily engaged in manufacturing radio and television broadcast and wireless communications equipment. Examples of products made by these establishments are: transmitting and receiving antennas, cable television equipment, GPS equipment, pagers, cellular phones, mobile communications equipment, and radio and television studio and broadcasting equipment. The SBA small business size standard for this industry classifies businesses having 1,250 employees or less as small. U.S. Census Bureau data for 2017 show that there were 656 firms in this industry that operated for the entire year. Of this number, 624 firms had fewer than 250 employees. Thus, under the SBA size standard, the majority of firms in this industry can be considered small.

33. *Wireless Telecommunications Carriers (except Satellite).* This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves. Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless internet access, and wireless video services. The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees. U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year. Of that number, 2,837 firms employed fewer than 250 employees. Additionally,

based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services. Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees. Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

*E. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities*

34. The Commission anticipates that the rule changes adopted in the *Eighth Report and Order* will create *de minimis* new compliance requirements for small entities. The adopted rules will cause the 4.9 GHz Band Manager, once selected, to become eligible to apply for a nationwide overlay license and will authorize the Band Manager to enter into a sharing agreement with FirstNet. Pursuant to this sharing agreement, FirstNet may be permitted to use unassigned spectrum in the 4.9 GHz band as part of its NPSBN. Once selected, the Band Manager's primary responsibilities will include: (1) frequency coordination and interference protection for incumbent public safety licensees; (2) managing a spectrum sharing agreement with FirstNet; (3) incentivization of the use of the latest commercially available technologies; (4) facilitating non-public safety access through leasing; and (5) submitting an annual report to the Commission. The Commission notes that the rules adopted in the *Eighth Report and Order* do not create any significant additional compliance requirements for small entities. However, in assessing the cost of compliance for small entities, at this time the Commission is not in a position to determine whether these actions will require small entities to hire professionals to comply, and cannot quantify the cost of compliance with the rule changes that were adopted. Nevertheless, the Commission believes the benefits gained from the adopted rules by 4.9 GHz licensees and more optimized use of the band outweigh potential compliance costs incurred.

*F. Steps Taken To Minimize the Significant Economic Impact on Small Entities and Significant Alternatives Considered*

35. The RFA requires an agency to provide, ''a description of the steps the agency has taken to minimize the significant economic impact on small entities . . . including a statement of the factual, policy, and legal reasons for

selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.''

36. In the *Eighth Report and Order,* the Commission adopts measures to further promote use of the 4.9 GHz band for a variety of primary public safety operations. In doing so, it makes the 4.9 GHz Band Manager eligible to apply for a nationwide overlay license and authorizes the Band Manager to enter into a sharing agreement with FirstNet to enable use of the 4.9 GHz band as part of its NPSBN in a manner that fully protects incumbent operations. In this context, the Band Manager will be required to work with public safety licensees to rationalize their use. The Commission's actions do not alter any of the actions that the Commission adopted in the *Seventh Report and Order* as they pertain to requiring small and other public safety incumbents and future applicants for the 4.9 GHz band to submit data on FCC Form 601. As we noted in the *Seventh Report and Order,* collecting the additional technical data on public safety operations will benefit public safety licensees operating in the band because it will improve interference protection and give public safety licensees more confidence in the band without adding a significant economic or administrative burden on licensees or applicants to submit the data. The Commission considered alternative approaches, however, the record reflects support from commenters, some of which include or represent small entities, that agree our adopted approach in the *Eighth Report and Order* could have the effect of increasing band usage for first responders and other public safety missions, while preserving incumbent operations.

37. While small and other public safety applicants seeking to license facilities in the 4.9 GHz band will be subject to formal frequency coordination procedures, the economic impact will be minimized through the *Eighth Report and Order*'s adoption of a frequency coordination process with which public safety licensees operating PLMR facilities in other frequency bands are familiar. Once in place, the formal frequency coordination process will ensure the efficient assignment and use of spectrum while minimizing interference to incumbents. Consequently, the frequency coordination process will improve interference protection and give public safety licensees more confidence in the

band without adding a significant economic burden on applicants.

38. Finally, all other Commission actions related to the Band Manager in the *Eighth Report and Order,* such as the Band Manager's responsibility to identify unused spectrum access opportunities, do not create a significant economic impact on small entities.

### G. Report to Congress

39. The Commission will send a copy of the *Eighth Report and Order,* including this FRFA, in a report to Congress pursuant to the Congressional Review Act. In addition, the Commission will send a copy of the *Eighth Report and Order,* including this FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the *Eighth Report and Order,* and FRFA (or summaries thereof) will also be published in the **Federal Register**.

### Ordering Clauses

40. Accordingly, *it is ordered* that, pursuant to the authority found in sections 4(i), 4(j), 302, 303(b), 303(f), 303(g), 303(r), 309(j) and 405 of the Communications Act of 1934, as amended, 47 U.S.C. 154(i), 154(j), 302a, 303(b), 303(f), 303(g), 303(r), 309(j), and 405, as well as § 1.429 of the Commission's rules, 47 CFR 1.429, that this *Eighth Report and Order is hereby adopted.*

41. *It is further ordered* that this *Eighth Report and Order shall be effective* 30 days after publication in the **Federal Register**.

42. *It is further ordered* that the Commission's Office of the Secretary, *shall send* a copy of this *Eighth Report and Order,* including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

43. *It is further ordered* that the Commission *shall send* a copy of this *Eighth Report and Order* in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, see 5 U.S.C. 801(a)(1)(A).

### List of Subjects

#### 47 CFR Part 0

Authority delegations (Government agencies).

#### 47 CFR Part 90

Administrative practice and procedure, Common carriers, Communications, Communications common carriers, Communications equipment, Emergency medical services, Organization and functions (Government agencies), Radio,

Reporting and recordkeeping requirements, Telecommunications.

Federal Communications Commission.

**Katura Jackson,**

*Federal Register Liaison Officer.*

**Final Rules**

For the reasons discussed in the document above, the Federal Communications Commission amends 47 CFR parts 0 and 90 as follows:

## PART 0—COMMISSION ORGANIZATION

■ 1. The authority citation for part 0 continues to read as follows:

**Authority:** 47 U.S.C. 151, 154(i), 154(j), 155, 225, 409, and 1754, unless otherwise noted.

■ 2. Section 0.331 is amended by adding paragraph (i) to read as follows:

### § 0.331  Authority delegated.

\*    \*    \*    \*    \*

(i) The Chief of the Wireless Telecommunications Bureau is delegated authority jointly with the Chief of the Public Safety and Homeland Security Bureau to administer provisions of §§ 90.1203, 90.1207, 90.1209, and 90.1217 of this chapter. The Chief of the Wireless Telecommunications Bureau is also delegated authority to establish the procedures by which a Band Manager selection committee will be chosen; identify representatives to sit on the selection committee; determine the requisite number of selection committee members; identify the applicable selection criteria; confirm that the Band Manager selectee meets the selection criteria; and establish the appropriate procedures and oversight for the selection process as part of choosing the Band Manager. The Chief of the Wireless Telecommunications Bureau is also delegated authority to develop the form and procedures pursuant to which the Band Manager will submit certifications required by §§ 90.1207(h)(3) and 90.1209(e) of this chapter to the Commission; to manage the process of determining the appropriate Band Manager funding mechanisms; and to perform oversight and any other functions for the administration of the Band Manager and its responsibilities.

■ 3. Section 0.392 is amended by adding paragraph (k) to read as follows:

### § 0.392  Authority delegated.

\*    \*    \*    \*    \*

(k) The Chief of the Public Safety and Homeland Security Bureau is delegated authority jointly with the Chief of the

Wireless Telecommunications Bureau to administer provisions of §§ 90.1203, 90.1207, 90.1209, and 90.1217 of this chapter. The Chief of the Public Safety and Homeland Security Bureau is also delegated authority to establish the procedures by which a Band Manager selection committee will be chosen; identify representatives to sit on the selection committee; determine the requisite number of selection committee members; identify the applicable selection criteria; confirm that the Band Manager selectee meets the selection criteria; and establish the appropriate procedures and oversight for the selection process as part of choosing the Band Manager. The Chief of the Public Safety and Homeland Security Bureau is also delegated authority to develop the form and procedures pursuant to which the Band Manager will submit certifications required by §§ 90.1207(h)(3) and 90.1209(e) of this chapter to the Commission; to manage the process of determining the appropriate Band Manager funding mechanisms; and to perform oversight and any other functions for the administration of the Band Manager and its responsibilities.

## PART 90—PRIVATE LAND MOBILE RADIO SERVICES

■ 4. The authority citation for part 90 continues to read as follows:

**Authority:** 47 U.S.C. 154(i), 161, 303(g), 303(r), 332(c)(7), 1401–1473.

■ 5. Section 90.175 is amended by revising paragraph (g)(2) to read as follows:

### § 90.175  Frequency coordinator requirements.

\*    \*    \*    \*    \*

(g) \* \* \*

(2) *For frequencies between 4940–4990 MHz:* A statement is required from the nationwide band manager recommending the most appropriate channel(s), bandwidth, operating power, and any other technical parameter which promotes robust and efficient use of the band while minimizing interference.

\*    \*    \*    \*    \*

■ 6. Section 90.1203 is amended by revising paragraph (b) and adding paragraph (c) to read as follows:

### § 90.1203  Eligibility.

\*    \*    \*    \*    \*

(b) 4.9 GHz band licensees eligible pursuant to paragraph (a) of this section may enter into sharing agreements or other arrangements for use of the spectrum with entities that do not meet the eligibility requirements in this

section. However, all applications in the band are limited to operations in support of public safety.

(c) The 4.9 GHz Band Manager is eligible to hold a nationwide overlay license in the 4940–4990 MHz band consistent with the requirements of § 90.1207(h).

■ 7. Section 90.1207 is amended by revising paragraphs (a), (b) introductory text, (c), and (e) introductory text and adding paragraph (h) to read as follows:

### § 90.1207 Licensing.

(a) A 4940–4990 MHz band license held by an entity eligible under § 90.1203(a) gives the licensee authority to operate on any authorized channel in this band within its licensed area of operation. See § 90.1213. A 4940–4990 MHz band license will be issued for the geographic area encompassing the legal jurisdiction of the licensee or, in case of a nongovernmental organization, the legal jurisdiction of the State or local governmental entity supporting the nongovernmental organization.

(b) Subject to § 90.1209, a 4940–4990 MHz band license held by an entity eligible under § 90.1203(a) gives the licensee authority to construct and operate any number of base stations anywhere within the area authorized by the license, except as follows:

\*      \*      \*      \*      \*

(c) A 4940–4990 MHz band license held by an entity eligible under § 90.1203(a) gives the licensee authority to operate base and mobile units (including portable and handheld units) and operate temporary (1 year or less) fixed stations anywhere within the area authorized by the license. Such licensees may operate base and mobile units and/or temporary fixed stations outside their authorized area to assist public safety operations with the permission of the jurisdiction in which the radio station is to be operated. Base and temporary fixed stations are subject to the requirements of paragraph (b) of this section.

\*      \*      \*      \*      \*

(e) Applications for license in the 4940–4990 MHz band by an entity eligible under § 90.1203(a) must include the following technical information.

\*      \*      \*      \*      \*

(h) The 4.9 GHz Band Manager is eligible under § 90.1203(c) to hold a nationwide overlay license for the 4940–4990 MHz band, subject to the exclusion of licensed geographic areas and frequencies held by an incumbent entity eligible under § 90.1203(a). The 4.9 GHz Band Manager:

(1) Shall not be eligible to independently operate stations in the 4940–4990 MHz band;

(2) Consistent with §§ 90.1217(a), (d) and 2.103(b) of this chapter, may allow the First Responder Network Authority, pursuant to a sharing agreement, to construct and operate stations at any geographic site within the Band Manager's licensed area and on any channel for which the Band Manager is licensed, subject to the exclusions in this paragraph (h) and provided such stations do not cause harmful interference to incumbent licensees and otherwise comply with Commission rules and coordination requirements;

(3) Shall certify to the Wireless Telecommunications Bureau and Public Safety and Homeland Security Bureau prior to entering into any sharing agreement with the First Responder Network Authority that such agreement meets the requirements of § 2.103(b) of this chapter and this paragraph (h);

(4) Shall certify to the Wireless Telecommunications Bureau and Public Safety and Homeland Security Bureau when stations have been placed in operation pursuant to § 90.1209(e); and

(5) shall ensure that stations operating pursuant to a sharing agreement in this subpart comply with the relevant technical and licensing rules governing operations in the 4940–4990 MHz band in §§ 90.1205, 90.1209(b) through (c), (e), 90.1213, and 90.1215.

■ 8. Section 90.1209 is amended by revising paragraphs (a) and (d) and adding paragraph (e) to read as follows:

### § 90.1209 Policies governing the use of the 4940–4990 MHz band.

(a) Channels in this band licensed to any entity eligible under § 90.1203(a) are available on a shared basis only and will not be assigned for the exclusive use of any licensee.

\*      \*      \*      \*      \*

(d) Stations used by an entity eligible under § 90.1203(a) must be placed in operation within twelve (12) months from the date of grant in accordance with § 90.155. Licensees of temporary fixed stations must place at least one such station in operation within twelve months of license grant.

(e) Stations used by an entity eligible under § 90.1203(h) must be placed in operation within twelve (12) months from the date that the Band Manager and the First Responder Network Authority execute a sharing agreement pursuant to §§ 90.1207(h) and 2.103(b) of this chapter.

■ 9. Section 90.1217 is amended by:
■ a. Revising the introductory text;
■ b. Revising paragraphs (a) and (b); and
■ c. Adding paragraphs (d) and (e).
The revisions and addition read as follows:

### § 90.1217 4.9 GHz Band Manager.

The 4.9 GHz Band Manager will have the following primary responsibilities:

(a) Frequency coordination and interference protection for 4.9 GHz band incumbent public safety operations;

(b) Incentivizing the use of the latest commercially available technologies, including 5G;

\*      \*      \*      \*      \*

(d) Managing a sharing agreement with the First Responders Network Authority pursuant to §§ 90.1207(h) and 2.103(b) of this chapter; and

(e) Filing an annual report with the Commission.

[FR Doc. 2024–26794 Filed 11–19–24; 8:45 am]

**BILLING CODE 6712–01–P**